Filed 7/23/14 Unmodified opinion attached

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S049626 |
| v. | ) | |
| | ) | Santa Clara County |
| STEPHEN EDWARD HAJEK | ) | Super. Ct. No. 148113 |
| AND LOI TAN VO | ) | |
| | ) | |
| Defendants and Appellants. | ) | |
| _____ | ) | |

## ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING

THE COURT:

The opinion herein, filed May 5, 2014, and appearing at 58 Cal.4th 1144, is modified as follows:

On page 1161 of 58 Cal.4th, insert the underlined words at the beginning of the second sentence of the first full paragraph: "<u>On direct examination, Cary testified that </u>Vo said he could not wait that long and demanded that Cary take him to Ellen's school."

This modification does not affect the judgment.

The petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |  |
|---|---|---|---|
| THE PEOPLE, | ) | | |
| | ) | | |
| Plaintiff and Respondent, | ) | | S049626 |
| | ) | | |
| v. | ) | | |
| | ) | | Santa Clara County |
| STEPHEN EDWARD HAJEK | ) | | Super. Ct. No. 148113 |
| AND LOI TAN VO, | ) | | |
| | ) | | |
| Defendants and Appellants. | ) | | |
| _____ | ) | | |

Defendants Stephen Edward Hajek and Loi Tan Vo were convicted of the 1991 murder of Su Hung (Pen. Code, § 187)[1] as to which lying-in-wait and torture-murder special circumstances were found true (former § 190.2, subd. (a)(15), (18)). Additionally, defendants were convicted of four counts of premeditated attempted murder (§§ 664/187), one count of kidnapping (§ 207, subd. (a)), three counts of false imprisonment (§§ 236/237), one count of robbery (§ 211, 212.5, subd. (a)), and one count of first degree burglary (§§ 459, 460.1). Hajek was separately convicted of dissuading a witness. (§ 136.1, subd. (c)(1).) The jury also found true firearm use allegations as to Hajek and deadly or dangerous weapon use allegations as to Vo, in their commission of the murder,

---

[1] All further unlabeled statutory references are to the Penal Code.

attempted murder, kidnapping, and false imprisonment counts. (Former §§ 12022, subd. (b), 12022.5, subd. (a).)

Following the penalty phase trial, the jury returned verdicts of death as to each defendant, which the trial court declined to modify. The court sentenced each defendant to death for the murder of Su Hung, and on the remaining counts, sentenced Hajek to life plus 21 years and Vo to life plus 9 years. This appeal is automatic.

For the reasons set forth herein, we reverse the lying-in-wait special-circumstance findings as to both defendants. (See *post*, pt. II.B.1.a.) We also order that the firearm use enhancements found true as to defendant Hajek be struck and replaced with deadly or dangerous weapon use enhancements. (See *post*, pt. II.B.1.d.) In all other respects, the death judgments are affirmed.

## I. FACTS

### A. Guilt Phase

On the morning of January 18, 1991, defendants gained access to the Wang residence, where they held various members of the family hostage for several hours.[2] At some point, they killed Su Hung, the family's 73-year-old grandmother, who was visiting from Taiwan. The attack on the Wang family was in retaliation for a minor altercation a few days earlier between the family's teenage daughter, Ellen, defendant Hajek, and a girl named Lori Nguyen, who was a friend of both defendants. On the night before the attack, Hajek told another friend that he was going to the house of an unidentified girl who had threatened him. He said he planned to kill each member of her family while she watched and

---

[2]     For clarity, we refer to individual members of the Wang family by their first names and to the family's father, Chi Ching Wang, as "Tony," the name used at trial.

2

then kill her last.  The next day, he and Vo went to the Wang residence, where the events transpired that led to the charges in this case.

### 1. *Prosecution Evidence*

#### a. *The altercation between Hajek, Nguyen, and Ellen*

On January 14, 1991, between 4:30 and 5:00 p.m., Hajek and his friend, Lori Nguyen, were sitting in front of a Baskin-Robbins store eating ice cream. Hajek was 18 years old and Nguyen was 15 or 16.  Ellen, also 16, and six friends walked past the pair on their way to a Fry's Electronics store.  Ellen had once been good friends with Nguyen, but they had had a falling out.  She had never seen Hajek before.  One of Ellen's friends, Tina Huynh, testified that Nguyen was "dogging" or giving them "a dirty look" as they passed.  Huynh called Nguyen a "bitch," and Nguyen responded in kind.

Subsequently, as Ellen and her friends crossed a parking lot, Hajek drove up in a white van and stopped.  Nguyen was in the passenger seat.  She and Huynh exchanged words and began to struggle, while Nguyen was still sitting in the car and Huynh was standing outside.  Huynh's sister, Jacee, and then Ellen joined the fight with Nguyen.  Noticing the car's ignition had been pulled out, Ellen yelled, "The car is picked," meaning it had been stolen.  Hajek exited the van, picked Ellen up, and threw her into some bushes.  Ellen and Hajek cursed each other before Hajek and Nguyen drove off.

Hajek and Nguyen went to Hajek's house. At some point in the evening Ellen and Hajek spoke on the phone.  Ellen asked Hajek if he had a problem with her or wanted to start something with her.  The conversation ended with their screaming obscenities at each other.  Ellen testified she had no further communication with Hajek, but Nguyen testified that Ellen made a series of "crank calls" to Hajek that evening and threatened to have friends of hers kill him.

3

Nguyen testified that Hajek threatened Ellen in return and "probably" discussed getting revenge. At some point, while Nguyen was still at Hajek's house, defendant Vo showed up. Vo was present when some of the crank calls from Ellen to Hajek were made.

Vo and Hajek were very close friends and part of a group of friends that also included Nguyen. Vo harbored intense feelings for Nguyen that she did not reciprocate because she had a boyfriend. Hajek also had romantic feelings toward Nguyen that she did not return.

### b. Hajek's conversation with Tevya Moriarty

On the evening of January 17, 1991, three days after the fight, Hajek telephoned Tevya Moriarty. Moriarty and Hajek had worked together at the Home Express during the summer of 1990. Moriarty had been on friendly terms with Hajek, though he was not a close friend. Moriarty asked him if he was going out with anyone. Hajek told her that he was going out with an Asian girl and that they had been involved in a fight after getting ice cream a few days earlier. He told her that he had pushed a girl into some bushes during the incident and that he wanted to get back at that girl. He said he was going to go to the girl's house and kill her and her family. Hajek told Moriarty he planned to kill the girl's family first and to kill her last because he "wanted to look in her eyes when he killed her." He also said he was going to make the incident look like a robbery. Hajek said all this in a conversational tone of voice. Moriarty did not believe he was really planning to do these acts.

The next day, Moriarty saw a television report of the crimes at the Wang residence and told her parents about her conversation with Hajek. When she learned that Hajek was one of the culprits, she went to the police. Moriarty talked to the police on January 21, 1991, and told them it was her impression Hajek was

4

going to enlist two other people to commit the murder and robbery. However, at trial, she could not recall what in the conversation had given her that impression and testified that Hajek spoke only of himself.

### c. *Hajek and Vo gain entry into the Wang residence*

On January 18, 1991, the Wang family — parents Cary and Tony, and daughters Ellen and 10-year-old Alice — lived on Silver Leaf Road in San Jose. Also staying with them was 73-year-old Su Hung, Cary's mother, visiting from Taiwan. On the morning of January 18, only Su Hung and Alice were at home.

Around 10 a.m., Hajek and Vo came to the door. Alice answered it. They told her they wanted to see Ellen because they had a sweater for her. Alice told them Ellen was not home. Vo handed her the sweater, and they left. A few minutes later, defendants returned. When Alice answered the door, they said they wanted to write a note to Ellen. Alice testified she did not invite defendants inside the house, but "[t]hey just came in." Alice gave them a pen and paper. Su Hung was in the kitchen. They wrote the note, and Alice put it on the sweater. They then called Alice over, and Hajek pointed a gun at her. Hajek told Alice to get her grandmother.

Alice had to use the bathroom. Alice testified Vo told her to take her grandmother with her. When Alice and Su Hung came out of the bathroom, Vo tied up Su Hung using rope from the laundry room, which he cut with scissors or a knife. He then blindfolded her. Su Hung was trembling but compliant. Vo took her upstairs while Hajek remained downstairs with Alice, watching cartoons. Although Hajek had put the gun in his waistband, Alice was frightened. Vo came downstairs, and then Hajek took Alice to the upstairs bathroom, where she remained for what seemed like a long time before defendants told her she could come out. While she was in the bathroom, she heard clattering noises, like

5

marbles or coins. Vo took her downstairs; 10 minutes later Hajek followed. At some point, Alice's mother, Cary, called the house. Alice was allowed to answer the phone, but defendants told her to speak English.

Alice testified that Cary told her she was coming home and, as previously planned, she was going to take Su Hung to the beauty salon, and then the three of them would go out to lunch. Alice did not typically speak to her mother in English, and Cary asked if anything was wrong. Alice was frightened and said no. Sometime later, maybe a half-hour, Alice heard the garage door open. Vo went into the downstairs bathroom after taking a knife from the kitchen. Before he went into the bathroom, Vo told Alice to stay seated on the sofa and to try to calm her mother down.

Cary testified that when she entered the house through the garage, Vo came out of the bathroom, placed a hand over her mouth, and with the other hand held a knife to her throat. Vo told Cary not to scream, or he would kill her whole family. Both he and Hajek were wearing gloves. Cary was upset and frightened. She told Vo to put down his knife and she would give him anything he wanted as long as he did not hurt her family. She ended up sitting with Vo at the dining room table. Vo told Cary he was looking for Ellen because she had had an argument with his relative at school. At some point, Vo returned the knife to the kitchen. Alice told her mother the men had had a gun and had pointed it at her. Hajek also told her he had two guns, although Cary never saw a gun.

Cary repeatedly begged defendants to allow her to see her mother because Su Hung suffered from high blood pressure. Hajek went upstairs alone, and then a second time he went upstairs with Alice. When Alice went upstairs with Hajek, she was not allowed to go into the room where her grandmother was being held. She stood at the doorway and "peeked" into the room, but could only see her

grandmother's legs. Alice reported to her mother that her grandmother was reading a newspaper.[3]

### d. Vo and Cary go to Ellen's school; Tony comes home

Cary told defendants that Ellen would be home around 3:00 p.m. Vo said he could not wait that long and demanded that Cary take him to Ellen's school. He told her that Ellen and his relative had had an argument at school and that he had come to the Wang residence to teach her a lesson. He said she would know what kind of lesson when Ellen got home. Cary testified that when Vo said this, he "look[ed] mean." Before they left, Cary asked if she could cancel some appointments, a ruse to call her husband, Tony. She called Tony and told him she needed to cancel a 1:00 o'clock appointment. Tony was surprised to hear from her. She sounded strange to him. He asked Cary if she meant he should come home at 1:00 o'clock. She said yes. Cary was allowed to make a second call to her office, a travel agency, where she spoke to Sofia Kuo. She told Kuo she had to cancel an appointment because there was an emergency at home "similar to something that happened before." Cary was alluding to the burglary of her house two years earlier. She hoped the hint would alert Kuo.

Vo and Cary left in Cary's car. Vo told her he had a gun. When they got to Ellen's school, Cary was told that Ellen was not there. Vo stayed at her side. After they left the school, Cary told him she had emergency airline tickets that she needed to drop off at her office. When they arrived at the office, Cary managed to tell a man named Paul, who worked next door, to call the police. She and Vo then

---

[3] There is some discrepancy in the testimony of Alice, Cary, and Tony about whether Alice reported her grandmother was reading a newspaper the first time she looked in on her, when only Cary was at home, or the second time, when both parents were present. What is clear is that on each occasion, Alice was only permitted a glimpse of her grandmother and did not see her face or talk to her.

drove back to the Wang residence.  On the way, they passed a police car and Vo asked her whether she had called the police.  He had repeatedly threatened to kill her family if she called the police.  When they got to her house, Vo ordered her to park in the garage.

While Cary and Vo were out, Tony had come home.  He testified that when he entered the house, he saw Alice sitting with Hajek at the dining room table playing cards.  Alice told him that defendants had guns and a knife.  She also told him he could not use the telephone or go upstairs.  Hajek had one of his hands in his pocket.  Tony was scared.  He sat down at the table and asked Alice where his wife had gone.  She told him Cary and another man had gone to look for Ellen.  Tony asked Hajek what he wanted.  Hajek said there was a problem between Ellen and his girlfriend.  He wanted to "bring her home and then scare her."  Tony said if there was a problem, maybe there was something they could do to solve it.  Hajek said they had to wait until Ellen was home.  Tony played cards with Alice and Hajek.  Hajek kept one of his hands in his pocket.  He was wearing gloves.

When Cary and Vo arrived, Tony offered defendants money and to have his daughter apologize.  One of them said there was nothing to do until Ellen came home.  Tony testified that each defendant went upstairs separately "many times," but he could not remember how many times or how long they remained upstairs.  At one point, Hajek again took Alice upstairs to the room where Su Hung was being held.  Alice thought she was sleeping but did not get a very clear look at her.  Hajek ordered Alice to tell her parents that her grandmother was okay.

Vo told Hajek that Tony looked very strong and Vo needed to tie him up.  Vo tied Tony's hands behind his back, and Hajek took him upstairs to the master bedroom.  Tony asked to see his mother-in-law, but Hajek refused and said she was fine.  In the master bedroom, Hajek tied Tony to the bed.  Hajek threatened to

8

kill Tony if he screamed. Tony was frightened. Tony asked to speak to Vo because he thought it would be easier to talk to another Asian. Vo came into the room and sat down by the bed. He spoke to Tony in a "very mean" way and threatened to kill him if he yelled. Then Vo gagged him.

> *e. The police arrive and capture defendants; Su Hung's body is discovered*

While Tony was being taken upstairs, a Mr. Cho called. He worked with Paul, the man Cary had earlier told to call the police. Cary answered the phone. Cho told her to answer yes or no and asked if she needed the police right away. Cary said yes. A few minutes later the doorbell rang — it was the police. Hajek told Alice to answer the door. As they walked toward it, Cary called to Alice in Chinese and they ran into the garage. Cary opened the garage door, and they ran to the waiting police. Cary yelled that people were still inside. She was frightened and agitated. Hajek was apprehended in the backyard as he attempted to flee. He was carrying what appeared to be a black revolver in his hand, but he threw it down when he was ordered to stop and shouted, "It's a pellet gun." Vo tried to run out of the house, but ran back in when a police officer pointed his shotgun at him and told him to stop. Vo stumbled and fell, and the police apprehended him. Vo was unarmed.

Police found Tony bound and gagged in the master bedroom. When the gag was removed, he said he was concerned about his mother-in-law. Su Hung was found on the floor of her bedroom, her body covered by a comforter. Her hands were tied behind her back, her mouth was gagged, and her throat had been slashed. The area around her was covered with blood, and she was dead.

9

### f. Physical and medical evidence

In a neighborhood canvass, the police found a stolen minivan parked around the corner from the Wang residence. It was later determined to have been the vehicle defendants used. The car's ignition switch had been removed, and there was a screwdriver in the center console. Items found in the minivan included packaging for a pair of leather bike gloves, a plastic grip for a pellet gun that matched the gun Hajek threw to the ground, and two knives.

In the laundry room of the Wang residence, where Vo was arrested, police found a brown paper bag containing five bottles of cooking oil and $278 in cash. At the top of the stairs, police found a black bag containing items taken from various rooms of the house.

Blood found on a glove used by Hajek was consistent with Su Hung's blood. A bloodstain found on Hajek's jacket was too small for additional testing to determine whether it was human. The serologist testified the blood on the jacket could have been transferred from the blood on Hajek's gloves. No bloodstains were found on Vo's clothing. Another pair of gloves, however, was found on the kitchen table. A knife in the kitchen sink tested positive for blood, but it could not be determined whether the blood was human or animal, fresh or old.

Dr. Angelo Ozoa, the chief medical examiner for Santa Clara County, performed the autopsy on Su Hung. At the time of her death, Su Hung was five feet one inch tall and weighed 87 pounds. Her death was caused by strangulation and an incised wound to her neck. She was first strangled and then, while she was still alive, her throat had been slashed. Ozoa could not provide a time of death. He saw other injuries on the body in addition to the lethal injuries. There was a recent bruise on the right side of Su Hung's chin caused by blunt force, possibly

10

from a fist.  There was a nonlethal stab wound to her left shoulder, one inch long and one inch deep, which was inflicted and bled while she was still alive.  The left side of Su Hung's chest had five "very superficial" cuts, which Ozoa indicated could have been inflicted while she was alive, even if these cuts produced no bleeding.  He found no defensive wounds or anything that indicated a struggle.

Su Hung had been strangled with a cord and gagged with a towel.  The cord had been pulled so tight it left a furrow around her neck, and the towel was saturated with blood.  Dr. Ozoa found petechial hemorrhages — burst blood vessels — all over Su Hung's face, on her eyelids, and on the lining around her eyeballs.  The presence of petechiae indicated that she had been strangled before her throat was cut and that sufficient pressure had been applied to her neck to cut off the flow of blood from the head to the heart.  Ozoa also found that the victim's thyroid cartilage — her Adams' apple — had been fractured while she was being strangled.  Ozoa testified the amount of petechiae indicated she had been strangled slowly.

The incised wound on Su Hung's neck was three and a half inches in length and three-quarters of an inch deep.  She had been cut through the trachea and the jugular vein on the right side of her neck was also partly severed.  The amount of bleeding from the cut indicated she was still alive when it was inflicted.  Dr. Ozoa could not say how long it had taken for Su Hung to die.  Nor could he say whether she experienced extreme pain, because it was possible the strangulation had rendered her unconscious.

2.  *Defendant Hajek's Evidence*

Hajek conceded his guilt of the kidnapping, false imprisonment, robbery, burglary and dissuading a witness counts, but claimed that because he was

11

mentally ill before and during the commission of the crime, he did not have the specific intent necessary for the murder and attempted murder counts.

Hajek was born in Florida in September 1972 and was abandoned by his biological mother at birth. He was placed in a series of foster homes before Linda and Bob Hajek adopted him when he was two years old. Hajek suffered from physical and psychological problems at the time he was adopted. He engaged in repetitious behavior and was very withdrawn. He sometimes went into screaming panics when he heard loud noises such as sirens, and he sometimes banged his head against the wall. He was afraid of being dirty and once, when he dropped some food, he turned white and covered himself as though he feared Mrs. Hajek was going to beat him. The Hajeks made every attempt to make Hajek feel safe and secure. Mr. Hajek, a firefighter, resigned from the military rather than accept a transfer to Germany that would have separated him from his wife and son. By the time the Hajeks moved to California, when Hajek was about five, he was more like a normal child, though he still had problems.

When he was 15 or 16, Hajek's behavior began to deteriorate. Mrs. Hajek described him as "explosive, angry," and "easily frustrated." Early in high school, he had belonged to the ROTC, but he dropped out of it and began to surround himself with mostly Asian friends. Hajek became so involved in Vietnamese culture that he claimed to be Asian and would speak in what sounded like an Asian language. Hajek also became obsessed with Japanese animation.

Around this time, Hajek was arrested for indecent exposure after he "streaked" through his neighborhood. Hajek told his probation officer, Sally Lowell, that he had run through his apartment complex naked to get even with a neighbor who was always picking on him. Hajek's parents told Lowell they believed there was distortion in Hajek's thought process. The police report of the

12

incident contained a notation that Hajek's behavior when he was arrested — he was volatile, profane and angry — suggested psychiatric problems. The court ordered counseling. A psychological evaluation confirmed that Hajek had emotional problems. The doctor who evaluated Hajek described these problems as a lack of trust in others, pervasive loneliness, extreme sensitivity, and an inability to express hostility in a direct manner, which led Hajek to isolate himself.

Lowell had Hajek placed in a school and counseling program. Hajek did not complete the program because he was arrested for driving a stolen car and being in possession of a bank card that was not his own. A third juvenile delinquency petition was sustained after Hajek got into a fight with a coworker and broke that boy's nose. These arrests all occurred between March and June 1989. Lowell placed Hajek in a second program in the summer of 1989, but he was subsequently expelled.

Dr. James Griffin, a clinical psychologist, treated Hajek from June to December 1989. Based on the results of psychological testing, his review of background information, and his counseling sessions with Hajek, Griffin found Hajek to be "significantly disturbed." Griffin testified Hajek had an impaired sense of reality and demonstrated an inability to control his emotions, impulsivity, difficulty relating to other people, and a low tolerance for frustration. Ultimately, Griffin decided Hajek needed inpatient care. Griffin recommended that Hajek be hospitalized because he was depressed, decompensating, and moving toward schizophrenia.

Hajek was admitted to Monte Villa Hospital at the end of 1989 and remained there until early 1990. John Hennessey, a social worker, and Dr. Dean Freelander, a psychiatrist, both worked with Hajek and testified about his hospitalization. Both men testified that Hajek's behavior improved once he was

put on the drug lithium, which is used to treat bipolar disorder. While Freelander was reluctant to diagnose Hajek with bipolar disorder because he did not meet all the diagnostic criteria, Freelander had "no doubt" that Hajek was mentally ill and possibly in the early stages of bipolar disorder.

Dr. Rhan Minagawa, a clinical psychologist, testified as the defense mental health expert. Minagawa interviewed Hajek, administered psychological tests, and reviewed material regarding Hajek's medical, psychological, and social history as well as the circumstances of the crime. Minagawa concluded that when the offenses occurred, Hajek was mentally ill and suffering from a cyclothymic disorder and a borderline personality disorder with antisocial traits. Minagawa explained that a cyclothymic disorder is a mood disorder similar to, but not as serious as, bipolar disorder.

According to Dr. Minagawa, people with borderline personality disorders have several characteristics, including problems with identity, problems developing relationships, self-destructive behaviors, and suicidal ideation. Minagawa explained the identity problems manifested in the inability of such individuals to "know who they are," which would cause them to "fluctuate between thinking they are going to be one way or another way." In Hajek's case, one indication of this problem might have been his over-identification with Asian culture to the point where he claimed to be Asian. By suicidal ideation, Minagawa was referring to individuals with this condition "talking about suicide." Such people may also have transient periods of paranoid delusions. Under stress they undergo dissociation, where they "separate themselves out of their bodies." Minagawa testified that Hajek's personality disorder was primarily the result of environmental factors. He traced Hajek's borderline personality disorder to the time of his birth, when his mother abandoned him, and to the disruptions in his

14

attachments while he was moved around in foster care during the first two and a half years of his life.

In Dr. Minagawa's opinion, Hajek was in a hypomanic state between January 17 and January 21, 1991, encompassing the time just before, during, and just after Su Hung's murder. Therefore, according to Minagawa, Hajek's judgment was impaired to the point that he was acting irrationally. Minagawa's testimony was the basis of Hajek's "diminished actuality" defense, in which his attorney argued his mental illness prevented him from forming the mental states required for murder and attempted murder.

### 3. Defendant Vo's Evidence

Vo conceded his guilt of the false imprisonment counts but argued that he had gone with Hajek only to frighten Ellen, and that Hajek alone had killed Su Hung while he was in the midst of a manic episode. To that end, Vo presented witnesses who testified regarding Hajek's prior acts of seemingly impulsive violent behavior. James O'Brien testified that when he and Hajek worked at a Round Table Pizza, Hajek had punched the then 15-year-old O'Brien in the face, breaking his nose, apparently because he was upset that O'Brien was getting off work early. Douglas Vander Esch, a Santa Clara correctional officer, testified about an episode involving Hajek at the county jail. Hajek told Vander Esch he wanted to talk to a sergeant without disclosing why. Vander Esch told him he would have to fill out a grievance form, which he would then give to the sergeant for Hajek. Hajek responded by destroying various items in the day room including a television, glass on a bulletin board, glass around a shower, a sink, a coffee pot, and a telephone.

The bulk of Vo's defense, however, consisted of his own testimony. Vo testified that Hajek came to his house on the morning of January 18, 1991, and

15

roused him from bed. After driving to a couple of other stops, they ended up at the Wang residence. Vo did not know Ellen. Hajek had a problem with Ellen and wanted to talk to her. Vo testified he was "just a tag along" in case the confrontation became hostile. Hajek said nothing to Vo about killing Ellen or any of her family members.

Vo affirmed they entered the house on the pretext of writing a note to Ellen, because they did not believe Alice when she said Ellen was not home. Vo admitted taking Su Hung upstairs and tying her up because, he said, she "seemed to be angry and hostile" and he did not want "thing[s] [to] get out of hand."

Vo also admitted he "pulled a knife" on Cary when she came home. He denied pressing it to her neck, testifying that he "flashed it" to "scare her" and that he told her, "Don't scream and no one will get hurt." Vo claimed he made a show of putting the knife back into the knife holder so Cary would not be frightened of him. He also testified it was Cary's idea to go look for Ellen at Ellen's high school.

Under cross-examination by the prosecutor, Vo confirmed he and Hajek had arrived at the Wang residence in a stolen vehicle and were wearing gloves. He admitted Hajek had a gun and pointed it at Su Hung. Vo also confirmed that he was at Hajek's house after Hajek's altercation with Ellen and that he was told about the incident. Vo acknowledged he decided to tie up Tony because he thought Tony "could be a problem." According to Vo, Hajek took Tony upstairs, and when Hajek came back downstairs, he told Vo that Su Hung was dead. Vo testified he went upstairs to see for himself and was shocked to discover Su Hung's body. Vo then went to the room where Tony was being held. Tony was "talking and talking," so Vo gagged him. A couple of minutes later, Vo heard the

16

police at the door downstairs. Vo did not surrender because he was panicked and confused. He gave the police a false name because he was afraid of the media.

Under cross-examination by Hajek's attorney, Vo admitted he wrote Nguyen a letter in December 1992, in which he said, among other things, "I can't explain my feeling towards you. It's both hate and love. I hate you for loving you so much . . . . When I say I love someone, I always will." Nonetheless, Vo denied his feelings for Nguyen motivated him to join Hajek in going to the Wang residence.

### B. Penalty Phase

#### 1. Prosecution Evidence

The prosecution's penalty phase case relied almost entirely on the circumstances of the crime. The prosecution called a single victim impact witness, Ellen. Ellen testified her grandmother Su Hung had taken care of her in Taiwan until she was five. Even after Ellen and her family moved to the United States, she and her grandmother remained close. They spoke weekly on the telephone, and Su Hung came to visit every year, staying three to six months. Ellen missed her grandmother and blamed herself for her death. She did not return to school for several months after the murder because her mother, Cary, was frightened and did not want her children or her husband out of her sight.

After Su Hung's death, Cary and Tony sold their residence at a loss because it had too many bad memories. Cary sold her business, and she and Tony separated. Cary moved to Taiwan, while Tony remained in the United States. Cary still cried when she thought about her mother or saw her picture.

#### 2. Defendant Hajek's Evidence

June Fountain, the social worker who oversaw Hajek's eventual placement with his adoptive parents, testified about that process. Hajek was abandoned by

17

his birth mother in the hospital and placed in foster care with a couple who wanted to adopt him. Because Florida prohibited the adoption of children by their foster parents, Hajek was abruptly removed from the first foster home and placed in a second foster home. Nine months later, Hajek was removed from that second home and placed for adoption with another couple.

This couple already had a six-year-old biological daughter, and they wanted to adopt a son between the ages of two and three. They failed to disclose to Fountain that the wife was pregnant when Hajek was placed in their home. Fountain was concerned that if the wife gave birth to a boy, the husband might reject Hajek. Nonetheless, she did not want to remove Hajek from yet another home. Based on her observations of the couple's parenting of their daughter, Fountain made some suggestions to improve their skills, which caused friction between the couple and Fountain. After several weeks of silence, Fountain called them. She learned that the husband had lost his job, the wife had given birth to a boy, and Hajek and the couple's daughter were fighting. The husband asked Fountain to come to their house after the holidays. Fountain was certain they were going to ask that Hajek be removed from their house.

Fountain visited the couple and found them under enormous stress. The wife was worried that she might hurt Hajek. Hajek was removed from the couple's home and immediately placed in the home of the Hajeks. Fountain testified that under new practices no adoption agency would ever move a child directly from a failed adoption setting into a new adoptive home out of fear that the child would come to blame the second set of parents for removing him or her from the first set of parents. Fountain believed Hajek was emotionally abused during his stay with the couple.

Dr. Minagawa, who had testified at the guilt phase, testified again at the penalty phase. Minagawa testified that Hajek's removal from the foster parents who had wanted to adopt him was the most traumatizing event of his first two years of life and that the later failed adoptive placement impaired Hajek's ability to develop the trust in other human beings necessary for a sense of stability and security in the world. Minagawa testified that the effects of this trauma did not go away but went "underground," only to emerge during adolescence and in early adulthood. He testified that, at 18, Hajek was still an adolescent in terms of his judgment, maturation, and impulsivity. In the guilt phase, Minagawa described Hajek's mood disorder as cyclothymia, which is similar to, but not the same as bipolar disorder. In the penalty phase, Minagawa amended the diagnosis to bipolar disorder, which is genetically based and treatable with medication and counseling. Minagawa opined that on the date of the murder, Hajek was under the influence of a bipolar or cyclothymic disorder that impaired his judgment. Additionally, Minagawa testified Hajek was suffering from the personality disorder he had described in his guilt phase testimony.

3. *Defendant Vo's Evidence*

Vo called 29 witnesses. They fell into four categories: family and friends; teachers; members of the National Guard; and correctional officers. His witnesses also included an expert on Vietnamese immigration into the United States and a correctional expert.

Vo's father, Tan Van Viet, testified he had eight children, four born in Vietnam and four in the United States. Tan Van Viet worked for the United States government in Vietnam, and the family was well-off. When Saigon fell to the Communist regime in the north in 1975, the family had only 30 minutes to leave. First they went to Guam, then to an Army base in Arkansas, then to Tennessee,

19

then to Kentucky, and ultimately to California, where the family settled in San Jose. After failed attempts to obtain a college degree and to become a farmer, Tan Van Viet found employment as a school crossing guard. Tan Van Viet claimed his family was happy, and he had never needed to discipline his children.

Vo's mother, Keen Vo, testified briefly that Vo was a good son and that she did not want him to receive the death penalty.

Vo's brothers, Dexster and Sparkman Vo, gave accounts of their family life that differed significantly from their father's. Dexster described the family's departure from Vietnam as "chaotic." In Guam and then in Arkansas, they lived in a military barracks. Their living conditions after Arkansas were not much better, and their San Jose residence was "a shack." Dexster described his father as very strict and said there was a culture clash between his father's traditional Vietnamese ways and his children's American ways. His father used a belt to discipline him. His parents fought, and their fights escalated from verbal to physical violence. These fights frightened him and his siblings, and Vo would shut down and hide his feelings. Dexster joined the military in part to get away from his family.

Dexster testified that during one fight, his mother pulled a knife, and his father and the children ran into a room and locked the door. His father told Dexster to climb out the window and go for help, as his mother pounded on the door. The police arrived. His mother tried to commit suicide and was hospitalized. Sparkman Vo, Vo's youngest brother, confirmed Dexster's testimony about their father's disciplinary methods and the violent arguments between their parents.

Kieu Ngan Vo testified that Vo was a good brother who, even in custody, remained part of the family, and that the family would be devastated if Vo received the death penalty.

A number of Vo's friends testified to his good character and his difficult home life. Billy McDonald, who met Vo when they were both freshmen in high school, testified that Vo helped McDonald through a suicidal period. Four other school friends also testified Vo was a loyal and dependable friend, as well as personable and honest. They were also aware Vo had problems at home and would stay late at school to avoid having to go home.

Four of Vo's high school teachers testified on his behalf. Patricia Accoritini, his photography teacher, testified Vo was an eager and conscientious student. Vo would spend his lunch period in Accoritini's classroom and would also "hang out" there after school. Vo told her that his father abused his mother and that Vo once had to leave home for a while after attempting to protect his mother. Vo bought candy bars from Accoritini because he wasn't being fed at home. Vo was calm and nonviolent and had friends among the different racial and ethnic groups at the high school. Accoritini would have felt comfortable having Vo in her own home and considered having him live with her family because of his problems at home. Paul Enders and Rudolf Franke, who supervised Vo when he was a staff photographer on the yearbook, confirmed that he worked hard, was helpful beyond what was required of him, and got along with others. Franke formed the impression that Vo's father was strict.

Francis Nieman was a German teacher who taught Vo for three years. Vo was an average student, but he worked hard. He was a very active participant in the German club, and he mixed well with everyone and was liked and respected by

the other students. Nieman never saw any type of violence from Vo. He was under the impression that Vo's parents were strict and traditional.

Nora Mazotti was Vo's high school counselor. Vo told her on more than one occasion that his father was abusive. At one point she wrote up a report of suspected child abuse when Vo told her his father punched him and threatened to throw a chair at him.

Members of the National Guard testified on Vo's behalf about his record in the National Guard. Two of his commanding officers, David Whittum and Scott Sutherland, testified he had been a satisfactory Guard member. A fellow member of the Guard, Dwayne Talbot, testified Vo was a good soldier.

Nine correctional officers attested that Vo was a model inmate. Frances Paragon-Arias, an art instructor at the Santa Clara County jail, testified Vo was an enthusiastic and motivated student who was helpful, positive, and respectful. Gregory Dalcher, a volunteer tutor at the jail, testified Vo was a dedicated student and a positive and stable person.

Professor Hien Duc Do testified as an expert on the Vietnamese immigrant experience in the United States. Do explained that Vo's family belonged to the first wave of Vietnamese immigrants to the United States who left Vietnam in 1975 after the Communist victory. People like Vo's father who had worked for the United States government were forced to leave because they feared persecution. They had been educated and were middle or upper middle class in Vietnam, but in the United States they experienced a loss in status. The men were forced to take menial jobs, and their wives, who had not worked in Vietnam, went to work to help support their families. The women became semi-independent, and this change created marital tensions that could lead to domestic violence because the men expected women to keep to their traditional roles. The children of these

22

families were caught in a cultural vise between American individualist and Vietnamese traditional cultures. Moreover, because the children acculturated while their parents did not, there was a role reversal in which the children were in a role of authority. Do opined that the stresses, tensions, and incidents of violence within Vo's family as described in the testimony of Vo and his family members were consistent with the experiences of the first wave of immigrants.

James Park, a clinical psychologist, testified as an expert in prisoners' classifications and their adjustment to prison life. Based on his review of Vo's record, Park opined that Vo would be a productive and nonviolent prisoner.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. Severance Motions

Before the start of trial, Vo filed an omnibus motion in limine, which included a motion to sever. Vo argued severance was required on two grounds. First, he argued Hajek had made statements to various individuals incriminating Vo that would be inadmissible at their joint trial under the *Aranda/Bruton* rule. (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123 [a nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible as a violation of the latter's rights to confrontation and cross-examination].)[4] Second, Vo claimed severance was required because he and Hajek were advancing antagonistic defenses. Hajek's counsel orally joined in the motion to sever. The prosecution opposed both motions, and the trial court

---

[4] To the extent *Aranda* "require[d] the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 [citation.]. [Citations.]" (*People v. Fletcher* (1996) 13 Cal.4th 451, 465, fn. omitted.)

denied them. The court also denied Vo's oral motion for severance during the penalty phase.

Defendants contend the trial court abused its discretion when it denied their respective severance motions. Alternatively, they argue that, even if pretrial denial of severance was not an abuse of discretion, retrospectively it amounted to a due process violation. For the reasons below, we find no merit to any of these contentions.

" 'Our Legislature has expressed a preference for joint trials. [Citation.] Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. . . . [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder " 'resulted in "gross unfairness" amounting to a denial of due process.' " [Citation.]' [Citation.] Severance motions in capital cases generally receive heightened scrutiny for potential prejudice. [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 848.)

Defendants were charged with having committed common crimes that involved the same individuals and same series of events. The joinder of their

24

cases was proper. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner and Tobin*).)

Although Vo advanced two grounds for severance in his pretrial severance motion, on appeal he argues only that severance was required because the "irreconcilable defenses of the co-defendants here resulted in a trial lacking due process of law."[5]

"Severance is not required simply because one defendant in a joint trial points the finger of blame at another. ' " 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.' [Citation.]" (*People v. Homick, supra,* 55 Cal.4th at p. 850; see also *Letner and Tobin, supra,* 50 Cal.4th at p. 150.)

Here there was sufficient independent evidence of both defendants' guilt apart from any potential conflict in the defenses. The evidence showed that both defendants had a motive to commit the charged crimes. Hajek told Tevya Moriarty he was going to kill Ellen and her family in retaliation for his altercation

---

[5] Vo had additionally argued that certain statements by Hajek violated the *Aranda/Bruton* rule. The trial court's rejection of this argument was sound. The statements by Hajek to Moriarty about his plan to kill Ellen's family and Hajek's postarrest threats to her did not incriminate Vo. The *Aranda/Bruton* rule applies to a " 'nontestifying codefendant's extrajudicial . . . statement that inculpates the other defendant.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 652.) The trial court later admitted those statements against both defendants. (See *post*, pt. II.B.3.a.)

with Ellen. Vo learned about the altercation on the same day it occurred, when he was present with Hajek and Lori Nguyen that night and Hajek and Ellen were exchanging hostile phone calls. Vo had unrequited romantic feelings toward Nguyen and was Hajek's friend. Vo later told Cary he was looking for Ellen because she had had an argument with his relative at school and said he wanted to teach her a lesson. The evidence showed further that defendants together arrived at the Wang residence, prepared to commit a violent act. They drove a stolen van and parked it around the corner. Wearing gloves and armed with a pellet gun, they gained entrance into the residence on a pretext. Once inside, Hajek pointed the gun at Alice to force her compliance. At another point, Vo held a knife to Cary's throat and threatened to kill her and her family if she called out. Working in concert, Hajek and Vo held members of the Wang family hostage for several hours, during which they repeatedly threatened the victims' lives and murdered Su Hung.

As described by the Wangs, both defendants took an active part in these events, which included binding and blindfolding the victim and isolating her in an upstairs room that each visited repeatedly. When the police arrived at the scene, Hajek attempted to flee, and Vo, upon being arrested, lied about his identity.

Because sufficient independent evidence existed against both defendants, the trial court's rejection of the severance motions was not an abuse of discretion.

In any case, their defenses were not truly conflicting. Vo argues that Hajek's defense was that Vo was the actual perpetrator, creating an irreconcilable conflict because the jury could not have accepted Hajek's defense without convicting Vo. This mischaracterizes Hajek's defense. Hajek's defense was that his mental illness reduced his culpability, not that he was not culpable. While Hajek's attorney may have suggested in closing argument that Hajek was not the

26

actual killer, she explained that "the heart of [Hajek's] defense" was that he was in a manic state at the time of the offenses due to his mental illness, and therefore did not premeditate or deliberate. Indeed, Vo's trial counsel sought to capitalize on Hajek's mental illness defense by presenting evidence of episodes where Hajek lost control of himself and acted impulsively or violently. Vo's defense was that Hajek killed Su Hung in a manic state without Vo's knowledge or assistance and that Vo had accompanied Hajek to the Wang residence merely to confront Ellen, not to commit murder.

A jury need not have believed Vo was guilty to accept Hajek's mental illness defense. Vo's defense, if believed, did not require the jury to convict Hajek. "[T]his was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to defendants to convince the jury that the other was that person." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287.) Again, no abuse of discretion has been shown.

Vo next contends that the denial of his pretrial severance motion — viewed retrospectively — resulted in gross unfairness sufficient to constitute a denial of due process. (See *People v. Homick, supra,* 55 Cal.4th at p. 852; *People v. Hoyos* (2007) 41 Cal.4th 872, 896.) He argues that much of the evidence adduced at his joint trial with Hajek was prejudicial to Vo and would have been excluded as irrelevant had he been tried alone.[6] But the evidence Vo cites — Hajek's altercation with Ellen and his telephone conversation with Moriarty, defendants' jailhouse conversation, and defendants' close friendship with each other and

---

[6]     Threaded through Vo's argument is his claim that the prosecution should not have been allowed to argue for his culpability on the basis of what he calls its "uncharged and wildly expansive conspiracy theory." This claim, which we reject *post*, in part II.B.2., has no bearing on whether the cases should have been severed.

Nguyen — would likely have been admitted at a separate trial for Vo to provide context and motive for his actions at the Wang residence.

Vo further contends that Hajek's mental illness evidence prejudiced Vo because the jury must have anticipated that Vo, too, would have presented such a defense. The claim is speculative, unsupported by the record or any relevant authority. Equally unpersuasive is Vo's claim that the prosecutor at one point used Hajek's mental illness defense to suggest Vo was the more culpable actor because he was not mentally ill. As the record reflects, *Hajek's* attorney had argued that the plan to kill Ellen's family in retaliation for a minor altercation was so bizarre it could not have been planned but was the product of Hajek's mental illness. In response, the prosecutor argued that enlisting Vo as a cohort was evidence that Hajek was not mentally ill when he planned and carried out the crime. Thus, the prosecutor's argument merely refuted Hajek's mental illness defense and did not suggest Vo was more culpable because he was not mentally ill.

Vo next contends that evidence of Hajek's prior criminal conduct and "bad character" — e.g., his interest in Satanism, his delusions about being Asian, and his sadism — tainted Vo by association.

Severance may be justified "where there may be prejudicial association with codefendants" (*People v. Boyde* (1988) 46 Cal.3d 212, 232), but only if, at the guilt phase, "the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant." (*Letner and Tobin, supra,* 50 Cal.4th at p. 152.) Those circumstances are not present here. As recounted above, ample independent evidence implicated Vo in the crimes of which he was

28

convicted.  In these circumstances, there is no likelihood the jury convicted Vo solely because of his association with Hajek.  Moreover, the evidence regarding Hajek's prior criminal conduct and various obsessions was clearly admitted against Hajek alone, and we have no reason to doubt that the jury followed the instructions to consider separately each defendant's guilt.  Finally, evidence that tended to depict Hajek as an out-of-control deviant aided Vo's defense that Hajek killed the victim in the midst of a manic episode.  Indeed, Vo himself introduced some of this evidence.

In sum, denial of Vo's pretrial severance motion did not amount to a due process violation.

Vo also challenges the denial of his penalty phase severance motion.  On direct examination during the penalty phase, Hajek's expert, Dr. Minagawa, testified that at the time of Su Hung's murder, Hajek was mentally ill and in the midst of a manic episode.  On cross-examination, the prosecutor repeatedly sought to impeach Minagawa by suggesting he had avoided asking Hajek questions that would have undermined this diagnosis.  In this vein, the prosecutor asked Minagawa whether he had pressed Hajek about the circumstances of the murder.  To four of these questions, Minagawa replied that Hajek had denied killing the victim.  Vo's counsel objected on hearsay grounds.  The trial court responded with a limiting instruction:  "The testimony is strictly limited to Mr. Hajek and it is not being received as to Mr. Vo. . . .  So when you receive the testimony as to Mr. Hajek, it is received only as to Mr. Hajek.  And when you receive testimony as to Mr. Vo, it is received only as to Mr. Vo.  [¶]  Objection is overruled."

In a hearing outside the presence of the jury, Vo's counsel moved for a mistrial or, alternatively, severance.  He argued that by relating Hajek's denial that he killed the victim, Dr. Minagawa's testimony violated the *Aranda/Bruton* rule.

29

Counsel asserted the trial court's admonition was inadequate to cure the violation. On appeal, Vo challenges the denial of these motions.

The *Aranda/Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. " '*Aranda* and *Bruton* stand for the proposition that a "nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." [Citation].' [Citation.] The United States Supreme Court 'limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. (*Richardson*, *supra*, at pp. 206-207.) That is because, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." (*Id.* at p. 208.)' " (*People v. Homick, supra,* 55 Cal.4th at p. 874, fn. omitted; see *People v. Fletcher*, *supra*, 13 Cal.4th at pp. 463-464.)

Hajek's statement to Dr. Minagawa that he did not kill Su Hung did not facially incriminate Vo. Its incriminatory effect depended entirely on its linkage to other evidence. Moreover, the point of the prosecutor's cross-examination was to suggest that Hajek's denial of culpability was a lie that Minagawa accepted at face value because it was consistent with his diagnosis. Thus, the issue was not the identity of Su Hung's killer, but Minagawa's credibility as an expert. Under these circumstances, the trial court's limiting instruction properly guided the jury's

30

consideration of the testimony. (*Richardson v. Marsh, supra,* 481 U.S. at p. 206 ["Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."].)

We turn to Hajek's severance claim. Hajek's counsel orally joined Vo's pretrial motion for severance on the ground of antagonistic defenses. As noted, sufficient independent evidence existed of both defendants' guilt so as to render the denial of their severance motion an appropriate exercise of discretion at the time the court ruled. Moreover, although Hajek complains that Vo was permitted to call two witnesses who testified to two episodes of Hajek's violent behavior involving an attack on a coworker and the destruction of jail property, Hajek concedes that he himself referred to these incidents as part of *his* mental illness defense. Under these circumstances, Hajek fails to demonstrate that the denial of his severance motion resulted in gross unfairness amounting to a due process violation.

Hajek also contends the trial court erroneously denied his penalty phase severance motion. The motion to which he refers was for a mistrial, not severance. The claim is forfeited. (*People v. Tafoya* (2007) 42 Cal.4th 147, 163; *People v. Ervin* (2000) 22 Cal.4th 48, 68.)[7] Even if the claim were not forfeited, it is meritless. Hajek argues he was prejudiced by Vo's extensive "good character" defense, because Hajek's inability to mount a comparable defense cast him in a

---

[7]    For the same reason — because he moved for a mistrial, not severance — Hajek also forfeited his claim that severance was required after the prosecutor asked one of Vo's witnesses if Hajek had been a "gangster" in high school. In any event, the trial court sustained the objection of Hajek's counsel and granted her motion to strike. Hajek points to no further prosecutorial questioning on this subject.

bad light before the jury. As already noted, the jury was specifically admonished "not to weigh one defendant against the other or choose between them," and to make "an individualized determination based on the character and circumstances of each individual and the circumstances of the case." We presume the jury understood and followed these instructions. (*People v. Avila* (2006) 38 Cal.4th 491, 575.)

## 2. Keenan *Counsel*

Vo contends his right to effective assistance of counsel was violated by the initial denials of his request for a second or *Keenan* counsel (*Keenan v. Superior Court* (1982) 31 Cal.3d 424) and by a later denial of his request to continue the trial when *Keenan* counsel withdrew for health reasons. We reject his claims.[8]

### a. Background

In September and October 1991, Vo's trial counsel, James Blackman, filed declarations seeking appointment of a second attorney to defend Vo. Blackman asserted the second counsel was required for research and related work on various motions, including motions for discovery, severance, a section 995 motion to dismiss, a motion to preclude the death penalty based on the charging policies of the Santa Clara County District Attorney, and motions related to the admissibility of particular pieces of evidence. The requests were summarily denied.

Blackman sought a hearing, which was conducted on November 20, 1991, by Judge Hastings. To justify his *Keenan* counsel request, Blackman repeatedly cited the complexity of the case and of the various motions and investigations he

---

[8]      Vo links these alleged errors with claims pertaining to funding issues during the trial and to his counsel's attempt to withdraw after the court excluded testimony from one of his experts, Dr. Berg, as a discovery sanction. The issues are distinct and are discussed separately. (See *post*, pts. II.D.1., II.C.3.)

planned to undertake in Vo's defense. He additionally cited the fact that a number of his witnesses spoke only Vietnamese.

The trial judge noted his own experience as a criminal defense lawyer, which included 13 years in practice and certification as a criminal law specialist, and his judicial experience presiding over hundreds of jury trials, including five death penalty cases. The judge pointed out that in *Keenan* "there was a very critical time issue involved for the lawyer to get prepared after his appointment," whereas in Vo's case "the matter isn't even set for trial." The judge characterized Blackman's statement that the case was complicated as "conclusionary" and again denied the motion.

In March 1994, Blackman made a third request for *Keenan* counsel before a different trial judge, and this time the request was granted. Attorney Mary Ann Bachers was appointed second counsel and began work on the case in May 1994. Neither the declarations submitted in connection with the third *Keenan* request nor the transcript of any hearing is in the record.

Trial was set for January 17, 1995. On December 16, 1994, Blackman presented the court with a doctor's note stating Bachers was completely disabled and unable to continue to represent Vo. He asked for a continuance of the trial date. Both the prosecutor and Hajek's counsel objected. On January 6, 1995, Blackman reported he had not yet found a replacement for Bachers. On January 17, the court held a hearing on the continuance request. Blackman characterized the case as "complicated," and recounted his initial unsuccessful attempts to obtain *Keenan* counsel as well as the time he spent litigating the section 995 motion and subsequent appeal.[9] Blackman acknowledged that, while the case was on appeal

---

[9] Blackman had filed a section 995 motion that resulted in dismissal of all special-circumstance allegations except torture murder. The prosecution's appeal was successful, and the Court of Appeal reinstated the special circumstances in an

33

following the granting of Vo's section 995 motion, "[w]e just didn't do anything because the focus of the attention at that point was to see what happened in the Court of Appeal."  Blackman said his request for *Keenan* counsel had been granted following the Court of Appeal's reinstatement of the special circumstances.  He insisted he could not go to trial because Bachers had been in charge of penalty phase preparations and, as a result of her withdrawal from the case, the penalty phase case was not ready.  He told the court he had been unsuccessful in his efforts to find a replacement for Bachers.

The trial court denied the continuance request.  The court said it had read the transcript of the November 21, 1991, *Keenan* hearing before Judge Hastings and observed, "[a]ll the arguments you're putting forth here were the same arguments you put forth at that time . . . .  I don't think this case will ever be prepared . . . .  [A]ll the information you need for a competent guilt phase and penalty phase investigation is at your fingertips."

On February 10, 1995, Attorney Jeane Dekelver was appointed as replacement *Keenan* counsel.  Trial began on February 14, 1995.  As stated in the factual summary above, Vo called 29 penalty phase witnesses, including family members, friends, and experts on the Vietnamese immigrant experience and on prisoner classifications and prisoner adjustment.

### b.  Discussion

We begin with the initial denial of Vo's request for *Keenan* counsel.  In capital cases, "courts have the statutory discretion to appoint a second defense attorney at public expense.  [Citations.]  But unlike the constitutional right [to

---

unpublished opinion filed on October 29, 1993.  Subsequently, however, the trial court dismissed the robbery-murder and burglary-murder special-circumstance allegations at the end of the prosecution's guilt phase case.

counsel], the statutory right to appointed second counsel is qualified." (*People v. Roldan* (2005) 35 Cal.4th 646, 686, fn. omitted; § 987, subd. (d).) "In ruling on an application for second counsel, the trial court must be guided by the need to provide a capital defendant with a full and complete defense . . . . The initial burden is on the defendant to present a specific factual showing of 'genuine need' for the appointment of second counsel. [Citation.] We review the decision whether to grant a request to appoint second counsel under section 987 for abuse of discretion. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 432.) "The abuse of discretion standard is used in many other contexts and reflects the trial court's superior ability to consider and weigh the myriad factors that are relevant to the decision at hand. A trial court will not be found to have abused its discretion unless it 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice.' [Citation.]" (*People v. Roldan, supra,* 35 Cal.4th at p. 688.)

We find no abuse of discretion in the denial of Vo's initial requests for *Keenan* counsel. To the extent Vo's counsel sought to justify such an appointment because the case was complex, the trial court correctly dismissed such justification as conclusory and therefore insufficient. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 278-279 [no abuse of discretion where request for appointment of second counsel is denied, where the request asserts only that the case is " 'complex' "].) Nor do we find the trial court abused its discretion merely because Vo's counsel referred to specific motions and investigations as grounds for his request. Indeed, as the court noted, the matter had not yet even been set for trial. *Keenan*'s genuine need standard requires the defendant to show specific and *compelling* reasons for appointment of second counsel. (*Keenan v. Superior Court*, *supra*, 31 Cal.3d at p. 429.) The trial court gave clear and detailed reasons

35

why it did not find the justifications offered by Vo's counsel to be compelling. We cannot say the court's findings constituted an abuse of discretion.

Nor are we swayed by the fact that a second judge was later persuaded to appoint *Keenan* counsel. Neither the declarations submitted in connection with that request nor a transcript of the hearing, if any, are in the record. Accordingly, we do not know whether new or different arguments were made or what other factors may have informed the second judge's exercise of discretion. The subsequent appointment of second counsel does, however, obviate any possibility of prejudice even were we to assume the first judge abused his discretion, which we do not.

The same abuse of discretion standard governs the trial court's ruling on Vo's request for a continuance after his *Keenan* counsel withdrew for medical reasons. "A continuance in a criminal trial may only be granted for good cause. [Citation.] 'The trial court's denial of a motion for continuance is reviewed for abuse of discretion.' [Citation.] 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' [Citations.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118 (*Mungia*).) "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.] [¶] Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered. [Citations.]" (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

Here, as the trial court noted, the January 17, 1995, hearing on the motion was also the fourth anniversary of the crime. Vo's counsel acknowledged that

36

work had essentially stopped on the case for over one year while the Court of Appeal reviewed the granting of the section 995 motion, which had resulted in the striking of all but one of the special circumstances.  As the trial court pointed out, however, the section 995 motion had not been granted as to the torture-murder special circumstance, and so the case had remained a capital case.  Regarding the main reason for the continuance request — the withdrawal of *Keenan* counsel for health reasons — the court pointed out that over a month had passed, and Vo's counsel had not secured a replacement.  The court also observed the penalty phase investigation that Vo's counsel claimed had not been completed involved issues such as Vo's Vietnamese immigrant experience, of which counsel had been aware as early as 1991, when he first requested *Keenan* counsel.  Moreover, the court questioned why Attorney Bachers, rather than the defense investigator, was interviewing penalty phase witnesses, "because the person you want talking to those people is somebody you're going to put on the stand to talk in the case, and you're not going to put *Keenan* counsel on the stand."  In sum, the trial court concluded that the defense was sufficiently prepared to proceed with both the guilt and penalty phases and that the withdrawal of second counsel did not necessitate a continuance.

We find no abuse of discretion.  Even if counsel could have chosen to allocate his time differently, he was not denied a reasonable opportunity to prepare a defense.  (*People v. Doolin*, *supra*, 45 Cal.4th at p. 450.)  Thus, the trial court was justified in rejecting counsel's request for more time to prepare his penalty phase case in light of *Keenan* counsel's withdrawal.  Moreover, a replacement

counsel was appointed, and an extensive penalty phase case was in fact presented. Thus, Vo fails to demonstrate prejudice in any event.[10]

### B. Guilt Phase Issues

#### 1. Sufficiency of the Evidence Claims

Defendants claim the evidence is insufficient to support the lying-in-wait special-circumstance findings, the torture-murder special-circumstance findings, the attempted murder convictions, the firearm enhancements as to Hajek, and the knife use enhancements as to Vo. Based on the alleged insufficiency of the evidence at the close of the prosecution's guilt phase case-in-chief, defendants additionally contend the trial court should have granted their section 1118.1 motions for dismissal of the lying-in-wait special circumstances and for acquittal

---

[10] "As to this and virtually all other appellate claims, defendant contends that an issue raised and decided in the trial court resulted in constitutional violations, but he did not present those constitutional theories below. In such instances, it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the United States and California Constitutions. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, applying *People v. Partida* (2005) 37 Cal.4th 428, 433-439.) In the latter case, no separate constitutional discussion is required or provided where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Contreras* (2013) 58 Cal.4th 123, 139, fn. 17.) We apply this principle here and elsewhere where defendants, separately or jointly, assert on appeal constitutional claims not advanced below.

on counts 2 through 5 of the information regarding the attempted murders of Cary, Alice, Tony, and Ellen, and on the knife use enhancements.**11**

In determining whether the evidence was sufficient either to sustain a conviction or to support the denial of a section 1118.1 motion, the standard of review is essentially the same. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).) " '[W]e do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " (*Ibid.*; see also *People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020.) Notably, however, "[r]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point." (*Houston*, at p. 1215; see *Watkins*, at p. 1019.)

---

**11**     As relevant here, section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

### a. Lying-in-wait murder and lying-in-wait special circumstance

Defendants argue the trial court abused its discretion in denying their motions to dismiss the lying-in-wait special-circumstance allegations at the close of the prosecution's case-in-chief.  (§ 1118.1.)  They also contend the evidence was insufficient to support their convictions of first degree murder on a lying-in-wait theory and the true findings on the lying-in-wait special-circumstance allegations.  (§§ 189, 190.2, former subd. (a)(15) as added by Prop. 7, enacted by voters Nov. 7, 1978.)  For the reasons below, we agree the lying-in-wait special-circumstance findings must be reversed, but conclude that reversal of these findings does not require reversal of defendants' death sentences.

At the time of Su Hung's murder, "the elements of the lying-in-wait special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.  [Citations.] . . .  [The period of waiting and watching] need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." '  [Citation.]  ' " 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct.  It is not required that he be literally concealed from view before he attacks the victim.' " ' " '  [Citation.]  The factors of concealing murderous intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by lying in wait.'  [Citation.]"  (*People v. Stevens* (2007) 41 Cal.4th 182, 201-202, fns. omitted; *People v. Morales* (1989) 48 Cal.3d 527, 557.)  "[T]he lying-in-wait special circumstance requires 'that the killing take place *during the period of concealment and watchful waiting . . . .*'

40

[Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1149.) " 'During' means 'at some point in the course of.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 514 (*Lewis*).)

Moreover, when the capital crime occurred, the lying-in-wait special circumstance required a showing that the defendant "intentionally killed the victim *while* lying in wait." (§ 190.2, former subd. (a)(15), italics added.) In 2000, the electorate approved Proposition 18 which, among other things, "changed the language of the lying-in-wait special circumstance to delete the word 'while' and substitute in its place 'by means of.' " (*Lewis, supra,* 43 Cal.4th at p. 512, fn. 25.) Because Su Hung's murder occurred before this statutory change, we apply the case law interpreting the more stringent requirement of the former law. (See *id*. at p. 511.)

At trial, the evidence showed that Su Hung was killed while defendants were waiting for her granddaughter, Ellen, to return home. The trial court, using a "transferred intent" analogy, concluded that even though Ellen was the target, "the murder did occur during the process of lying in wait, so that special [circumstance] will not be dismissed."[12] The Attorney General disavows the trial court's rationale and argues on appeal that Su Hung herself was the target of defendants' lying in wait.[13] Defendants counter the evidence was insufficient to establish that Su Hung's murder occurred while they were lying in wait for her.

---

[12] Our research has yielded no support in case law for the trial court's transferred intent analogy.

[13] Defendants maintain the People have forfeited this argument because it was not presented at trial. However, review of the prosecution's closing argument discloses it did not rely on a transferred intent analogy but rather, as the Attorney General does here, contended the evidence showed defendants lay in wait for the murder victim herself. Accordingly, we reject the claim of forfeiture.

In evaluating defendants' contentions, we find *Lewis*, *supra*, 43 Cal.4th 415, instructive. There, the defendant and his accomplices had "accomplished the forcible kidnapping of [several victims] while lying in wait, but then drove the still living victims around in their cars for periods of one to three hours, while withdrawing money from the victims' bank accounts, before killing them. By the time of the killings, the concealment, the watchful waiting, and the surprise attack all had taken place at least one and up to three hours earlier." (*Id*. at p. 514.) In assessing the sufficiency of the evidence, *Lewis* took note of the prosecutor's argument that the defendant had concealed his purpose to kill from each of the victims until the moment they were killed, in some cases assuring the victims they would not be harmed. Nonetheless, *Lewis* concluded that " 'mere' concealment of purpose is not enough to support the lying-in-wait special circumstance. [Citation.] Rather, such concealment must be contemporaneous with a substantial period of watching and waiting for an opportune time to act, and followed by a surprise attack on an unsuspecting victim from a position of advantage. [Citation.]" (*Ibid*.) As *Lewis* emphasized, "there was no evidence that, while concealing his purpose to kill, defendant watched and waited for an opportune time to kill the victims. Rather, the evidence suggests each was killed when, and only when, his or her ATM withdrawal limit had been reached and the victim had been driven to a suitable location for killing. Moreover, there was no evidence that the victims were surprised. Indeed, the evidence suggests each victim must have been aware of being in grave danger long before getting killed." (*Id*. at pp. 514-515.)

The evidence here is comparable to that in *Lewis* and calls for a similar result. Defendants entered the Wang residence by ruse, displayed a gun, and shortly thereafter bound and blindfolded the frightened victim and isolated her in

42

an upstairs bedroom for several hours before finally killing her. From the moment defendants took Su Hung and Alice hostage, Su Hung could not have perceived their actions as anything other than a serious threat to her safety, even if they untied her for a period of time while she was kept isolated in the bedroom. Thus, even assuming defendants engaged in a period of watchful waiting before entering the house using the element of surprise, it was followed by "a series of nonlethal events" over the course of several hours, "and then a cold, calculated, inevitable, and unsurprising dispatch" of the victim. (*Lewis*, *supra*, 43 Cal.4th at p. 515.) Moreover, even assuming defendants never revealed their true purpose to kill the entire Wang family, there was no evidence that, while concealing that purpose, defendants watched and waited for an opportune time to kill Su Hung. Thus, even when the evidence is considered in a light most favorable to the judgment, it simply fails to establish that defendants' concealment was contemporaneous with a substantial period of watching and waiting for an opportune time to act, or that their concealment allowed them to launch a surprise attack on an unsuspecting victim from a position of advantage. Although the evidence shows Su Hung was killed in a most horrifying manner, it falls short of establishing she was killed while defendants were lying in wait for her.

Accordingly, we conclude the evidence was insufficient to show that defendants "intentionally killed the victim *while* lying in wait," as required under the former law. (§ 190.2, former subd. (a)(15), italics added; see *Lewis*, *supra*, 43 Cal.4th at pp. 514-515.) We now address whether reversal of the lying-in-wait special-circumstance findings requires reversal of defendants' death sentences.

Citing *Stringer v. Black* (1992) 503 U.S. 222, Hajek (joined by Vo) argues that "the invalidated aggravating factor necessarily added to the aggravating side

of the balance and this prejudiced [defendant] when the jury was deciding whether to sentence him to death." We disagree.

Not only did a valid special-circumstance finding remain (torture murder, see *post*, pt. II.B.1.b.), but the jury was statutorily permitted to consider all of the facts and circumstances underlying Su Hung's murder. As the United States Supreme Court recognized in *Brown v. Sanders* (2006) 546 U.S. 212, the invalidation of a special circumstance does not require reversal of the death sentence under California's statutory scheme if "one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." (*Id.* at p. 220; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1354.) In urging the death penalty, the prosecutor here relied almost exclusively on factor (a) of section 190.3, which allows consideration of "the immediate temporal and spatial circumstances of the crime," as well as "that which surrounds the crime materially, morally, or logically." (*People v. Hamilton* (2009) 45 Cal.4th 863, 926.) In this case, the factor (a) evidence was the same evidence the prosecutor cited in his attempt to establish lying in wait — that is, defendants gained entry into the Wang residence by ruse; they displayed a gun; they quickly bound and blindfolded Su Hung; and they isolated her upstairs for several hours before finally killing her. In the words of the United States Supreme Court, "[a]ll of the aggravating facts and circumstances that the invalidated [special circumstances] permitted the jury to consider were also open to their proper consideration under [section 190.3, factor (a)]," and thus the invalid special circumstances "could not have 'skewed' the sentence." (*Brown*, at p. 223 [finding no constitutional violation where jury rendered death verdict after making four special-circumstance findings, two of which were invalidated on appeal].) That the evidence was insufficient to establish lying in weight did not render its

44

consideration by the jury inappropriate. Because the invalid lying-in-wait special circumstances "did not alter the universe of facts and circumstances to which the jury could accord . . . weight" (*People v. Bonilla* (2007) 41 Cal.4th 313, 334), and because "[t]here is no likelihood that the jury's consideration of the mere existence of the [lying-in-wait] special circumstance tipped the balance toward death" (*Mungia, supra,* 44 Cal.4th at p. 1139), the invalidity of the lying-in-wait special circumstances does not warrant reversal of the death sentences.**14**

### b. *Torture murder and torture-murder special circumstance*

Defendants contend the first degree torture-murder convictions and the torture-murder special-circumstance findings were not supported by substantial evidence.**15** We conclude the evidence was sufficient.

"To prove torture murder, the prosecution must establish ' "a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." ' [Citation.] To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to

---

**14** In light of our conclusions above, defendants' attacks on the constitutionality of the special circumstance are moot. We also find it unnecessary to address defendants' claims that the evidence is insufficient to support the convictions of lying-in-wait first degree murder, because the first degree murder verdicts can be affirmed on theories of torture murder and premeditated murder. (See *post*, pt. II.B.1.b.; *People v. Rundle* (2008) 43 Cal.4th 76, 141 [" '[W]e need not consider [a sufficiency] claim . . . when the court can determine from the record that the verdict rested on a theory which is supported by sufficient evidence.' "].)

**15** Defendants did not move for dismissal or acquittal of the torture-murder special-circumstance allegations at the conclusion of the prosecution's case-in-chief. (§ 1118.1.) Accordingly, we look to the entirety of the guilt phase to assess the sufficiency of the evidence for these special circumstance findings.

cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citation.] The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 237 (*Streeter*).)[16] " 'There is no requirement that the victim be aware of the pain.' " (*People v. Elliot* (2005) 37 Cal.4th 453, 466-467.) Thus, as to both torture murder and torture-murder special circumstances, the sufficiency inquiry is directed at evidence of the defendant's torturous intent. (*People v. Mincey* (1992) 2 Cal.4th 408, 433 (*Mincey*).)

It bears emphasis that "the trier of fact may find intent to torture based on *all* the circumstances surrounding the charged crime, including the nature and severity of the victim's wounds and any statements by the defendant revealing his state of mind during the crime." (*People v. Bemore* (2000) 22 Cal.4th 809, 841 (*Bemore*).) For example, evidence that the defendant intentionally inflicted nonlethal wounds on the victim may demonstrate the requisite " 'sadistic intent to cause the victim to suffer pain in addition to the pain of death.' " (*Ibid.*; see *id.* at p. 844 ["Certain nonlethal knife wounds . . . seem plainly calculated to cause extreme pain and to induce [the victim's] cooperation."]; see also *Mungia, supra,* 44 Cal.4th at p. 1137 ["When we have upheld [torture-murder special-circumstance findings], the evidence has shown that the defendant deliberately

---

**16**     Hajek contends that the prosecutor conflated the elements of torture murder and the torture-murder special circumstance, but the relevance of this assertion to his sufficiency argument is unclear. He acknowledges that "the principal area of overlap" between the elements of the torture murder and the torture-murder special circumstance "is the requirement that the prosecution prove beyond a reasonable doubt that the defendant had an intent to cause the victim extreme pain." It is precisely this intent requirement that Hajek argues is unsupported by substantial evidence, and it is this contention we address.

inflicted nonfatal wounds or deliberately exposed the victim to prolonged suffering."]; *People v. Crittenden* (1994) 9 Cal.4th 83, 141 (*Crittenden*) [intentional nonfatal injuries "are consistent only with an intent to inflict extreme pain"].) Although evidence of binding, by itself, is insufficient to establish an intent to torture (*Mungia*, at p. 1138), it is appropriate to consider whether the victim was bound and gagged, or was isolated from others, thus rendering the victim unable to resist a defendant's acts of violence. (*Crittenden*, at p. 141 [victims bound and gagged]; *People v. Proctor* (1992) 4 Cal.4th 499, 532 ["victim was isolated and prevented from resisting or escaping"]; cf. *People v. Chatman* (2006) 38 Cal.4th 344, 391 [binding not required to prove torture].) Finally, the manner of the victim's death may also evidence the defendant's intent to torture. (*Proctor*, at pp. 531-532.)

Considered as a whole, the circumstances surrounding Su Hung's murder provide substantial evidence of defendants' torturous intent. Significantly, there was substantial medical evidence showing Su Hung suffered a number of nonlethal wounds before she was strangled and her throat slashed. These wounds — which were neither inadvertent nor accidental — included blunt force trauma to her chin, a stab wound to her shoulder that left a bleeding gash one inch long and one inch deep, and five shallow puncture wounds to her chest from a sharp instrument. These wounds evidenced deliberate and gratuitous violence beyond that which was necessary to kill the victim, and the jury could reasonably infer from the circumstances that the wounds were inflicted to cause her severe pain while she was bound, gagged, and utterly helpless. (See *Bemore*, *supra*, 22 Cal.4th at p. 842; *Crittenden*, *supra*, 9 Cal.4th at p. 141.)

Moreover, the jury was presented with explicit evidence that defendants' crimes were motivated by a sadistic intent. Hajek was heard to make statements

47

that evidenced his intent to carry out a vengeful and sadistic plan to murder. Two days before the killing, Hajek told Tevya Moriarty that he and his girlfriend had gotten into a fight with a girl, and that he wanted to get back at the girl. He said that he was going to the girl's house to kill her and her family, and that he planned to kill the girl's family first so he could "look in [the girl's] eyes when he killed her." Not only did these statements evidence Hajek's desire to murder Ellen after forcing her to watch as they first killed her family members, but a jury could reasonably find that such statements, in combination with the condition of Su Hung's body, showed that defendants did not kill Su Hung quickly but intended to inflict extreme pain before finally executing her.

Finally, the manner in which Su Hung was killed furnished additional evidence of defendants' torturous intent. Death by strangulation will always take some amount of time, so generally that fact alone is insufficient to establish an intent to torture. However, combined with the other circumstances here — including the duplicative nature of the lethal wounds to Su Hung's throat, the nonlethal wounds, and evidence of an express sadistic intent — evidence of the manner of Su Hung's death is consistent with an intent to inflict extreme pain or suffering.

Hajek effectively concedes his statements to Moriarty were evidence of a motive to exact revenge against Ellen. He argues, however, they did not provide substantial evidence of an intent to inflict extreme pain on the murder victim, Su Hung. We are not persuaded. While Hajek did not explicitly say he intended to inflict extreme pain on Su Hung or any of the Wangs before killing them, that intent can be inferred from the totality of the circumstances: the sadistic nature of defendants' plan (to first kill Ellen's family members while she watched and then to kill her), the deliberate and nonlethal wounds they inflicted on Su Hung while

48

she was bound and completely defenseless (striking her chin hard enough to leave a bruise, stabbing her gratuitously in the shoulder, and treating her like a pincushion while they superficially punctured her chest five times),[17] and the manner in which they killed her (choking her slowly but forcefully with a ligature until they fractured her thyroid cartilage, then slashing her throat through her trachea and jugular vein).

Hajek also fails to persuade us that Su Hung's injuries did not reflect a torture murder because they were not sufficiently similar to the "extreme injuries" that other decisions found "support[ed] the inference of an intent to inflict extreme and prolonged pain."[18]  With regard to the perceived lack of severity of Su Hung's wounds, it was obvious to defendants that she was a frail woman who was elderly and diminutive.  Su Hung's physical dimensions (she stood five foot one and weighed 87 pounds) were basically those of a child, and her age (73 years) rendered her extremely vulnerable.  She was, moreover, bound, gagged, separated from her family, and completely under the domination of the two defendants.  We

---

[17]     The coroner testified he could not tell whether the five puncture wounds to Su Hung's chest had been inflicted pre- or postmortem because there was little blood associated with them.  However, he also repeatedly testified that he would not have expected there would have been much blood even if they had been inflicted premortem.  The jury could reasonably have inferred, given the nonlethal and nonaccidental stab wound to the victim's shoulder, that the wounds to her chest were inflicted while she was still alive.  The substantial evidence standard of review requires that we draw this inference, and all other favorable inferences that are supportive of the jury's special circumstance finding.  (*Streeter, supra,* 54 Cal.4th at p. 241.)

[18]     Hajek's sufficiency of the evidence claim appears to incorporate a challenge to the prosecutor's characterization of the victim's injuries in closing argument.  To that extent, the claim is one of prosecutorial misconduct that has been forfeited by the failure to object to the prosecutor's remarks at trial.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)

cannot agree with Hajek that the wounds left by the various acts of striking, stabbing, puncturing, and strangling this frail, defenseless, and isolated victim were not sufficiently extreme to support the inference of an intent to cause her severe pain and suffering, when considered in light of the totality of the circumstances — including defendants' express sadistic plan. (See *Bemore*, *supra*, 22 Cal.4th at pp. 841-842; *Crittenden, supra,* 9 Cal.4th at p. 141.)

Vo argues separately that the evidence is insufficient as to him because there was no evidence that he himself killed or tortured the victim, or that he intended to participate in the killing or the torture. At trial, Vo testified he tagged along with Hajek that day out of friendship, without any knowledge of Hajek's plan to murder Ellen's family and then Ellen. There was, however, substantial evidence casting grave doubt on his credibility.

First, the prosecution's case included letters that Vo had written to Lori Nguyen. These letters, which revealed Vo's unrequited love for Nguyen, provided substantial evidence that Vo had his own independent motive to seek revenge on Ellen: He could impress Nguyen with how much he loved her.

Second, Vo had to have known about the altercation between Nguyen, Hajek, and Ellen, because Vo was at Hajek's house the night of its occurrence and had heard Hajek and Ellen exchanging angry phone calls. Moreover, Hajek had told Moriarty, who was scarcely more than an acquaintance of his, that because of this altercation he planned to kill the family of the girl involved (Ellen), and then the girl herself. From these two circumstances the jury could reasonably have concluded it inconceivable that Hajek would not similarly have confided his sadistic and murderous plan to Vo, one of his best friends, whom he enlisted to carry out the plan.

50

Third, the evidence did not show that Vo passively followed Hajek in the activities leading up to the murder. To the contrary, the evidence established that Vo was an active participant who often took the lead in executing the plan. It was Vo who tied up Su Hung, Vo who threatened Cary with a knife, and Vo who told Cary he wanted to teach Ellen a lesson. When Ellen did not come home as anticipated and time was passing, Vo became impatient and forced Cary to go out on a search for Ellen to bring her home, presumably so that the killing could begin.

Finally, all the evidence is consistent with a conclusion that Vo actively participated in the torture of Su Hung. The evidence established that each defendant went several times to the bedroom where the victim was being held in isolation. Thus, Vo was as likely as Hajek to have inflicted some or all of the victim's nonlethal and lethal wounds. Because Vo was the only defendant seen possessing and using a knife, the jury could reasonably have concluded that Vo inflicted the shoulder stabbing, chest punctures, and throat slashing. Although Vo points to the minute amounts of the victim's blood on Hajek's glove and coat as evidence that Hajek, not Vo, killed Su Hung, such evidence did not foreclose a conclusion that Vo tortured or killed the victim. Indeed, there was evidence that a second pair of gloves, presumably Vo's, was found on the kitchen table.[19] Additionally, a knife that later tested positive for blood was found lying over a puddle of water in the kitchen sink, although it could not be determined whether the blood was human or animal, fresh or old. On this record, the jury could reasonably have accepted the prosecution's theory that Vo removed his gloves to use the knife on the victim and then washed both his hands and the knife in the

---

[19]     Although Cary had seen Vo wearing gloves when he held a knife to her throat, Tony testified that Vo was not wearing gloves later on when Vo gagged and threatened to kill Tony in the upstairs room.

kitchen sink. Thus, while it is plausible that Hajek used the knife on Su Hung, it is just as plausible that both of them, or perhaps only Vo, did so.

In any event, even if Vo did not personally inflict the lethal and nonlethal wounds on Su Hung, there was substantial evidence showing that Vo shared Hajek's torturous intent and aided and abetted the commission of torture murder. Considering all the evidence in the light most favorable to the judgment, and presuming the existence of every fact the jury could reasonably deduce from the evidence, we conclude the jury could reasonably have found that Vo shared the intent to torture and murder the victim.

In sum, we find that the totality of the circumstances of the crime amply demonstrated an intent to torture, and that substantial evidence supports the torture murder convictions and torture-murder special-circumstance findings as to both defendants. (*Streeter, supra,* 54 Cal.4th at p. 246 [where evidence supports first degree murder conviction on torture-murder theory it also supports a finding of torturous intent for purpose of the torture-murder special-circumstance allegation].)

Furthermore, and in any event, ample evidence supports both defendants' first degree murder convictions on a deliberate and premeditated murder theory. Defendants arrived at the Wang residence in furtherance of their plan to exact revenge on Ellen. The circumstances of the murder, including the evidence of defendants' planning, motive, and the manner of killing, indicate it was conduct undertaken with "preexisting thought and reflection" and was not the result of "an unconsidered rash impulse." (*Houston*, *supra*, 54 Cal.4th at p. 1216 [planning,

52

motive, and manner of killing are relevant to resolving issue of premeditation and deliberation].)[20]

### c. *Attempted murder*

Defendants challenge the denial of their section 1118.1 motions for acquittal of the attempted murder counts involving Cary, Alice, Tony, and Ellen. They also contend the evidence is insufficient to support their convictions on these counts. Although we may look to the entire record to evaluate the latter contention, we find we may dispose of both contentions by reviewing the evidence adduced in the prosecution's case-in-chief.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.' [Citations.] [¶] . . . [T]he line between mere preparation and conduct satisfying the act element of attempt often is difficult to determine; the problem 'is a question of degree and depends upon the facts and circumstances of a particular case.' [Citation.] The act that goes 'beyond mere preparation' need not constitute an element of the target crime [citation], and it ' "need not be the ultimate step toward the consummation of the design." ' [Citation.] Instead, ' "it is sufficient if [the conduct] is the first or some subsequent act directed towards that end after the preparations are made." ' [Citation.] In other words, we have explained, the act must represent ' "some

---

[20] Having concluded that substantial evidence supports defendants' first degree murder convictions on torture-murder and premeditated murder theories, we need not, and do not, address whether substantial evidence supports defendants' first degree murder convictions on a burglary-murder or robbery-murder theory.

appreciable fragment of the crime." ' [Citations.]" (*People v. Watkins, supra*, 55 Cal.4th at p. 1021.) For the reasons below, we find substantial evidence of defendants' attempt to murder Cary, Alice, Tony, and Ellen.

The evidence presented in the prosecution's case-in-chief included the following. Hajek told Moriarty he planned to kill Ellen and her family in retaliation for his altercation with Ellen, and to make the crime appear like a robbery. Although Vo did not participate in this conversation, the evidence showed that Vo was present at Hajek's house with Nguyen when Hajek and Ellen were exchanging hostile phone calls later that evening, and that Vo also had an unrequited romantic interest in Nguyen. The evidence also showed that Vo and Hajek were good friends and that they acted in concert the day of the crimes. That morning, defendants drove a stolen van and parked it some distance from the Wang residence. Wearing gloves and armed with a pellet gun, they gained entrance to the Wang residence. Hajek pointed the gun at Alice, and Vo bound and blindfolded Su Hung and isolated her by moving her to an upstairs room. Over the course of several hours, defendants, either jointly or individually, held four members of the Wang family hostage; accosted the family members with weapons and threatened to kill them; went out in search of Ellen, presumably to force her home and start the planned killings; refused to negotiate with Cary or Tony, but insisted on waiting for Ellen; bound and gagged Tony in an upstairs room, just as they had his mother-in-law; and killed Su Hung. Defendants also ransacked the house, inferentially in furtherance of their plan to make it appear as if a robbery had occurred. Their plot to kill Ellen and her entire family might very well have succeeded had the police not been called to intervene. On this record, there was substantial direct and circumstantial evidence that each defendant

54

harbored a specific intent to kill, that they agreed on a plan for doing so, and that each took significant steps in putting their plan into action.

Although Hajek made explicit statements concerning his murderous intent to Moriarty, he argues those statements alone cannot constitute the corpus delicti of the crime. (*People v. Ochoa* (1998) 19 Cal.4th 353, 450 [prosecution must establish the corpus delicti of the crime by evidence independent of the defendant's extrajudicial statements].) While true, this does not help him. "The independent evidence [establishing the corpus delicti of a crime] may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1181.) The same " 'slight acts' " standard applies to evidence establishing the overt acts for purposes of attempt. (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8 ["[W]e have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.' "]; see *People v. Dillon* (1983) 34 Cal.3d 441, 455; *People v. Morales* (1992) 5 Cal.App.4th 917, 926-927.) Here, the independent evidence of Hajek's actions at the Wang residence was more than sufficient to permit consideration of his statements to Moriarty regarding his intent.

Vo contends Hajek's statements to Moriarty, which were not made in Vo's presence and of which he claims no knowledge, constituted the only evidence the prosecution presented of his intent to murder Ellen and her family. That is incorrect. As indicated, there was evidence that Vo was infatuated with Nguyen and that he was aware of the altercation involving her, Hajek, and Ellen, because he was at Hajek's house during some of the hostile calls between Hajek and Ellen.

The evidence also shows that Vo went to the Wang residence with Hajek and participated fully in the criminal conduct that occurred over the course of several hours, often taking the lead. Indeed, Vo told Cary at one point he was going to teach Ellen a lesson.

From the facts and circumstances surrounding Vo's activities, a jury could reasonably have concluded that he was aware of Hajek's plan to kill all the members of the Wang family and shared Hajek's intent to do so. Under the applicable standard of review, it matters not whether the circumstances might also reasonably support a different finding. (*People v. Watkins, supra,* 55 Cal.4th at p. 1020.)

Both defendants maintain there was insufficient evidence of an act that went beyond mere preparation. We reject their claim under the " 'slight acts' " rule cited above. (*People v. Superior Court (Decker)*, *supra,* 41 Cal.4th at p. 8.) At the point defendants entered the Wang residence and took Alice and Su Hung hostage, it can fairly be said they were " ' "actually putting [their murderous] plan into action." ' " (*Id.* at p. 9; *People v. Morales, supra,* 5 Cal.App.4th at pp. 926-927.) Certainly, their subsequent conduct, up to and including the actual murder of Su Hung, reflected far more than slight acts toward commission of their plan to kill the entire Wang family.

In sum, the record contains substantial evidence of defendants' attempt to murder Cary, Alice, Tony, and Ellen.

### d. Hajek's firearm use enhancements

Pursuant to former section 12022.5, subdivision (a), counts 1 through 9 of the information alleged that Hajek personally used a firearm, "to wit: [a] PELLET GUN," in the commission of the offenses. The jury found these allegations true, and Hajek was sentenced to five years on each of the enhancements for counts 1

through 9. Hajek contends that a change in the law excluding pellet guns from the definition of a firearm requires that we vacate or strike these nine firearm use enhancements. We agree in part.

Former section 12022.5 was part of part 4, title 2 of the Penal Code pertaining to control of deadly weapons. Prior to 1991, the definition of "firearm" for purposes of former section 12022.5 was set forth in sections 12001 and 12001.1, and section 12001.1 at the time included pellet guns within its definition. (Former § 12001.1, added by Stats. 1988, ch. 1605, § 3, p. 5821.) In 1991, the Legislature repealed section 12001.1 (Stats. 1991, ch. 950, § 4, p. 4324) and amended section 12001 (Stats. 1991, ch. 955, § 1.1, p. 4451). As amended in 1991, section 12001 did not include pellet guns within the definition of "firearm" for purposes of any title 2 enhancement. (§ 12001, subd. (b), added by Stats. 1991, ch. 955, § 1.1, p. 4451.) The only reference to pellet guns was in subdivision (g) of section 12001, which expanded the definition of "firearm" for purposes of prohibiting the sale of firearms to minors.

In *People v. Vasquez* (1992) 7 Cal.App.4th 763 (*Vasquez*), a jury had convicted the defendant of four counts of robbery, with enhancements for being armed with a firearm and personal use of a firearm. Because the weapon that was the basis of the enhancements was a pellet gun, the defendant argued on appeal that the repeal of section 12001.1 and the amendment of section 12001 required reversal of the enhancement findings. The Court of Appeal agreed: "Application of this new statutory definition for 'firearm,' or restricted definition, to Vasquez's crimes committed before its operative date (Jan. 1, 1992) changes the legal consequences of his criminal conduct. [Citation.] Such application is permissible because the restricted definition generally favors defendants. [Citation.]"

57

(*Vasquez,* at p. 767.)  Accordingly, the court reversed the true findings of all the firearm enhancements.  (*Id.* at p. 769.)

The *Vasquez* court relied heavily on the rule articulated in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), which established an exception to the general rule that no part of the Penal Code is retroactive.  (§ 3 [no part of the Penal Code is retroactive "unless expressly so declared"]; see *Vasquez, supra,* 7 Cal.App.4th at pp. 767-769.)  In *Estrada*, we held that "where [an] amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed."  (*Estrada*, at p. 748.)

As we recently explained, *Estrada* represents "an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively:  When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date. [Citation.]  We based this conclusion on the premise that ' "[*a*] *legislative mitigation of the penalty for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law." '  [Citation.]  ' "Nothing is to be gained," ' we reasoned, ' "by imposing the more severe penalty after such a pronouncement . . . other than to satisfy a desire for vengeance" ' [citation] — a motive we were unwilling to attribute to the Legislature."  (*People v. Brown* (2012) 54 Cal.4th 314, 323 (*Brown*).)

Importantly, however, while acknowledging the continuing viability of the *Estrada* rule, we have emphasized its narrowness:  "Applied broadly and literally,

58

*Estrada*'s remarks about section 3 would . . . endanger the default rule of prospective operation.  Recognizing this in *Evangelatos* [*v. Superior Court* (1988) 44 Cal.3d 1188], we declined to follow *Estrada*'s remarks about section 3 and held that 'language in *Estrada* . . . should not be interpreted as modifying this well-established legislatively-mandated principle.'  [Citation.]  Accordingly, *Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments.  [Citation.]" (*Brown*, *supra*, 54 Cal.4th at p. 324.)

We agree that, thus understood, *Vasquez* properly applied the *Estrada* rule to the 1991 repeal of section 12001.1 and amendment of section 12001.  Consistent with *Vasquez*, we conclude that, because Hajek's judgment was not yet final at the time of the legislative action, his firearm use enhancements involving the use of a pellet gun must be struck.

That, however, does not end the discussion.  In *People v. Schaefer* (1993) 18 Cal.App.4th 950, the same division of the Court of Appeal that decided *Vasquez* was confronted by a similarly situated defendant who also sought reversal of true findings of firearm use enhancements because he, too, had been armed with a pellet gun when committing the crimes.  *Schaefer* agreed the defendant was entitled to the benefit of *Vasquez*, but went on to conclude that "*Vasquez* [did] not eliminate the law holding a pellet gun to be a deadly or dangerous weapon within the meaning of Penal Code section 12022, subdivision (b).  [Citation.]" (*Schaefer*, at p. 951.)  Reasoning that the defendant's admission of the firearm use enhancements (former § 12022.5) necessarily included his admission of deadly or

dangerous weapon enhancements (former § 12022, subd. (b) (former section 12022(b)), *Schaefer* struck the former enhancements and replaced them with enhancements under the latter statute, resulting in a reduced sentence. (*Schaefer*, at p. 951.)

Like the defendant's admissions in *Schaefer*, the jury's true findings on the firearm use enhancements (former § 12022.5, subd. (a)) necessarily included true findings on deadly or dangerous weapon use enhancements (former § 12022(b)). Consistent with *Schaefer*, we order that Hajek's firearm use enhancements be struck and replaced with deadly or dangerous weapon use enhancements.

### e. Vo's knife use enhancements

The amended information alleged that Vo used a deadly weapon, to wit, a knife, in the commission of the attempted murders of Cary, Alice, Tony, and Ellen (counts 2 through 5), the kidnapping of Cary (count 6), and the false imprisonment of Tony (count 9). (Former § 12022(b).) The jury found these allegations true. Vo contends the evidence was insufficient to support the knife use allegations and findings.

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "The question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the elements of the underlying enhancement beyond a reasonable doubt." (*People v. Alvarez* (1996) 14 Cal.4th 155, 225.)

At the time of Vo's crimes, former section 12022(b) provided: "Any person who personally uses a deadly or dangerous weapon in the commission or

attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, unless use of a deadly or dangerous weapon is an element of the offense of which he or she was convicted." (Stats. 1989, ch. 1284, § 2, p. 5058.) This provision represents a legislative judgment that the use of a deadly or dangerous weapon in the commission of some felonies "justifies an additional penalty to that prescribed for the underlying felonies." (*People v. Wims* (1995) 10 Cal.4th 293, 305.) "In order to find 'true' a section 12022(b) allegation, a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself intentionally displayed in a menacing manner or struck someone with an instrument capable of inflicting great bodily injury or death. [Citations.]" (*Id*. at p. 302.)

In determining whether there was substantial evidence of Vo's knife use, we may properly consult cases construing the term "uses" in other enhancement statutes under " 'The Dangerous Weapons' Control Law.' " (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1006.) Hence, we may rely on cases construing the term as it is understood for purposes of section 12022.5, which addresses personal use of a firearm in the commission or attempted commission of a felony. (*People v. James* (1989) 208 Cal.App.3d 1155, 1163; see *People v. Wilson*, *supra*, 44 Cal.4th at pp. 806-807 [construing "uses" in former § 12022.5, subd. (a)]; *People v. Granado* (1996) 49 Cal.App.4th 317, 325 [same] (*Granado*).) As we have recognized in the context of former section 12022.5, subdivision (a), " 'The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' [Citation.] 'Thus when a defendant deliberately shows a gun, or otherwise makes its presence

known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure.' " (*People v. Wilson, supra,* 44 Cal.4th at pp. 806-807, quoting *Granado, supra*, 49 Cal.App.4th at p. 325.)

In *Granado*, the Court of Appeal, applying these principles, upheld a firearm use enhancement as to a victim who was not aware the defendant was armed and did not see the firearm. The defendant and another man confronted the two victims, Walter and Wilfredo Calderon, on the street and demanded money from them. Defendant took a gun from his waistband, which Walter saw, but Wilfredo fled without apparently having seen the gun. (*Granado, supra,* 49 Cal.App.4th at pp. 320-321.) On appeal, the defendant argued that the firearm use enhancement as to Wilfredo should be set aside because the evidence did not show that Wilfredo was aware the defendant was armed with a gun. In a thoughtful opinion, the Court of Appeal rejected the argument. As the court pointed out, the underlying purpose of the firearm use statute is to deter defendants from using a firearm. "At its core the statute addresses the pervasive and inherent escalation of danger which arises from the *defendant's act* of deployment. By merely bringing a gun 'into play,' the defendant removes impediments to its actual discharge and thus enhances the danger of violent injury not only through an intentional act by the victim or a third party, but through an impulsive or inadvertent act by the defendant." (*Id.* at p. 327.) In light of this purpose, the court reasoned, "[t]o excuse the defendant from this consequence merely because the victim lacked actual knowledge of the gun's deployment would limit the statute's deterrent effect for little if any discernible reason." (*Ibid.*) We find this reasoning equally

62

applicable in the context of deadly or dangerous weapon use enhancements under former section 12022(b).

Vo contends that, "[a]side from the one brief period" when he held a knife "near" Cary before putting it away, there was no other evidence he was seen in possession of, or using, a knife. We disagree. Applying the principles articulated above, we find substantial evidence of Vo's knife use as to all victims.

The prosecution's case-in-chief included the following evidence. The police discovered two knives in the stolen van in which defendants arrived at the Wang residence, showing that defendants apparently contemplated, from the beginning, use of a knife to carry out their plan to kill Ellen and her family. The murder victim's throat had been slashed by a "sharp bladed instrument" that the coroner believed was a knife, and her shoulder and chest also disclosed several nonlethal injuries inflicted by a knife. Thus, it was clear that defendants' arsenal anticipated knife use, and a knife was indeed used in committing the crimes.

Turning specifically to Vo's knife use, Alice testified she watched Vo arm himself with a knife and hide in the bathroom. Then, when Cary entered the house, Vo deliberately held the knife to Cary's throat. According to Cary's testimony, Alice told her not to scream so that Vo would not hurt them. This sufficiently established Vo's use of the knife not only against Cary, but also against Alice.

Regarding Tony, Alice warned him that defendants had a knife as well as guns. Alice's remark was clearly based on her observation of Vo's open use of the knife on her mother. Thus, Vo's knife use against Cary and Alice had the additional direct effect of instilling fear in Tony and securing his compliance when, later, defendants tied him up and took him upstairs. This evidence was sufficient to establish knife use against Tony. (See *People v. Wilson, supra,* 44

63

Cal.4th at p. 807 [firearm use need not be strictly contemporaneous with the base felony; " '[A] jury could reasonably conclude that although defendant's presence with the victims was sporadic, the control and fear created by his initial firearm display continued throughout the encounter.' "].)

The jury also found true the knife use enhancement in connection with the attempted murder count involving Ellen, even though Ellen was not present at the Wang residence. Just as the fortuity of Ellen's absence does not lessen Vo's culpability for attempted murder, given the substantial evidence of his intent to kill and his commission of an overt act, neither does such fortuity render insufficient the evidence supporting the knife enhancement on this count. From the outset, defendants were evidently prepared to use knives to murder Ellen and her family. They did, in fact, use a knife to kill Su Hung. As was true in *Granado*, where one of the victims was not aware the defendant was armed, to excuse Vo from the consequence of his knife use merely because Ellen lacked actual knowledge of the knife's deployment "would limit the statute's deterrent effect for little if any discernible reason." (*Granado*, *supra*, 49 Cal.App.4th at p. 327.)

In sum, Vo's intentional use and display of a knife to intimidate and control the victims who either saw the knife (Cary and Alice) or were made aware of its use (Tony) facilitated defendants' plan to murder the entire Wang family, including Ellen. Accordingly, we conclude the trial court did not abuse its discretion in refusing to grant a directed verdict of acquittal on the knife use allegations and that sufficient evidence supports all the knife use enhancements under former section 12022(b).

64

## 2. *Use of Uncharged Conspiracy as Theory of Liability*

Although defendants were not charged with the substantive offense of conspiracy, the prosecutor used conspiracy as a theory of derivative liability. Defendants challenge the use of uncharged conspiracy for this purpose.

The Attorney General contends the claim is forfeited because neither defendant objected to the prosecutor's use of uncharged conspiracy as a theory of liability. Both defendants had objected to the trial court's giving of conspiracy instructions, but their contention was limited to the perceived insufficiency of evidence of a conspiracy and did not assert the theory was legally impermissible. Nonetheless, even assuming the claim has been preserved, its substance is meritless.

"Conspiracy principles are often properly utilized in cases wherein the crime of conspiracy is not charged in the indictment or information. In some cases, for example, resort is had to such principles in order to render admissible against one defendant the statements of another defendant. [Citations.] In others evidence of conspiracy is relevant to show identity through the existence of a common plan or design. [Citation.] In still others the prosecution properly seeks to show through the existence of conspiracy that a defendant who was not the direct perpetrator of the criminal offense charged aided and abetted in its commission. [Citations.]" (*People v. Durham* (1969) 70 Cal.2d 171, 180-181, fn. 7.)

Conspiracy can itself be the basis of derivative liability quite apart from aiding and abetting principles. "It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] 'Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which

65

are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations].' [Citation.]" (*People v. Belmontes* (1988) 45 Cal.3d 744, 788-789.) Contrary to Hajek's assertion, use of an uncharged conspiracy does not violate state law, even though the statutory definition of "principals" set forth in section 31 does not include conspirators. (*People v. Valdez* (2012) 55 Cal.4th 82, 149-150 (*Valdez*).)

In *Valdez*, the defendant argued that the use of an uncharged conspiracy creates a constitutionally impermissible conclusive presumption " 'that a person who engages in an uncharged conspiracy to commit a substantive offense is guilty of the substantive offense later committed by others.' " (*Valdez, supra,* 55 Cal.4th at p. 150.) We disagreed: " '[L]ike aiding and abetting, conspiracy (as used here) is itself a *theory of liability*. . . . The instructions given here did not tell the jury that it could presume any particular element of murder, including intent, based on proof of predicate facts. Instead, the instructions specified that, as an *alternative* to finding, based on the elements of murder, that [defendant] himself committed or aided in the crime, it could find him responsible for the crime based on his participation in a conspiracy to commit murder. This correctly stated the law concerning conspiracy as an alternative theory of liability. [Citations.] Accordingly, there was no error.' " (*Ibid*.) Hajek advances the same claim, and, for the reasons stated in *Valdez*, we again reject it.

Both defendants also contend the use of an uncharged conspiracy violated due process by depriving them of notice of the charges against them. Assuming, without deciding, the claim is not forfeited, it is meritless. " 'Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by

surprise by evidence offered at his trial.' " (*People v. Seaton* (2001) 26 Cal.4th 598, 640-641.) Defendants here were so advised.

By the time the trial began, defendants were well aware the prosecutor intended to proceed on a conspiracy theory to establish derivative liability. For example, in opposing Vo's motion to suppress evidence removed during a search of his locker, the prosecutor argued that the evidence consisting of writings by Vo and Nguyen was relevant to establish motive and a conspiracy. At the hearing on the motion, the prosecutor repeatedly referred to conspiracy as a basis for the admission of those documents. Additionally, defendants' objections to the admission of Hajek's letters to Vo questioned whether such letters were relevant to the prosecutor's conspiracy theory. On this record, defendants cannot plausibly maintain that they were surprised or unaware of this theory or unable to prepare to defend against it. (See *People v. Pike* (1962) 58 Cal.2d 70, 88-89 [no "element of surprise or unfairness" where, before trial began, defendant was "well aware" that "the case against him was based on theories of conspiracy and aiding and abetting"].)

Vo argues the prosecutor "used his expansive conspiracy theory as a substitute for evidence of" Vo's guilt. This merely repeats his sufficiency of the evidence claims, which we have already addressed and rejected. (See *ante*, pt. II.B.1.) Vo also argues that use of the conspiracy theory permitted the admission of improper evidence against him. This is, in part, a rehash of the severance claim, which we have also already addressed and rejected. (See *ante*, pt. II.A.1.) To the extent it challenges the admission of particular pieces of evidence, we take up those challenges below. (See *post*, pt. II.B.3.)

Vo asserts the trial court erred by admitting evidence of a conspiracy without first making a finding regarding the existence and the scope of such

conspiracy. Because Vo's trial counsel neither requested such a preliminary finding nor pressed the prosecution for an offer of proof, the claim is forfeited. Certainly, the prosecution was entitled to present evidence to establish the elements of conspiracy without first seeking leave of court, subject, of course, to the evidentiary rules governing admissibility. (Cf. *People v. Belmontes, supra,* 45 Cal.3d at p. 789 ["There being evidence supportive of all the elements of a conspiracy, the People were entitled to proceed on that alternative theory of liability."].) Vo's claim is really no more than a reprise of his sufficiency argument, addressed above, and his assertion, addressed below, that certain evidence was improperly admitted against him.

Vo also argues his due process rights were violated because the prosecution was not required to prove either the existence or the scope of the uncharged conspiracy beyond a reasonable doubt. Again, his quarrel is with the sufficiency of the evidence and the admissibility of certain evidence against him. Even taking his claim at face value, it is without merit.

In *Valdez*, the defendant similarly argued it was error for the trial court to have failed to instruct the jury that, to convict the defendant of murder based on conspiracy, under a theory of derivative liability, it must unanimously agree as to the existence and scope of the conspiracy and the defendant's participation therein beyond a reasonable doubt. We rejected the claim. (*Valdez, supra,* 55 Cal.4th at p. 153.) "Under our prior decisions, '[i]t is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, [the jurors] need not decide unanimously by which theory he is guilty. [Citations.]' [Citation.] 'Not only is there no unanimity requirement as to the theory of guilt, *the individual jurors themselves need not choose among the theories,* so long as each is convinced of guilt.' [Citation.]"

68

(*Ibid*.) We applied these principles to an uncharged conspiracy when used "as an alternative theory of liability for the charged, substantive crime of murder." (*Id.* at p. 154.) Because the jurors need not unanimously agree on the theory of a defendant's guilt, a court may discharge its obligations by instructing on the elements of conspiracy and the prosecution's burden to prove the defendant's guilt of murder beyond a reasonable doubt. That is what the court did here.

Accordingly, we reject defendants' claim that the prosecution's use of an uncharged conspiracy as a basis of derivative liability was impermissible. We address defendants' challenges to the conspiracy instructions below. (See *post*, pt. II.B.4.d.)

### 3. Evidentiary Issues

#### a. Moriarty's conversation with Hajek

Moriarty testified that Hajek called her the night before the murder. He talked about the altercation he and Nguyen had had with an unnamed girl and his fight with her a few days earlier. He also spoke of his plan to get revenge by going to the girl's home, killing her family in front of her, and then killing her, while making his attack look like a robbery. Initially, Moriarty testified that in speaking of his plan, Hajek used the word "I," implying only he would do these things. However, she acknowledged she had told police that Hajek talked about going to the victim's house with two or three others, and had so testified at the preliminary hearing. On cross-examination by Vo's attorney, she clarified that when Hajek spoke of entering the house and killing the girl and her family, he spoke only of himself and not of anyone else. She again acknowledged she had indicated to police and at the preliminary hearing that Hajek had referred to unnamed others in carrying out the plan, but added she did not remember using the words attributed to her in the police interview.

69

Vo argues that admission of Moriarty's testimony violated his confrontation rights under *Crawford v. Washington* (2004) 541 U.S. 36 and that it also violated the *Aranda/Bruton* rule. His claims are meritless.

In *Crawford*, the United States Supreme Court held that "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford v. Washington*, *supra*, 541 U.S. at p. 59, fn. omitted; *Williams v. Illinois* (2012) ___ U.S ___ [132 S.Ct. 2221, 2232].) Hajek's conversation with Moriarty cannot be deemed testimonial within the meaning of *Crawford* because it was not a conversation involving an agent of the police.

The *Aranda/Bruton* argument fares no better. "The *Aranda/Bruton* rule addresses the situation in which 'an out-of-court confession of one defendant . . . incriminates not only that defendant but another defendant *jointly charged*.' [Citation.] 'The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is "powerfully incriminating" as to a second defendant when determining the latter's guilt, admission of such a confession *at a joint trial* generally violates the confrontation rights of the nondeclarant.' " (*People v. Brown* (2003) 31 Cal.4th 518, 537.) In this case, however, Hajek's statements to Moriarty were not "powerfully incriminating" as to Vo. Instead, they reflected vague statements about unnamed individuals whom Hajek might enlist in an event that had not yet occurred.

### b. Defendants' jailhouse conversation

After defendants were arrested and taken into custody, they were placed into a room together and their conversation was secretly tape-recorded. The prosecution prepared a transcript of the recording. Prior to trial, counsel for both defendants objected to admission of both the tape and the transcript on the ground

70

that the tape was inaudible and the transcript misleading. Hajek argued the tape's inaudibility rendered it irrelevant and inadmissible under Evidence Code section 352. Hajek added that if the court were inclined to admit the tape, it should admit only the tape and not the transcript. Vo argued that providing the jury with so inaudible a tape would lead to speculation. The trial court ruled the tape admissible, but not the transcript, because the latter was misleading.

Before the tape was played, both defense counsel stipulated that the court reporter need not transcribe it. Detective Walter Robinson authenticated the tape. Robinson acknowledged the overall quality of the tape was "fairly poor," noting that a "good deal" of defendants' conversation was whispered and that parts of the tape were inaudible and unintelligible. He testified further that "maybe 50 to 75 percent" of the conversation could be heard on the tape. He identified the defendants' two voices and acknowledged that, in general, Hajek spoke at a normal level, while Vo whispered.

During guilt phase deliberations, the jury requested a transcript of the conversation, which the court denied because the transcript was not in evidence. At the hearing on defendants' motion for a new trial, one of the jurors testified the jury listened to the tape during guilt phase deliberations "on a very poor tape recorder." During the penalty phase, the jurors listened to the tape on a different tape player.

Hajek argues that admission of the tape constituted an abuse of discretion, because its poor quality rendered it unreliable, irrelevant or, if relevant, more prejudicial than probative. (Evid. Code, §§ 210, 350, 352.) He also maintains that its admission violated his federal constitutional rights to due process and heightened reliability in capital cases. As support, Hajek cites the trial court's exclusion of the transcript prepared by the prosecution. He also relies on two

71

jurors' testimony at the hearing on defendants' new trial motions that during penalty phase deliberations some jurors heard statements that Hajek contends were not on the tape.

Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Of course, a trial court may "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) Questions regarding the admissibility of evidence are committed to the trial court's sound discretion. (*People v. Homick, supra,* 55 Cal.4th at p. 859.)

"[A] tape recording may be admissible even if substantial portions of it are unintelligible." (*People v. Siripongs* (1988) 45 Cal.3d 548, 574.) In light of the broad statutory definition of relevance, and the considerable discretion the trial court exercises in passing on questions of admissibility, we agree with *People v. Polk* (1996) 47 Cal.App.4th 944 that " ' "[t]o be admissible, tape recordings need not be completely intelligible for the entire conversation as long as enough is intelligible to be relevant without creating an inference of speculation or unfairness." [Citations.]' [Citation.] [¶] Thus, a partially unintelligible tape is admissible unless the audible portions of the tape are so incomplete the tape's relevance is destroyed." (*Id.* at p. 952.)

Our review of the tape confirms Detective Robinson's testimony that it is generally of poor quality and that much of the conversation is whispered and therefore inaudible or unintelligible. Nonetheless, we cannot conclude the quality of the tape is so compromised as to be rendered completely irrelevant. Those

portions of the tape that are audible contain information generally corroborative of the prosecution's guilt phase case, mostly through Hajek's words. For example, Hajek states that he would have continued to flee from police had he not heard the officer who was pursuing him prepare to fire his gun. Hajek also refers to the fact that the victim was strangled and then had her throat slashed. Hajek talks about having seen Ellen at the jail and expresses his anger at her.

Hajek's intention to flee the scene, his knowledge of the manner in which the victim was killed, and his continuing anger toward Ellen are relevant to the issue of his guilt, because they show consciousness of guilt (flight), participation in the murder (knowledge of how the victim was killed), and support for the prosecutor's theory of his motive (anger toward Ellen.) Similarly, while both defendants discuss the charges they are likely to face (kidnapping and murder), neither one at the same time denies culpability or expresses surprise or dismay at those charges. Regarding Vo, the jury could reasonably have concluded that Vo's decision to whisper during the conversation reflected a desire not to be overheard, supporting a conclusion that he was making incriminating statements.

While the nature of the recording may have made the evidence less probative than if the entire conversation had been clearly captured, the court did not abuse its discretion in determining that the audible portions nonetheless were relevant and admissible. (*People v. Roldan, supra,* 35 Cal.4th at p. 688 ["A trial court will not be found to have abused its discretion unless it 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice.' "].) The fact that the trial court excluded the prosecutor's transcript because it deemed the transcript misleading does not suggest that the court believed the tape itself was without evidentiary value. The court's concern instead focused on the debatable accuracy of the transcript, a

concern shared by Hajek's trial counsel who, while opposing admission of either tape or transcript, preferred the tape alone be admitted. In addition, the posttrial controversy over what the jurors heard on the tape during their penalty phase deliberations has no bearing on the trial court's initial ruling since, obviously, that information was not before it. Finally, Hajek fails to demonstrate that the risk of undue prejudice posed by the recording's admission substantially outweighed its probative value, such that exclusion under Evidence Code section 352 was required. Accordingly, we conclude the trial court did not abuse its discretion in admitting the tape.

Vo also argues that admission of the tape violated the *Aranda/Bruton* rule. Because Vo failed to make any such objection below, the Attorney General correctly notes the claim is forfeited.[21] In any event, Vo fails to identify any statements on the tape that would implicate that rule. Citing section 190.9's requirement that all proceedings in capital cases be on the record, Vo additionally argues that the trial court erred by failing to direct the court reporter to transcribe the tape when it was played in court. But both defense counsel stipulated that the tape need not be transcribed, and the claim is therefore forfeited. (*Houston, supra,* 54 Cal.4th at p. 1213.) In any event, "it is sufficient [for purposes of section 190.9] that the record contains [this] recording[] and defendant had access to [it]." (*Id.* at p. 1214.)

In sum, we conclude the admission of the tape was not an abuse of discretion and did not violate defendants' constitutional rights.

---

[21] In response to the Attorney General's forfeiture argument, Vo inaccurately cites an objection he made to potential questioning by Hajek's counsel of Detective Robinson about the interview Robinson conducted with Hajek prior to the taped conversation.

*c. Hajek's alleged interest in Satanism*

Exhibit No. 64 was a letter that Hajek wrote to Vo while in custody, and it included the following remarks: "The devil made me do it! Satan [drawing of a pentangle]. I'm still trying to get a Satanic Bible in here." During his examination of Nguyen, the prosecutor asked her a series of questions about Hajek's interest in Satanism. Both Hajek and Vo objected to the prosecutor's initial question, "Did Mr. Hajek ever tell you about his interest in Satanism or Satanic things?" Hajek objected on relevance grounds, and Vo on hearsay grounds. Hajek withdrew his objection when the prosecutor argued the question was relevant to Hajek's mental state and motivation. With respect to Vo's relevance objection, the court instructed the jury, "it is a statement by Mr. Hajek and it does not flop over to Mr. Vo."

Hajek objected a second time when the prosecutor asked if Hajek was interested in Satanic rituals, and the objection — "That assumes this young woman even knows what a Satanic ritual is" — was sustained. The trial court also sustained Hajek's objection when the prosecutor asked Nguyen, "Ever hear him say he wanted to kill someone as part of his Satanic beliefs?" The court, however, overruled the objection to the prosecutor's next question, "Did he ever say he would kill the people in this case, Ellen's grandmother, for this reason?" When Nguyen answered, "No," the prosecutor moved on to other subjects. Vo joined the prosecutor in seeking to have exhibit No. 64 admitted, and the trial court admitted the letter over Hajek's objection.

On appeal, Hajek contends the admission of Nguyen's testimony and exhibit No. 64 was prejudicial error because evidence regarding Hajek's interest in Satanism was irrelevant or, if relevant, unduly prejudicial under Evidence Code section 352. He further argues that the evidence should have been barred under

Evidence Code section 1101, subdivision (a), which provides that evidence of a person's character or trait of his or her character ordinarily "is inadmissible when offered to prove his or her conduct on a specified occasion." Finally, Hajek asserts the admission of this evidence violated his Eighth Amendment interest in heightened reliability in capital cases. We reject these contentions for the reasons below.

Here, a rational jury could have viewed Hajek's statement in exhibit No. 64 — "The devil made me do it" — as an admission of guilt, contrary to his statement to police in which he denied all responsibility. It was therefore relevant and admissible on that point, and its admission was not error.

With respect to Hajek's references to Satan and the Satanic Bible, even assuming those statements should have been excluded, any error was harmless. These brief references in a lengthy letter pale in comparison with the overwhelming evidence of Hajek's guilt. As to his claim that admission of such evidence violated Evidence Code section 1101, subdivision (a), Hajek has forfeited that claim by failing to raise it at trial.

For the same reason, Hajek was not prejudiced when the trial court permitted the prosecutor to explore Hajek's interest in Satanism with Nguyen, to determine whether Hajek may have made similar remarks to her, given their close relationship both before and after the offenses. Two of Hajek's objections to specific questions by the prosecutor to Nguyen were sustained, and he withdrew another. As to the one question to which Hajek unsuccessfully objected, about whether Hajek ever told Nguyen he had killed the victim because of his interest in Satanism, Nguyen answered no, and the prosecutor moved on. Thus, despite Hajek's attempts on appeal to make it appear as if his alleged interest in Satanism

76

was a centerpiece of the prosecution's case, these references were brief and scattered.[22]

Vo contends the evidence of Hajek's interest in Satanism was bad character evidence that was admitted in violation of Evidence Code section 1101, which tarred him by association. The argument is forfeited as Vo's counsel failed to object on this ground below. (*People v. Kennedy* (2005) 36 Cal.4th 595, 612 ["When an objection is made to proposed evidence, the specific ground of the objection must be stated."].) Moreover, as to exhibit No. 64, Vo's counsel not only failed to object on any ground but joined the prosecutor in seeking to have the letter admitted. Finally, as to Nguyen's testimony, the trial court instructed the jury that that evidence applied only to Hajek and did not "flop over" to Vo. Vo complains the trial court's instruction was inadequate, but the onus was on Vo's counsel to have requested a clarifying instruction in that case and, having failed to do so, he may not complain about it on appeal. (*People v. Homick, supra,* 55 Cal.4th at p. 873.) In any event, given that the references were not prejudicial to Hajek directly, they could not have indirectly prejudiced Vo.

### d. Other crimes evidence

Over Hajek's objections, Vo was permitted to call James O'Brien and Douglas Vander Esch as part of his defense that Hajek had lost control at the crime scene and killed the victim without Vo's knowledge. O'Brien testified to an incident that occurred when he and Hajek were coworkers at a pizza parlor. At the end of their shifts, Hajek, for no apparent reason, hit O'Brien in the face, breaking his nose. Vander Esch, a correctional officer, testified that, when he declined

---

[22]    Hajek also complains that the prosecutor referred to the letter in his closing argument. Hajek failed to object to the argument, and any issue as to its propriety is forfeited. (*People v. Ledesma, supra,* 39 Cal.4th at p. 726.)

Hajek's request to talk to a sergeant, Hajek went on a rampage, destroying jail property. On appeal, Hajek contends the admission of this testimony violated Evidence Code section 1101's ban on bad character evidence and constituted an abuse of discretion under Evidence Code section 352. We reject these claims.

Hajek himself had already introduced evidence of these incidents and other criminal activity on his part in furtherance of his mental defect defense. Hajek's mother testified he was "explosive, angry" and "easily frustrated," and had been arrested for indecent exposure and separately for possession of nunchucks. Both she and Hajek's former probation officer testified that Hajek had fought with a coworker at the pizza parlor, breaking the coworker's nose. Hajek's expert witness, Dr. Minagawa, testified regarding an incident in which Hajek destroyed jail property. Indeed, in lodging her objection to Vo's intention to call O'Brien and Vander Esch, Hajek's attorney argued "the jury has heard extensive testimony [about the two incidents] and it's clear that Mr. Hajek and I are not disputing those facts."

Thus, Vo's evidence did no more than echo Hajek's defense, and it was introduced for essentially the same purpose: To show that Hajek was acting under the influence of a mental defect or disease when the crimes occurred. Accordingly, we find no error under either Evidence Code section 1101 or Evidence Code section 352.

### e. Testimony of Norman Leung

Hajek contends the trial court abused its discretion when it declined to conduct an Evidence Code section 402 hearing before permitting the prosecutor to call Norman Leung, a friend of Hajek's. He also contends Leung's testimony should have been excluded under Evidence Code section 352. We find no abuse of discretion under either provision of the Evidence Code.

78

### i. Background

The prosecutor called Leung because three of Hajek's jailhouse letters referred to Leung in a manner that, the prosecutor argued, suggested Hajek had attempted to enlist Leung into the conspiracy to kill Ellen and her family. The prosecutor argued that the letters showed the plot was formed before defendants went to the Wang residence. Both defendants objected to the admission of the letters, Hajek essentially on relevance grounds and Vo on hearsay grounds. Hajek's counsel also objected to the prosecutor's intention to call Leung to the stand because, she argued, the prosecution got "nothing" from its earlier interviews with Leung. She argued that "just by asking [Leung] were you threatened by [Hajek] . . . is inherently prejudicial." Vo's counsel similarly objected and requested that the trial court conduct an Evidence Code section 402 hearing to test the admissibility of the testimony before allowing the prosecutor to call Leung as a witness at trial. The trial court rejected the request.

Leung was called to the stand. He testified that he was a good friend of Hajek's and a friend of Vo's, and that Hajek, Vo, and Nguyen were friends with each other. Leung professed lack of memory when asked about any matter related to the crimes. In response to the prosecutor's question about whether Leung had gone into hiding after the crimes because he was afraid Hajek would harm him, Leung testified, "It may have happened . . . . I can't remember it."

### ii. Discussion

Although a prosecutor commits misconduct by intentionally eliciting *inadmissible* evidence, " ' "merely eliciting evidence is not misconduct." ' " (*People v. Mills* (2010) 48 Cal.4th 158, 199.)

Here, the prosecutor had a viable theory of the relevance and probative value of Leung's testimony, i.e., it might help establish an existing conspiracy to

kill Ellen and her family to show that Hajek attempted to recruit Leung to join that conspiracy. Hajek's objection to Leung's testimony was that he was likely to be a nonresponsive or hostile witness, based on Leung's preliminary hearing testimony and interviews with the prosecutor's investigators. Be that as it may, absent a showing that the prosecutor was operating in bad faith, the prosecutor was entitled to call the witness for whatever value he could derive from his testimony, including his demeanor on the stand. (*People v. Scott* (2011) 52 Cal.4th 452, 493 ["a witness's 'demeanor is always relevant to credibility' "]; Evid. Code, § 780, subd.(a).) In this vein, it is clear, even from the cold transcript, that the jury could reasonably doubt Leung's credibility regarding his professed lack of memory as to whether Hajek solicited him to join the conspiracy or whether he feared Hajek.

Moreover, to the extent defendants believed the prosecutor's questions regarding those topics were improper, they could have objected, but for the most part they did not. Thus, they have forfeited any complaint on appeal regarding the propriety of those questions. In sum, the record establishes that the prosecutor called a witness he believed would be helpful to his case, and that the prosecutor's questions were asked in a good faith belief that the witness had knowledge of those topics. (Cf. *People v. Pearson* (2013) 56 Cal.4th 393, 434 ["A prosecutor may not ask questions of a witness suggesting facts harmful to a defendant without a good faith belief that such facts exist."].)

Finally, the trial court did not abuse its discretion by declining to conduct an Evidence Code section 402 hearing based on defense counsels' concern that Leung would be a nonresponsive witness. (*People v. Williams* (1997) 16 Cal.4th 153, 196 [A trial court's "broad discretion" to determine the admissibility of evidence extends to "whether or not to decide [such] questions under Evidence Code section 402"].) Nor did the court abuse its discretion by declining to exclude

80

Leung's testimony under the provisions of Evidence Code section 352. (*People v. Lancaster* (2007) 41 Cal.4th 50, 83 ["courts have broad discretion to weigh the prejudicial impact of testimony against its probative value"].)

### f. Testimony of McRobin Vo

Hajek contends the trial court erroneously allowed the prosecution to question Vo's brother, McRobin Vo, about Hajek's unresponsive answers to McRobin Vo's questions regarding the crimes when he visited Hajek in jail. Hajek asserts that, in doing so, the trial court permitted the prosecutor to violate *Doyle v. Ohio* (1976) 426 U.S. 610. Hajek also asserts the testimony should have been excluded as unduly prejudicial pursuant to Evidence Code section 352. The claims are without merit.

McRobin Vo testified he had visited Hajek in jail. The prosecutor asked him if he had questioned Hajek about what happened at the Wang residence. The witness responded: "He just played it off about he didn't really want to talk about it." Hajek's attorney objected. At a hearing outside the presence of the jury, counsel explained that questions about what Hajek had told the witness were irrelevant. The prosecutor indicated he did not intend to ask any further questions about those conversations, but he was interested in the witness's "observations as to [Hajek's] mental state." The following day, before trial recommenced, Hajek's attorney lodged an additional objection on Fifth Amendment grounds and also cited Evidence Code section 352.

The Attorney General argues that Hajek has forfeited his *Doyle* claim because Hajek's counsel objected only after McRobin Vo had already testified to the statement, and she did not then move to strike that testimony. We disagree. Hajek's attorney objected to the testimony as soon as it came in. In the course of the hearing on the objection, she made *Doyle* and Evidence Code section 352

81

arguments. Although counsel raised these points the following day, after the evening recess, the discussion about the basis of this objection was ongoing, and she made these points before the prosecutor resumed his examination of McRobin Vo.

Nonetheless, the argument is without merit. "In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony. [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 203.) *Doyle* does not apply where, as here, the conversation in which the defendant was silent involved a private party "absent a showing that such conduct was an assertion of [the defendant's] rights to silence and counsel." (*People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1520.) In *People v. Medina* (1990) 51 Cal.3d 870, we held the jury could draw adverse inferences from the defendant's silence when his sister asked him why he shot the victims, because the "record [did] not suggest that defendant believed his conversation with his sister was being monitored, or that his silence was intended as an invocation of any constitutional right." (*Id.* at p. 890.)

Similarly, nothing in the record before us suggests that Hajek's refusal to discuss the crimes with McRobin Vo was intended to be an invocation of his Fifth Amendment rights. Moreover, the prosecutor "did not attempt . . . to use the comment against defendant by inviting the jury to draw any adverse inferences from the remark." (*People v. Thomas* (2012) 54 Cal.4th 908, 936.)

We also reject Hajek's assertion that admission of this brief testimony was an abuse of the trial court's discretion under Evidence Code section 352. For purposes of that statute, prejudice "means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues." (*People v.*

82

*Crew* (2003) 31 Cal.4th 822, 842.)  The brief testimony was not an abuse of discretion, prejudicial or otherwise.

#### g.  *Statements and writings by and about Hajek*

Vo contends the admission of certain writings and statements by and about Hajek violated Vo's confrontation rights under both *Crawford v. Washington, supra,* 541 U.S. 36, and the *Aranda/Bruton* rule.  His claims either have been previously disposed of, or are forfeited or meritless, or both.

#### i.  *Moriarty's testimony*

Vo repeats his assertion that Moriarty's testimony regarding her phone conversation with Hajek the night before the crimes violated Vo's confrontation rights.  We have previously considered and rejected this claim.  (See *ante*, pt. II.B.3.a.)

#### ii.  *Tape of defendants' conversation at the jail*

Vo repeats his contention that admission of the audiotaped conversation between him and Hajek violated the *Aranda/Bruton* rule.  We have previously considered and rejected this claim.  (See *ante*, pt. II.B.3.b.)

#### iii.  *Dr. Minagawa's testimony that Hajek denied killing Su Hung*

Vo repeats the argument he made in connection with his severance claim that Dr. Minagawa's penalty phase testimony that Hajek denied killing Su Hung violated the *Aranda/Bruton* rule.  We have previously considered and rejected this argument in the context of Vo's severance claim.  (See *ante*, pt. II.A.1.)

*iv. Exhibit Nos. 63, 64, 65, 72, 73, 78, and 79*

Exhibit Nos. 63, 64, 65, 72, 73, 78, and 79 are letters written by Hajek to Vo after their arrest.[23] Vo asserts the prosecution's use of these letters violated Vo's confrontation rights, citing both *Crawford v. Washington, supra,* 541 U.S. 36, and the *Aranda/Bruton* rule, because Hajek made statements incriminating Vo in the letters without being available for cross-examination.

As Vo concedes, exhibit Nos. 63 and 79 were not admitted into evidence and therefore could not have had any impact on his confrontation rights. While Vo claims the prosecutor quoted extensively from these letters, he fails to direct us to where in the record the prosecutor did so. Even if the prosecutor did quote from these letters, any claim as to the impropriety of his doing so is forfeited given Vo's failure to object. Also forfeited is Vo's objection to the admission of exhibit No. 64. Indeed, as noted, Vo joined the prosecutor in urging that the letter be admitted against Hajek. When the court admitted it against both defendants, Vo did not object.

Vo asserts he did object to the admission of page 3 of exhibit No. 65 and exhibit Nos. 72, 73, and 78. However, Vo's counsel objected on confrontation grounds only with respect to exhibit No. 65 when he specifically invoked the *Aranda/Bruton* rule. His objections to exhibit Nos. 72, 73, and 78 were all rote and unelaborated objections on the grounds of hearsay, relevance, and Evidence Code section 352, not the confrontation clause.

Under Evidence Code section 353, subdivision (a), a reviewing court cannot grant relief on a claim that evidence was erroneously admitted unless a timely objection was made "and so stated as to make clear the specific ground of

---

[23] The letters are long and rambling. Given our conclusion that Vo has forfeited the claims he now attempts to assert, we find it unnecessary to quote the letters except as necessary to illuminate particular objections advanced by Vo.

the objection or motion." " 'What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' " (*People v. Geier* (2007) 41 Cal.4th 555, 609.) By failing to comply with the statutory mandate of a timely and *specific* objection, Vo has forfeited his confrontation claim with respect to exhibit Nos. 72, 73, and 78.

Even if he had not, we would conclude there was no violation of his confrontation clause rights under *Crawford*. Private communications between inmates are not testimonial, and their admission would not violate the principle laid down in *Crawford* that bars the use at trial of testimonial out-of-court statements as to which no opportunity for cross-examination was afforded. (*Crawford v. Washington*, *supra*, 541 U.S. at p. 68; see *U.S. v. Pelletier* (1st Cir. 2011) 666 F.3d 1, 9 [in-custody inmate conversations were not testimonial because "[t]hey were made not under formal circumstances, but rather to a fellow inmate with a shared history, under circumstances that did not portend their use at trial"].) Because "the confrontation clause is concerned *solely* with hearsay statements that are testimonial" (*People v. Cage* (2007) 40 Cal.4th 965, 981), and the letters are not testimonial, Vo's rights under *Crawford* were not implicated by their admission.

Moreover, even if Vo's *Aranda/Bruton* claim was preserved, any error, assuming error, would be harmless. Amid Hajek's ramblings in exhibit No. 65, he writes that he and Vo are "terrorists" and that "we are going to get away with this." In the first paragraph of exhibit No. 72, Hajek muses about the elements of attempted murder, drawing a distinction between "intent" and "preparation." He writes: "So if anyone was going to kill the Wangs, they were only preparing to do

85

so." He writes further: "And if my <u>main</u> goal was to kill Ellen, there was no way we could do any act towards killing the family. Specially since I had (supposedly) said to (Tevya) that we were going to wait [until] we had everybody — then kill. Ellen was supposed to be last. So that means that we were only preparing to kill everyone. So that means we can't be convicted of attempted murder! Sound good to you?' In exhibit No. 73, in the context of complaining about his lawyer, Hajek writes, "And what do you mean tagged along and Boom in jail? I won't say anymore. As for the case — WE ARE DOOMED." In exhibit No. 78, Hajek writes, "The D.A. is supposed to have a peice [*sic*] of evidence that is a for sure that we planned to go over there," and suggests the source of that evidence is "Bucket" (Leung).

As noted, *Aranda/Bruton* error is scrutinized under the *Chapman* harmless beyond a reasonable doubt standard. (*People v. Burney* (2009) 47 Cal.4th 203, 232.) This standard " ' " requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question as revealed in the record." ' " (*People v. Pearson*, *supra*, 56 Cal.4th at p. 463.)

For the most part, Hajek's statements, rather than "expressly incrimina[ting]" Vo (*Lewis, supra,* 43 Cal.4th at p. 456), are ambiguous. They can be viewed as setting forth Hajek's understanding of the legal and evidentiary case that is being prepared against them rather than as admissions that defendants committed the crimes. Hajek's statements about the attempted murder charges are carefully cast in hypothetical language, his statement about being doomed appears to refer to asserted deficiencies in his lawyer's representation and his reference to

86

the prosecutor's evidence is speculation on his part.  While we agree that certain statements in exhibit No. 65 do expressly incriminate Vo, nonetheless they were inconsequential on the issue of guilt when viewed in relation to the totality of the evidence before the jury.  Thus, even assuming admission of those statements constituted *Aranda/Bruton* error, such error was harmless under the applicable *Chapman* standard.

### h.  Crime scene and autopsy photographs

Vo, joined by Hajek, contends the trial court abused its discretion by admitting crime scene and autopsy photographs of the murder victim.  We reject the claim.  " ' "The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion.  [Citation.] 'A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' " ' " (*People v. Mills, supra,* 48 Cal.4th at p. 191.)  In this case, where torture murder and torture-murder special circumstances were alleged and hotly contested, the autopsy photographs were undoubtedly relevant and probative on that issue.  The photographs were disturbing, but they were not unnecessarily so.  They "simply showed what had been done to the victim; the revulsion they induce is attributable to the acts done, not to the photographs." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1054.)  Having examined the photographs, we conclude their admission fell well within the trial court's broad discretion.

### 4.  Instructional Error

### a.  Guilt phase instructions as a whole

Hajek, joined by Vo, asserts the multiplicity of instructions given in the guilt phase were "hopelessly confusing."  The assertion does not rise to a showing

87

of error, much less reversible error. As the Attorney General points out, capital cases are frequently tried on multiple theories of liability. Absent a showing of error, " '[w]e presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' [Citation.]" (*People v. Homick, supra,* 55 Cal.4th at p. 867.)

### b. *Torture-murder special-circumstance instruction*

Hajek, joined by Vo, contends an error in the torture-murder special-circumstance instruction requires reversal. We find the error harmless under any standard.

On the torture-murder special circumstance, the jury was instructed: "To find that the special circumstance referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved: [¶] 1. *A* defendant intended to kill, or with intent to kill, aided and abetted in the killing of a human being; [¶] 2. *The* defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose; [¶] 3. The torturous acts were committed while the victim was alive; [¶] 4. *A* defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration; [¶] 5. Awareness of pain by the deceased is not a necessary element of torture." (Italics added.)

Defendants focus on the discrepancy between the use of "*A* defendant" in the first and fourth sentences of the instruction and the use of "*The* defendant" in the second sentence. (Italics added.) They contend that, as given, the instruction did not require a finding that each defendant individually intended to kill but only

88

that "a" defendant intended to kill. (*People v. Davenport* (1985) 41 Cal.3d 247, 271 [Torture-murder special circumstance requires proof of intent to kill and intent to torture the victim].) They claim, moreover, that the inconsistencies between these sentences may have confused the jury.

A somewhat similar argument was advanced in *People v. Wilson*, *supra*, 44 Cal.4th 758. In *Wilson*, a different version of the instruction was given but, as in the instruction given here, there was a similar discrepancy between the use of the phrases "A defendant" and "The defendant." In the second sentence of the instruction, the word 'The' was crossed out, and the instruction read: " '[*A*] *defendant* intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose,' " while the third sentence read, " 'The defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration.' " (*Id.* at pp. 802-803, fn. omitted.) The defendant argued that the discrepancy was critical, because there were a number of other participants in the crimes, and "[w]ithout a specific finding that he personally intended to torture the victim . . . the jury may have believed that although he may have participated in the acts of torture, only [the other participants] actually harbored the requisite intent to torture the victim." (*Id*. at p. 803.)

Preliminarily, we noted: "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson, supra,* 44 Cal.4th at p. 803.) Although we concluded that instruction was "technically erroneous," we examined the evidence and found the error harmless because, among other things, the jury had

evinced no confusion regarding the instruction, there was substantial evidence that the defendant personally harbored the intent to torture the victim, and the jury's finding regarding the other elements of the torture instruction precluded the possibility that it would not have found intent to torture. (*Id.* at p. 804.)

Here, the issue is whether the instruction properly conveyed the requirement of each defendant's having intended to kill the victim. As we did in *Wilson*, we agree that the instruction was erroneous in light of our decision in *People v. Davenport*, *supra*, 41 Cal.3d at page 271. But, as in *Wilson*, we conclude the error was harmless under any standard. (*People v. Wilson, supra,* 44 Cal.4th at p. 804.)

Hajek's statement to Moriarty that he planned to revenge himself on Ellen by killing her and her family and making it look like a robbery provided compelling evidence of intent to kill the murder victim. That both defendants intended to kill was borne out by their concerted actions. For example, defendants parked their vehicle some distance from the house, brought gloves and weapons with them, and gained uninvited access to the Wang residence. Once inside, defendants held members of the family hostage while awaiting Ellen's arrival and refused offers by Cary and Tony to negotiate. Although defendants wore gloves, presumably to avoid leaving fingerprints, they made no effort to hide their identities from the victims, suggesting they intended to leave no witness alive. The murder victim, and later Tony, were bound and isolated from the rest of their family members so as to render them maximally vulnerable and unable to resist or to call out for help. Defendants ransacked the house, evidently to give the appearance that a robbery had occurred. These actions were consistent with their agreed plan to kill Ellen and each member of her family. On this record, we find any error harmless.

Hajek contends that the prosecutor's closing argument conflated the elements of torture murder and the torture-murder special circumstance, adding to the jury's confusion about the inconsistencies in the instruction. He claims that the prosecutor attributed a causal element — the torture caused the victim's death — to the special circumstance, when causation was an element of torture murder only. He also claims the prosecutor's argument confused the jury about which charge required the intent to kill. There is no indication in the record, however, that the jurors were confused. (See *People v. Wilson, supra,* 44 Cal.4th at p. 804 ["there is no indication the jury was aware of the slight difference between the written and oral versions of the instructions, as it asked no questions about this point"].) To the extent the claim is that the prosecutor misled the jury in closing argument, Hajek's failure to object to the prosecutor's comments forfeited such claim. In any event, the prosecutor did not argue that a finding of intentional killing as to each defendant was not required to find the torture-murder special circumstance true. Moreover, Hajek's counsel clearly told the jury it "must have an intentional killing" before it could find true the torture-murder special circumstance.

In further support of his claim, Hajek cites *People v. Petznick* (2003) 114 Cal.App.4th 663. In *Petznick*, the trial court erroneously instructed the jury that it could find the torture-murder special circumstance true if it found "*a defendant*" rather than "*the defendant*" intended to torture the victim. (*Id.* at p. 686.) Although the defendant was tried alone, there were three other participants in the crime, all of whom were referred to as defendants in the instructions. The Court of Appeal concluded that, "[t]hus, the jury could easily have understood *a defendant* as referring to any one of the four participants." (*Ibid.*) It concluded the error was prejudicial because the prosecutor's argument "did not refer to the

mental state requirement for the torture-murder special circumstance . . . so we cannot say that argument might have cured the error," and "[t]he jury demonstrated its confusion on the issue of intent by its question concerning the conspiracy instructions." (*Ibid.*) Moreover, "the evidence that defendant intended to torture the victim [was not] so overwhelming as to convince us the error was harmless." (*Ibid.*)

*Petznick* is distinguishable. In the case before us, the evidence of each defendant's intent to kill was compelling. The jury demonstrated no confusion regarding the intent issue posed by the instruction, and Hajek's attorney specifically told the jury it could not find the special circumstance true absent an intentional killing. Accordingly, *Petznick* does not support a finding of prejudicial error here.

### c. Accomplice instructions

Vo testified in his own behalf, denying any knowledge of, or responsibility for, Su Hung's death. On appeal, Hajek contends the trial court should have instructed, sua sponte, with CALJIC No. 3.18, which cautions the jury that the testimony of an accomplice "should be viewed with caution." We rejected the same argument in *People v. Abilez* (2007) 41 Cal.4th 472, where, as here, a codefendant testified in his own behalf. "At the time of trial, there was no law indicating that a court must provide CALJIC No. 3.18 sua sponte when a codefendant introduces accomplice testimony, and defendant did not request such an instruction." (*Id.* at p. 519.) Hajek concedes that *Abilez* applies to this case as well but urges us to reconsider our decision. He offers no persuasive reason to do so.

### d. Conspiracy instructions

Hajek, joined by Vo, contends that the conspiracy instructions were confusing and incomplete, and thus required reversal of his conviction. Specifically, he cites as instructional error: (1) the failure to identify any overt acts; (2) the failure to properly identify the object of the conspiracy, and; (3) the failure to give CALJIC No. 6.25, a unanimity instruction. These claims are without merit.

### i. Overt act

The jury was instructed with CALJIC No. 6.10.5, which, as relevant here, requires "proof of the commission of at least one overt act" in order to find that a defendant is a member of a conspiracy. The instruction defines the term "overt act" as "any step taken or act committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a public offense and which step or act is done in furtherance of the accomplishment of the object of the conspiracy." Hajek contends the instruction was defective because it did not identify a specific overt act.[24] We have repeatedly rejected this claim. (E.g., *Valdez, supra,* 55 Cal.4th at p. 151; *People v. Prieto* (2003) 30 Cal.4th 226, 251.) Hajek offers no persuasive reason to reconsider those decisions.

### ii. Failure to properly identify the object of the conspiracy

Hajek contends the instructions may have confused the jury by failing to properly identify the object or target crimes of the conspiracy. CALJIC No. 6.10.5 as given instructed the jury that "[a] conspiracy is an agreement between two or

---

[24] The Attorney General contends that Hajek forfeited this and other claims of instructional error regarding the conspiracy instructions by failing to object to them or seek modification in the trial court. In a similar circumstance, we declined to find forfeiture given the substantial rights involved. (*Valdez, supra,* 55 Cal.4th at p. 151.)

more persons with a specific intent to agree to commit a public offense, *such as* Burglary and Murder . . . ." (Italics added.) Hajek contends the italicized phrase suggested to the jury that burglary and murder were merely illustrative of potential target crimes rather than identifying the actual target crimes at issue here. He also argues that, because CALJIC No. 6.11 told the jury it must decide whether "the crime alleged in [Count] I (*murder*) was a natural and probable consequence" of the target crimes (burglary and murder), the instruction "left the jury with the strange task of determining whether murder could be the natural and probable consequence of an agreement to commit murder." Finally, he claims the trial court erred by not giving CALJIC No. 6.25, a unanimity instruction.

In reviewing a claim of instructional error, the ultimate question is whether "there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson, supra,* 44 Cal.4th at p. 803.) "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538.) "Moreover, any theoretical possibility of confusion [may be] diminished by the parties' closing arguments . . . ." (*People v. Garceau* (1993) 6 Cal.4th 140, 189.) " ' "Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case." ' " (*People v. Carey* (2007) 41 Cal.4th 109, 130.)

Bearing these principles in mind, we reject Hajek's claim that the trial court's reference to "a public offense, *such as* Murder or Burglary" (italics added) may have led to jury to believe those offenses were only illustrative of possible target crimes. The prosecutor's closing argument focused only on these two offenses as the target crimes, thus clarifying any potential ambiguity in the

instruction. Hajek points to nothing in the record that would indicate any confusion by the jury on this point.

We also reject Hajek's claim that the jury would have been incapable of distinguishing between burglary and murder for purposes of the natural and probable consequences rule set forth in CALJIC No. 6.11. Again, the prosecutor's closing argument is relevant. After identifying burglary as a target offense of the conspiracy, the prosecutor told the jury that, pursuant to the instructions, "if a number of persons conspired together to commit a burglary and if the life of another is taken by one or more of them . . . [as] an ordinary and probable result of the pursuit of that purpose, all the co-conspirators are deemed in the law to be equally guilty of murder in the first degree." Moreover, to assume the jurors would not see the tautological conundrum of determining whether murder is a probable and natural consequence of an agreement to commit murder is to denigrate the ability of the jurors to understand and correlate the instructions.

Regarding the trial court's failure to instruct on unanimity pursuant to CALJIC No. 6.25, the short answer, as Hajek recognizes, is that it is appropriate only where "it is charged that defendant conspired to commit two or more felonies and the commission of such felonies constitute but one offense of conspiracy." (Use Note to CALJIC No. 6.25 (5th ed. 1988).) The substantive offense of conspiracy was not charged here. Conspiracy was merely one theory of liability for murder. Under such circumstances, the jury must unanimously agree that the defendant is guilty of murder, but "it need not decide unanimously by which theory he is guilty." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918.) "The key to deciding whether to give the unanimity instruction lies in considering its purpose. . . . [T]he unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not

95

'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135.) Accordingly, CALJIC No. 6.25 was not required in this case.

Vo's complaints about the conspiracy instructions reiterate his objection to the use of uncharged conspiracy as a theory of liability. Thus, he claims error because the jurors were not required to make explicit findings about the nature and the scope of the conspiracy, whether those findings were unanimous, or the quantum of proof they employed. As noted, no such findings were required in this case because conspiracy was not charged as a substantive offense.

Vo also purports to see a conflict between certain conspiracy instructions. CALJIC No. 6.15 as given informed the jurors: "No act or declaration of a conspirator that is an independent product of [his] own mind and is outside the common design and not a furtherance of that design is binding upon [his] co-conspirators, and they are not criminally liable for any such act." Vo contends that this instruction is in conflict with CALJIC Nos. 6.12 and 6.24. The former instructed the jury, in relevant part: "The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent . . . ." (CALJIC No. 6.12.) The latter instructed the jury, in pertinent part: "Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine: . . . [¶] 3. That such statement was made in furtherance of the objective of the conspiracy." (CALJIC No. 6.24.)

There is patently no conflict among these instructions. If an "act or declaration" is the "independent product of [a conspirator's] own mind," and "outside the common design," then it is clearly not to be considered as a

96

"circumstance[] tending to show the common intent," nor as a "statement . . . in furtherance of the objective of the conspiracy" under the instructions.

In sum, we reject defendants' challenges to the conspiracy instructions given here.

### e. Mental disease and defect instructions

Hajek's defense was that he suffered from a mental impairment such that he did not form the intent required for the first degree murder and attempted murder counts and the special circumstances. The court provided two instructions addressing Hajek's mental impairment defense. The first, a modification of CALJIC No. 4.21.1 addressing first degree premeditated murder, torture murder, murder by means of lying in wait, and attempted murder, informed the jury that "[i]f the evidence shows that a defendant was mentally ill, suffered from a mental disease or defect at the time of the alleged crime, you should consider that fact in determining whether or not such defendant had such mental state, in other words, whether he did in fact premeditate and deliberate. [¶] If from all the evidence you have a reasonable doubt whether the defendant had such mental state, you must find that defendant did not have such mental state." The second instruction informed the jury: "Evidence has been received regarding a mental disease, mental defect or mental disorder of the defendant Stephen Haje[k] at the time of the commission of the crime charged namely, Murder and Attempted Murder in Counts 1, 2, 3, 4 and 5. You may consider such evidence solely for the purpose of determining whether [defendant Hajek] actually formed the mental state premeditated, deliberated which is an element of the crime charged in Counts 1, 2, 3, 4 and 5, to wit: Murder and Attempted Murder."

On appeal, Hajek challenges the adequacy of these instructions. First, he argues that the trial court failed to instruct the jury that it was to apply these

97

instructions to the aiding and abetting instructions.  Second, he contends that the use of the permissive language "should" and "may" in the instructions improperly allowed the jury to disregard his mental impairment evidence.  The claims are without merit.**25**

### i. Aiding and abetting

Hajek contends that the mental disease and defect instructions given in this case were not specifically correlated to his potential liability as an aider and abettor and were, therefore, inadequate and misleading.  For this proposition he relies on our decision in *People v. Mendoza* (1998) 18 Cal.4th 1114 (*Mendoza*).

As we explained in *Letner and Tobin, supra,* 50 Cal.4th 99, *Mendoza* concluded that "(1) evidence of voluntary intoxication is relevant to the extent it establishes whether an aider and abettor knew of the direct perpetrator's criminal purpose and intended to facilitate achieving that goal, even in cases in which the perpetrator intended to commit a 'general intent' crime [citation]; and (2) any instructions to the jury concerning voluntary intoxication should inform the jury of the possible effect of voluntary intoxication upon the aider and abettor's mental state [citation]."  (*Letner and Tobin*, at p. 186.)  In *Letner and Tobin,* the defendants argued the trial court's voluntary intoxication instructions "failed to explain to the jury how that condition could affect the mental state of an aider and abettor."  (*Ibid.*)

We concluded any error was harmless.  Quoting *Mendoza*, we explained: "[W]e 'review the instructions as a whole to determine whether it is "reasonably

---

**25**     The Attorney General contends that Hajek has forfeited his claim because he failed to object to the instructions at trial.  We will entertain his claim pursuant to section 1259, which states in part:  "The appellate court may also review any instruction given, refused or modified even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

likely the jury misconstrued the instructions as precluding it from considering" the intoxication evidence in deciding aiding and abetting liability. [Citation.] Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: "the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant." [Citation.]' " (*Letner and Tobin, supra,* 50 Cal.4th at p. 187.) On the substantive point, we noted: "Although the voluntary intoxication instructions did not specifically mention aiding and abetting, they did not *preclude* the jury's use of evidence of intoxication in evaluating whether defendants aided and abetted, that is, whether, pursuant to the trial court's other instructions, one defendant knew of the other defendant's criminal purpose and intentionally aided the commission of the crime. Nor did the prosecutor argue that the jury could not consider voluntary intoxication in determining whether a defendant who was an aider and abettor of the crimes formed the mental state required for aiding and abetting. There is nothing in the record to indicate the jury would not have understood that the mental states set forth in the voluntary intoxication instructions could apply both to the mental states required of a direct perpetrator and to those required of an aider and abettor. . . . For these reasons, any error in the instructions did not preclude the jury's consideration of defense evidence, nor is it reasonably probable that different instructions would have resulted in a verdict more favorable to defendants." (*Ibid.*)

This analysis applies with equal force to Hajek's claim that the trial court's instruction failed to correlate the mental disease and defects instructions with those pertaining to aiding and abetting liability. Here, as in *Letner and Tobin*, nothing in those instructions precluded the jury from applying them to the question of Hajek's potential liability as an aider and abettor, nor did the prosecutor suggest

99

in his argument the jury could not do so. Nor is there any indication in the record that the jury did not understand the mental disease or defect instructions were also applicable to the mental state required of an aider and abettor. Furthermore, as the Attorney General points out, the jury rejected Hajek's mental impairment defense by properly convicting him of four counts of attempted murder with findings that the offenses were "willful, premeditated, and deliberated." Accordingly, as in *Letner and Tobin*, any error was harmless.

### ii. Permissive language

Hajek contends that the use of "should" and "may" in the mental disease or defect instructions quoted above permitted the jury to disregard entirely his mental impairment defense. Not so.

CALJIC No. 4.21.1, as given here, provided: "If the evidence shows that a defendant was mentally ill, suffered from a mental disease or defect at the time of the alleged crime, you *should* consider that fact in determining whether or not such defendant had such mental state, in other words, whether he did in fact premeditate and deliberate." The next paragraph, however, instructed the jury that "[i]f from all the evidence you have a reasonable doubt, you *must* find that defendant did not have such mental state." (Italics added.)

The principle that jury instructions are read as a whole and in relation to one another (*People v. Burgener, supra,* 41 Cal.3d at p. 538) applies equally to the different parts of a single instruction. When so construed, the foregoing instruction was clear in requiring the jury to consider Hajek's mental impairment evidence in assessing whether he possessed the requisite mental state. This is because the jury could obviously not reach the issue of whether such evidence created a reasonable doubt without first considering it. We presume the jurors were capable of reading, understanding, and applying the instruction in this

100

commonsense manner rather than in Hajek's hypertechnical manner. (*People v. Carey, supra,* 41 Cal.4th at p. 130.)

Hajek's challenge to the second mental disease or defect instruction is equally unpersuasive. That instruction was a limiting instruction that, after referencing Hajek's mental impairment evidence, told the jury that its use was confined to determining whether Hajek actually formed the requisite mental state for the charged crimes. That is the meaning of the use of the word "may" in the instruction, as is made clear by the word "solely" that follows it: "You *may* consider such evidence *solely* for the purpose of determining whether [defendant Hajek] actually formed the mental state premeditated, deliberated which is an element of the crimes charged . . . ." (Italics added.) Thus, contrary to Hajek's reading, the instruction did not authorize the jury to disregard his mental impairment evidence.

### f. Motive instruction

As given, CALJIC No. 2.51 instructed the jury: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you feel it is entitled."

Hajek contends the instruction improperly permitted the jury to convict him based on motive alone and lessened the prosecutor's burden of proof. The Attorney General asserts the claim was forfeited, but we have held otherwise. (*People v. Cleveland* (2004) 32 Cal.4th 704, 750.) On the merits, we have rejected similar claims and do so again here. (*People v. Watkins*, *supra*, 55 Cal.4th at p.

101

1029; *People v. Friend* (2009) 47 Cal.4th 1, 53; *People v. Riggs* (2008) 44 Cal.4th 248, 314; *People v. Cleveland, supra,* 32 Cal.4th at p. 750.)

> g. *Instructing on first degree murder when the information charged only second degree malice murder*

Hajek, joined by Vo, argues the trial court erred by instructing on first degree premeditated murder and felony-murder theories when the indictment charged him only with murder with malice aforethought under section 187. Defendants assert that the trial court lacked jurisdiction to try them for first degree murder, and that by doing so the court violated their rights to due process, a jury trial, and to a fair and reliable jury trial. As defendants acknowledge, we have considered and rejected these contentions many times before. (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1057, and cases cited.) Defendants provide no persuasive reason for us to reconsider those decisions.

> h. *Failure to instruct that jury must unanimously agree on theory of first degree murder*

Hajek, joined by Vo, contends the trial court's failure to instruct the jury that it must unanimously agree on a theory of first degree murder (premeditated or felony murder) violated their due process rights, right to a unanimous verdict, and to a fair and reliable jury trial. As defendants acknowledge, we have previously considered and rejected this argument. (*People v. Loker* (2008) 44 Cal.4th 691, 707-708.) We do so again.

> i. *Dilution of requirement of proof beyond a reasonable doubt*

Hajek contends that three instructions given on circumstantial evidence (CALJIC Nos. 2.02, 8.83, and 8.83.1) and seven other instructions collectively "vitiated" the reasonable doubt instruction (CALJIC No. 2.90). Those other seven instructions are: the instruction pertaining to the respective duties of the judge and

102

jury (CALJIC No. 1.00); discrepancies in testimony (CALJIC No. 2.21.1); willfully false witnesses (CALJIC No. 2.21.2); weighing conflicting testimony (CALJIC No. 2.22); sufficiency of the evidence of a single witness (CALJIC No. 2.27); motive (CALJIC No. 2.51); and flight (CALJIC No. 2.52).   Vo challenges the reasonable doubt instruction itself as well as the circumstantial evidence instructions.  The United States Supreme Court has upheld our reasonable doubt instruction.  (*Victor v. Nebraska* (1994) 511 U.S. 1, 6, 10-17.)  We have previously considered and rejected similar challenges to the remaining instructions challenged here, and we do so again.  (See, e.g., *People v. Carey*, *supra*, 41 Cal.4th at pp. 129-131 [discussing and rejecting similar challenges to CALJIC Nos. 2.02, 8.83, 8.83.1,1.00, 2.21.1, 2.21.2, 2.22, 2.27, 2.51.]; *People v. Stewart* (2004) 33 Cal.4th 425, 521 [CALJIC Nos. 2.01, 2.02, 8.83.1].)

### j. Aiding and abetting instructions

Vo, joined by Hajek, contends the aiding and abetting instructions given in this case were confusing and permitted the jury to convict them without requiring a finding that defendants "personally possess the requisite intent for the charged offenses."  The claim is without merit.

A good deal of the argument criticizes the conspiracy instructions, not the aiding and abetting instructions.  We have already discussed and rejected defendants' challenges to the conspiracy instructions.  (See *ante*, pt. II.B.4.d.)  They now contend the jury may have concluded that each defendant's membership in the conspiracy was sufficient to find he was an aider and abettor without finding he had the requisite intent for aiding and abetting.  This claim is untethered to anything in the record except a question the jury asked during its deliberations regarding the lying-in-wait special circumstance, which we discuss below.

103

Although our reversal of the lying-in-wait special circumstance renders moot any discussion of instructional error with respect to it, defendants make the broader claim that this alleged error infected the issue of intent on each offense. Accordingly, we will discuss the substantive point.

In support of their claims, defendants cite *People v. Beeman* (1984) 35 Cal.3d 547. *Beeman*, however, is distinguishable. In *Beeman*, we concluded that "the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with the intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*Id*. at p. 560.) We found further that the then-standard aiding and abetting instruction was inadequate because it failed to require the jury to find that intent as a condition of convicting a defendant as aider and abettor. (*Ibid.*)

Here, however, the jury was correctly instructed that "[a] person aids and abets the commission or attempted commission of a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by acts or advice aids, promotes, encourages or instigates the commission of the crime." There was no *Beeman* instructional error.

Nonetheless, defendants contend a question posed by the jury during deliberations indicated it may have been confused about the intent requirement for aiding and abetting, and the court's actions in response were inadequate to dispel that confusion. We are not persuaded.

On the third day of guilt phase deliberations, the jury sent a note asking about the interplay of two instructions (instruction Nos. 57 and 59) pertaining to the lying-in-wait special circumstance in the event the jurors were uncertain about

104

whether a defendant was the actual perpetrator, a conspirator, or an aider and abettor.

The jury's note read: "(p. 57) [¶] 3 Under special circumstances: If a 'defendant' is determined to be an 'aider and abettor' or a 'co-conspirator' does he then become: '(The)(A) defendant on page 59, item #1 which reads: [¶] #1. (The)(A) defendant intentionally killed the victim."

Instruction No. 57 read, in relevant part, "If you find that defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree." Instruction No. 59 stated: "To find that the special circumstance, referred to in these instructions as murder while lying in wait, is true, each of the following facts must be proved: [¶] 1. [The] [A] defendant intentionally killed the victim, and [¶] 2. The murder was committed while [the] [a] defendant was lying in wait."

When the court questioned the foreperson about the note, he explained that some jurors wanted to know whether, if a defendant "fell into any one of the three categories" of actual perpetrator, aider and abettor, or coconspirator, that defendant would then "automatically be considered" "under [instruction No.] 59," a defendant who "intentionally killed the victim." Outside the presence of the jury, both defense counsel argued that the jury was asking whether it was sufficient to find a defendant was an aider or abettor or a coconspirator to find the special circumstance true, or if the jury must also find an intent to kill. The trial court reconvened the jury and explained three times that the jury could not find the

105

special circumstance true without finding the defendant harbored the requisite intent. The court explained, "You have to go one step further . . . . And you have to put the intent to kill . . . . I mean it goes back to the aider, abettor instruction, you can't be an aider, abettor unless you have the intent." The foreperson replied, "That answers the question." Outside the presence of the jury, Vo's counsel declared himself "satisfied with the court's explanation." Hajek's counsel added, "So was I, Your Honor."

Defendants assert on appeal that a "reasonable interpretation of the jury note is that jurors wanted to know whether membership in the uncharged, unproven, amorphous conspiracy supplied the 'intentional killing' requirement for the [lying-in-wait] special circumstance." Even assuming this interpretation of the note is reasonable, the trial court's response, emphasizing that an intent to kill must also be found, laid the jury's concern to rest.

As noted, based on this exchange, defendants further assert the jury's confusion extended to the question of intent as to each offense, and not merely the lying-in-wait special circumstance. This claim is unsupported by anything in the record, and we reject it.

### k. Failure to limit instruction on Hajek's conduct and mental defenses to Hajek

Vo contends that various of his constitutional rights were violated because instructions pertaining to Hajek's conduct and mental state were not limited to him. The argument is meritless.

The jury was instructed that it had to decide the guilt of each defendant separately; that some evidence was admitted against one defendant only and could only be considered against him; and that some evidence was admitted for a limited purpose and could not be considered for any other purpose. Furthermore,

106

instructions pertaining to mental state defenses, witness intimidation, and firearm use specifically named Hajek. The jury could only have understood the instructions pertaining to prearrest and postarrest statements to refer to Hajek, in light of evidence of his conversation with Moriarty, his postarrest letters, and the absence of comparable evidence pertaining to Vo.

The jurors are presumed to understand, follow, and apply the instructions to the facts of the case before them. (*People v. Carey, supra,* 41 Cal.4th at p. 130.) Vo points to nothing in the record that supports nonapplication of this presumption with respect to the instructions about which he complains. Moreover, he could have sought appropriate specific limiting instructions if he felt they were necessary, but did not do so. (Evid. Code, § 355.) Absent such request, the trial court was under no obligation to give such limiting instructions. (*People v. Cowan* (2010) 50 Cal.4th 401, 479-480.)

5. *Prosecutorial Misconduct*

Hajek contends the prosecutor engaged in misconduct during his closing argument by repeatedly referring to defense counsel's "salesmanship." The argument is without merit.

At several points during his closing argument, the prosecutor referred to defense counsel's "salesmanship," as, for example, when he commented about Hajek's counsel claim that, because of his mental impairment, Hajek was guilty of no more than second degree murder: "[I]t was particularly effective on her part, I think, to admit to you, to tell you what she is after, which is a second degree murder, which avoids all responsibility for any major penalty, is a garden variety, every day average type of murder where's there's no plan. [¶] And she told you actually that this was such a case. When you think about it that's amazing. That is really an incredible job of salesmanship, to get you to think about that even."

107

Hajek's counsel eventually objected to the prosecutor's use of the term "salesmanship." The court overruled the objection. The prosecutor then responded, "If she finds salesmanship — I will strike that word and call it excellent lawyering."

Hajek accuses the prosecutor of disparaging the truthfulness of his trial counsel. We are not persuaded. "It was clear the prosecutor's comment was aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally. We have found no impropriety in similar prosecutorial remarks. [Citations.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155.) Nor do we find any impropriety here.

### 6. *Cumulative Effect of Error*

Defendants contend the cumulative effect of guilt phase errors requires reversal of their convictions. We have found that insufficient evidence of the lying-in-wait special circumstance requires reversal of that finding. We have also concluded the gun use enhancements the jury found as to Hajek cannot be sustained and must be changed to deadly weapon enhancements. None of these errors, whether considered individually or in combination, requires reversal of the rest of the judgment. Apart from the foregoing, defendants have "demonstrated few errors," and we have determined that each such error or possible error is " 'harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment[s].' [Citation.]" (*People v. Homick, supra,* 55 Cal.4th at p. 884.)

### C. *Penalty Phase Issues*

### 1. *Decision to Charge Defendants with Capital Murder*

Defendants argue that the death penalty statute is unconstitutional because it allows prosecutors standardless discretion in seeking the death penalty. Hajek

illustrates his argument by comparing the facts of this case to seven other cases prosecuted by the Santa Clara County District Attorney in which the death penalty was not sought. Our prior decisions have rejected such claims. "Prosecutorial discretion to select those death-eligible cases in which the death penalty will actually be sought is not constitutionally impermissible. [Citations.] [¶] Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 126-127; *Crittenden, supra,* 9 Cal.4th at pp. 156-157.) We adhere to those decisions.

### 2. *Denial of Vo's Request for a Continuance*

On June 5, 1995, following Vo's conviction, his trial counsel moved for a continuance to prepare for the penalty phase. Counsel expressed surprise that Vo had been convicted. He complained about his difficulties in obtaining payment from the county for his experts, cocounsel, and for himself. He cited unspecified "instructional issues" he and cocounsel had "not attended to," as well as the fact he had evidently not yet spoken to all his penalty phase witnesses. He also referred to the "stress" of representing a capital defendant. The trial court noted that the case was four years old and that trial counsel had represented Vo since the preliminary hearing. The court further stated that, in its view, the facts of the case were not complicated and that counsel had had "more than a sufficient amount of time to become adequately prepared." The court denied the motion.

Vo contends the trial court abused its discretion because its denial of a continuance prevented him from fully developing mitigating evidence. He cites a declaration submitted after the penalty phase trial by Vincent N. Schiraldi, the executive director of the Center on Juvenile and Criminal Justice (CJCJ),

109

summarizing Vo's family background as additional evidence he could have presented had the continuance been granted.  The claim is without merit.

First, counsel did not explicitly cite the need to develop evidence pertaining to Vo's family background as the reason for which he sought a continuance. Second, several months earlier counsel had represented to the court that investigation into Vo's family background for the penalty phase trial had begun as early as December 1994.  Vo offers no explanation why this evidence was not available in June 1995 when the penalty phase began.  Finally, the family background evidence summarized in Schiraldi's declaration *was* presented at the penalty phase on Vo's behalf.  Vo fails to demonstrate that Schiraldi's declaration contained anything new, much less that it could not have been presented at the penalty phase trial in the absence of a trial continuance.  In sum, Vo fails to show the trial court abused its discretion in denying his continuance request.  (*People v. Beames, supra,* 40 Cal.4th at p. 920.)

### 3.  *Denial of Trial Counsel's Request to be Relieved*

Based on its finding that Vo's trial counsel had refused to comply with discovery requirements as to his proposed mental health expert, Dr. James Berg, the trial court excluded Berg's testimony.  Vo's counsel then declared a conflict of interest and asked to withdraw from the case.  The trial court rejected his request. On appeal, Vo contends the court erred by excluding Berg's testimony as a discovery sanction.  He also asserts the trial court erred when it denied his trial counsel's motion to withdraw.  Both arguments are meritless.

#### a.  *Background*

Vo retained Dr. James Berg, a mental health expert, in March 1994. During Vo's penalty phase case, both the prosecutor and Hajek's attorney complained that Vo's counsel had failed to disclose his intention to call Dr. Berg.

110

The prosecutor asked that Berg be excluded as a sanction for the failure by Vo's counsel to comply with discovery rules requiring timely disclosure of expert witnesses. The trial court declined to do so at that time, but added, "I may impose sanctions at the end if I believe that [Vo's counsel] has . . . sandbagged, that it was a willful violation of the law of the state of California and not turning over reports or not turning over the investigation to [the prosecutor]."

Somewhat later, the parties returned to the issue of Vo's compliance with discovery rules with respect to Dr. Berg. Hajek's counsel said, "I want to know if there's a report from Dr. Berg. I would like that report given to me now and I would also like the opportunity to speak with Dr. Berg before any of this is presented." Vo's counsel represented to the trial court there were no reports from Berg, but offered to give his phone number to Hajek's counsel and the prosecutor. The court noted that Hajek's counsel had turned over the report of her mental health expert, Dr. Minagawa, and expressed its belief that it was being "sandbagged" by Vo's counsel. Counsel denied the charge.

The following day, Hajek's counsel informed the court that she had spoken to Dr. Berg and that he had turned over to her about 20 pages of handwritten notes indicating, among other things, that Berg had administered some psychological tests to Vo. Hajek's counsel argued the test results were discoverable material and asked that they be provided. The prosecutor joined in the request. Vo's counsel objected to turning over the material on the ground that Berg would not be referring to the test results in his testimony. The prosecutor argued this was "all the more reason for us to be allowed to examine it, because if an expert is picking and choosing what he chooses to rely on . . . that should be explained in cross-examination." Hajek's counsel agreed with the prosecutor that she had a right to discover the material for its possible impeachment value. The trial court

111

instructed Vo's counsel to turn over the material, or it would preclude Berg from testifying. Vo's counsel refused to do so, claiming the material would be outside the scope of the testimony he intended to elicit from Berg. The trial court precluded Berg's testimony. The court went on to say: "I'll make a finding that [Vo's counsel] has not complied with discovery in good faith." Vo's counsel responded by "declar[ing] a conflict of interest" and asking the court to appoint new counsel for Vo, "who has some respect of the court so he is not subjected to a disparate treatment because of what the court believes as to my handling of this matter." The court denied the request.

### b. Exclusion of Dr. Berg's testimony

Vo contends that the trial court's exclusion of Dr. Berg's testimony as a sanction for his counsel's violation of the court's discovery order violated his due process right to present a defense. He is wrong. Section 1054.3, subdivision (a)(1), requires the defense to disclose to the prosecution, among other matters, "[t]he names and addresses of persons, other than the defendant, he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, including any reports or statements of experts made in connection with the case, and including the results of physical or mental examinations . . . which the defendant intends to offer in evidence at the trial." This provision includes the raw results of standardized psychological and intelligence tests administered by a defense expert upon which the expert intends to rely. (*Woods v. Superior Court* (1994) 25 Cal.App.4th 178, 184-185.)

In this case, while representing that Dr. Berg had not prepared a report, Vo's counsel neglected to mention that Berg had prepared 20 pages of handwritten notes and administered psychological tests to Vo. These materials constituted a report for purposes of the statute. (See *People v. Lamb* (2006) 136 Cal.App.4th

112

575, 580 [defense expert's notes were discoverable, notwithstanding defense's claim that the expert had not prepared a written report based on those notes].)  The court found that Vo's failure to provide these notes and test results was a willful violation of its discovery order and justified the preclusion of Berg's testimony as a sanction because of its adverse effect on the ability of the prosecutor and Hajek to cross-examine Berg.  Vo does not demonstrate, nor do we find, an abuse of discretion.  (*People v. Ayala* (2000) 23 Cal.4th 225, 299 [trial court may, in the exercise of its discretion, consider a broad range of sanctions for violation of a discovery order].)  Finally, Vo fails to demonstrate that the application of the discovery statutes violated his right to present a defense.  (Cf., *Chambers v. Mississippi* (1973) 410 U.S. 284, 302; *People v. Boyette* (2002) 29 Cal.4th 381, 414 [" ' "[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." ' "]

### c.  Denial of defense counsel's motion to withdraw as counsel

Vo maintains that the trial court erroneously rejected his trial counsel's request to withdraw from the case on the ground that a conflict of interest had emerged in the wake of the court's preclusion of Dr. Berg's testimony as a discovery sanction.  We are not persuaded.

"The determination whether to grant or deny a motion by an attorney to withdraw is within the sound discretion of the trial court and will be reversed on appeal only on a clear showing of abuse of discretion."  (*People v. Sanchez* (1995) 12 Cal.4th 1, 37.)  "The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest."  (*People v. Cox* (2003) 30 Cal.4th 916, 948.)  " 'Conflicts of interests may arise in various factual settings.  Broadly, they "embrace all

113

situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests." ' " (*People v. Doolin, supra,* 45 Cal.4th at p. 459, italics omitted.)

Vo asserts the trial court's "wrath" toward his trial counsel, reflected in its order precluding Dr. Berg's testimony, caused Vo's case to "suffer[]" and therefore constituted a conflict of interest. If, by this, he is suggesting the court precluded Berg's testimony out of pique with Vo's trial counsel, he is wrong. The exclusion of Berg's testimony was an appropriate sanction for the discovery violation. Vo cites no authority to support the proposition that an adverse ruling, even one accompanied by a finding of defense counsel's bad faith, creates a conflict of interest between counsel and his or her client. There being no identifiable conflict of interest between Vo and his trial counsel, there was no basis to grant counsel's motion to withdraw from the case, and the trial court appropriately denied it.

### 4. *Dr. Minagawa's Testimony Regarding Hajek's Denial of Being the Killer*

Vo claims the trial court erred in denying his motion for a mistrial after Dr. Minagawa (Hajek's mental health expert) was permitted to testify at the penalty phase that Hajek denied killing the victim. We have already discussed and disposed of this claimed violation of the *Aranda/Bruton* rule in connection with Vo's severance argument. (See *ante*, pt. II.A.1.) Our stated reasons for rejecting his severance contentions apply with equal force to this claim. The trial court did not err in denying his mistrial motion.

114

*5. Inadequate Notice of Factors in Aggravation*

Vo, joined by Hajek, contends the prosecutor provided inadequate notice of the evidence in aggravation, as required by section 190.3, thus violating his statutory and due process rights. The claim is without merit.

Section 190.3 provides in part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." "The purpose of the notice requirement is to afford a capital defendant the opportunity to prepare to meet evidence introduced in aggravation of the offense." (*People v. Carrera* (1989) 49 Cal.3d 291, 334.)

On February 6, 1995, eight days before the guilt phase trial began, the prosecution filed its notice of penalty phase evidence. The prosecution identified as its potential witnesses in aggravation all members of the Wang family, as well San Jose police officers, Department of Corrections officers, the medical examiner, and an FBI agent. Although a proof of service is not attached to the filing, subsequent record references to the notice and its contents by both defendants establish that they received the notice. On June 5, 1995, before the penalty phase began, the prosecutor filed a brief in which he sought to present additional evidence in aggravation, including evidence of Hajek's criminal history. Both defendants filed motions to restrict the prosecution to the evidence in aggravation set forth in its earlier section 190.3 notice. The trial court agreed with defendants. It limited the prosecution evidence to victim impact testimony from Ellen, photographs of Su Hung while she was still alive, and Hajek's conviction

for auto theft with a firearm enhancement, but not the underlying facts of that offense. Ultimately, the only evidence the prosecution presented was victim impact testimony from Ellen; it otherwise relied on the circumstances of the crime.

Vo contends the prosecutor's February 1995 notice, which listed victim impact testimony by members of the Wang family, was untimely because it was not provided within a reasonable period of time before trial. But defendants did not object to that notice, either in February or later in June 1995 when they sought to restrict the evidence in aggravation to evidence contained in the February notice. Accordingly, Vo has forfeited any claim that the timing of the February notice left him with an insufficient opportunity to prepare for Ellen's victim impact testimony. (See *People v. McDowell* (2012) 54 Cal.4th 395, 421.) In any event, Vo fails to demonstrate the unreasonableness of the notice's timing, and the record contains no indication of any adverse effect on his defense. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 958.) Accordingly, his claim is not only forfeited but meritless.

### 6. *Failure to Provide Separate Penalty Phase Juries*

Vo contends the trial court erred by declining to impanel separate juries for the guilt and penalty phases, based on the objection by Vo's counsel to the exclusion from the guilt phase of a prospective juror who stated he could not sentence a person to death. We reject Vo's assertion that his objection to the exclusion of this juror constituted a motion to impanel separate juries and, therefore, we find he has forfeited the claim. In any event, the claim is meritless.

"Section 190.4, subdivision (c) 'requires that, absent good cause, the same jury decide guilt and penalty at a capital trial.' [Citation.] The statute expresses a long-standing preference for a single jury to decide guilt and penalty [citation], and we have rejected claims that this preference in itself constitutes a denial of due

116

process of law or violates the defendant's right to a fair trial and reliable guilt and penalty determination. [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1281.) Vo fails to demonstrate that good cause existed for a second jury and, as *Prince* holds, the statutory preference for a single jury is constitutionally permissible.

### 7. Juror Excusal

Vo, joined by Hajek, contends the trial court abused its discretion when it excused one juror for hardship during the guilt phase and thereafter retained a second juror for the penalty phase despite her claim of hardship. We find no abuse of discretion.

#### a. Background

During the guilt phase trial, Juror C.E. informed the court that the grocery chain for which he worked had locked out its employees in a labor dispute, and he would no longer be paid for jury duty. C.E. had applied for work at nonunion companies, but none of them would hire him as long as he was serving on the jury. C.E. said he could not afford his house payments without a job. The court indicated it was inclined to excuse the juror. The prosecutor and Vo's counsel both suggested the court wait for a few days to see if the labor dispute would be resolved. The court pointed out, however, that C.E. was probably competing for a nonunion job with everyone else who had been locked out, and it was possible that all the nonunion jobs would be filled. Rather than defer the decision, the court excused the juror and seated an alternate.

The jury returned its guilty verdicts on May 22, 1995, and the penalty phase was scheduled to begin on June 5, 1995. At a hearing to discuss scheduling, the trial court informed counsel it had received a note from Juror K.W. indicating she had a hardship that would affect her ability to continue serving on the jury. When

117

asked to explain the nature of the hardship, K.W. said she was scheduled to attend a work-related event in Washington, D.C. that was a necessary step to promotion, beginning on June 5. She explained further that if she did not attend the event, she would be ineligible for promotion for another year. Initially, counsel for both defendants objected to excusing the juror, and the court declined to do so. A week later, however, defense counsel reversed course and asked that the juror be excused. Hajek's counsel explained she feared K.W. might be angry if she were not excused and might direct that anger at the defense. The trial court declined to excuse the juror. It also rejected a request by Vo's attorney to question the juror about whether its decision to retain her might affect her impartiality.

### b. Discussion

"Section 1089 provides for the discharge of a juror 'before or after the final submission of the case to the jury' for 'good cause' shown. In reviewing a trial court's decision either to retain or discharge a juror, we use the deferential 'abuse of discretion' standard. [Citations.] And we will uphold the decision unless it ' "falls outside the bounds of reason." ' " (*People v. Earp* (1999) 20 Cal.4th 826, 892; see *People v. Hart* (1999) 20 Cal.4th 546, 596-597 [finding no abuse of discretion where court declined to excuse a juror for financial hardship].)

Applying this standard, we find no abuse of discretion in the trial court's decision to discharge Juror C.E. The juror's uncontradicted representations established that a labor dispute had resulted in a job lockout and his loss of income from his employer. C.E. tried but was unable to obtain employment elsewhere, and was told he would not be hired so long as he was on jury duty. Moreover, it was reasonable for the court to infer that retention of the juror might cause him to lose out on any chance of securing other employment because of the competition

118

from his coworkers. Faced with these circumstances, the trial court's decision to excuse C.E. for financial hardship was an appropriate exercise of its discretion.

By contrast, Juror K.W.'s hardship did not concern a job or income loss. Instead, continued jury service meant she would not be eligible for a possible promotion for another year. Balanced against this hardship to K.W. would have been the loss of a juror who had already deliberated in the guilt phase. Under these circumstances, the trial court's decision to retain K.W. was not an abuse of its discretion. (See *Thiel v. Southern Pacific Co.* (1946) 328 U.S. 217, 224 ["Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear."].) Nor is there any support in the record for Vo's assertion that K.W.'s anger or disappointment at being retained on the jury — if, indeed, she was angry or disappointed — impaired her ability to be an impartial juror.

### 8. *Prosecutorial Misconduct*

Both defendants contend the prosecutor engaged in misconduct during the penalty phase. Vo focuses on the prosecutor's closing argument. Hajek, while also asserting impropriety in the prosecutor's argument, primarily addresses the prosecutor's cross-examination of his expert witness, Dr. Minagawa, on the subject of sadism. We find no misconduct.

"The standards governing review of [prosecutorial] misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a

119

prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*People v. Friend, supra,* 47 Cal.4th at p. 29.)

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Valencia* (2008) 43 Cal.4th 268, 281.)

We turn first to Vo's claims of improper prosecutorial argument. " '[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to determine.' " (*People v. Valencia, supra,* 43 Cal.4th at p. 284.) "When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Friend, supra,* 47 Cal.4th at p. 29.)

Vo contends the prosecutor committed misconduct in closing argument by: (1) improperly arguing nonstatutory factors in aggravation; (2) arguing that defendants were not entitled to mercy because they had shown none to the victim; (3) arguing that lack of remorse was a factor in aggravation; (4) arguing that Vo's youth was a factor in aggravation because his youth would make him dangerous in prison; and (5) urging the jury to consider defendants jointly rather than giving them individualized consideration.

Vo's trial counsel failed to object to a single remark he now assigns as misconduct by the prosecutor, thus forfeiting his claims of misconduct. Vo responds to the forfeiture argument with a pro forma assertion that any objection would have been futile and any request for admonition would have been inadequate to cure the harm. "A defendant claiming that one of these exceptions [to the forfeiture rule] applies must find support for his or her claim in the record. [Citation.] The ritual incantation that an exception applies is not enough." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) We find the claims forfeited. (*People v. Valencia, supra,* 43 Cal.4th at p. 281.) In any event, Vo's claims are meritless.

Vo aggregates several of the challenged remarks in arguing the prosecutor inappropriately urged the jury to consider nonstatutory factors in aggravation. Vo then singles out these same remarks for stand-alone claims of prosecutorial misconduct. For the reasons below, whether considered singly or in the aggregate, the remarks were not improper.

Vo first contends the prosecutor impermissibly argued that lack of remorse was a factor in aggravation. (*People v. Jurado* (2006) 38 Cal.4th 72, 141.) But the prosecutor did not make this argument. Although he made the observation that Vo expressed no remorse on the audiotape of his jailhouse conversation with Hajek, he did so in order to impeach Vo's testimony that he was sorry about the crime and had been shocked when he learned Su Hung had been killed. It is not misconduct to argue that "the evidence lacked the mitigating force the defendant claimed for it." (*People v. Raley* (1992) 2 Cal.4th 870, 917 [where defendant claimed his confession showed remorse, "the prosecutor was entitled to point out that he had denied culpability until he found out that one of his victims had survived and 'he's not going anywhere' "].)

121

Vo next claims the prosecutor impermissibly argued that Vo's failure to show mercy to the victim should be considered as a factor in aggravation. Not so. Pursuant to section 190.3, factor (k), the jury may consider as a mitigating factor "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." It was in the context of discussing the applicability of this factor to defendants that the prosecutor argued that mercy should not be shown to them in any greater measure than they showed mercy to the victim. The argument was permissible. (See *People v. Collins*, *supra*, 49 Cal.4th at p. 230 ["It is not improper to urge the jury to show the defendant the same level of mercy he showed the victim."].)

Vo also contends the prosecutor improperly argued that Vo's age was a factor in aggravation because his youth made him potentially more dangerous in prison. The prosecutor did no such thing. Rather, he argued that both defendants' ages should not weigh in their favor, because they were both adults, because the crime was "monstrous," and because, as Vo's expert told the jury, "age makes them worse prisoners, more dangerous, less controllable in the prison situation." In this regard, it is settled that " 'age' as statutory sentencing factor includes 'any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case.' " (*People v. Williams* (2013) 56 Cal.4th 165, 200.) Measured by this standard, the prosecutor's argument in this case was permissible.

Vo further contends the prosecutor suggested that the jury should consider as factors in aggravation the evidence that his family "car[ed] for him" and that he led an "alleged 'secret life.' " But the remarks to which Vo directs us were part of the prosecutor's argument that Vo's numerous character witnesses were ill-

122

informed as to Vo's true character and that his witnesses had exaggerated any familial abuse in his upbringing. Such comments by the prosecutor on his view of the evidence were entirely permissible. (*People v. Valencia, supra,* 43 Cal.4th at p. 284.)

Vo also contends the prosecutor, while paying "lip service" to the principle of individual consideration of each defendant, "in actuality" urged the jury to consider them jointly. We disagree. The record reflects that Vo's counsel objected when the prosecutor asked the jury rhetorically whether Hajek or Vo was worse. Agreeing such a comparison was improper, the prosecutor told the jury, "it is a mistake to ask you to compare defendants. That should not be done. Each defendant should be evaluated separately and individually." Before going over the section 190.3 factors, he again reminded the jury that "each defendant should be looked at separately and evaluated individually." The prosecutor then discussed the factors first as they applied to Vo, and then as they applied to Hajek. There was no misconduct on this ground.

Finally, Vo claims certain of the prosecutor's remarks about Hajek were misconduct. We discuss them below in connection with Hajek's claims of prosecutorial misconduct. As to Vo, suffice it to say there is no possibility that any perceived impropriety prejudiced him.

Hajek's prosecutorial misconduct claim focuses on the prosecutor's cross-examination of Hajek's mental health expert, Dr. Minagawa, about whether Hajek was a sadist. Hajek complains that most of the prosecutor's questions concerned his alleged sadistic tendencies, even though Minagawa "explained that 'sadism' is not recognized as a diagnosis in the DSM-IV." (Hajek explains that the DSM-IV, the Diagnostic and Statistical Manual of Mental Disorders, fourth edition, "is a

123

manual published by the American Psychiatric Association that includes all currently recognized mental health disorders.")

The misconduct claim is forfeited. Although several objections were made to this line of questioning, Hajek's counsel lodged only three objections, all of which came very late in the prosecutor's examination of Dr. Minagawa on this subject. Two of those objections were on relevance grounds. Only the third objection — "I object. There is no diagnosis for sadism in the DSM-IV, which the district attorney knows well" — could conceivably be characterized as an objection on grounds of prosecutorial misconduct. The trial court overruled the objection. Later, when Hajek specifically objected to questions about whether Hajek suffered from sexual sadism, the trial court sustained the objections. Hajek's counsel, however, failed to request an admonition.

A claim of prosecutorial misconduct is not preserved unless the defendant makes a *timely* objection *and* requests an admonition, and even then the issue is preserved *only if* the admonition was insufficient to cure any harm. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) Because Hajek failed to lodge a *timely* objection to most of the questions he now asserts were misconduct, and did not request admonitions when objections were sustained, we conclude his claim is forfeited.

The claim also fails on its merits. The underlying premise of Hajek's argument is that the only legitimate definition of sadism is the one that appears in the DSM-IV pertaining to sexual sadism, and therefore any other invocation of the concept of sadism is improper. We are not persuaded. While "sadism" may be narrowly defined for diagnostic purposes as a sexual aberration, it has a wider and more commonly understood meaning that includes a "delight in cruelty" and "excessive cruelty." (Merriam-Webster's Collegiate Dict. (10th ed. 2001),

124

p. 1027.) It is in this sense that the word appears in the instruction defining the torture-murder special circumstance that the jury found true as to Hajek. (CALJIC No. 8.24 (5th ed. 1988, 1992 rev.) ["The perpetrator committed the murder with [an] . . . intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose."].)

An inclination toward excessive cruelty or taking delight in the infliction of pain is undoubtedly a mental abnormality. The prosecutor, therefore, was justified in asking Hajek's mental health expert whether Hajek's conduct demonstrated this kind of sadism. Moreover, Dr. Minagawa understood this was the sense in which he was being questioned about sadism; he repeatedly engaged with the prosecutor on this issue, even at one point agreeing, "I think there are sadistic parts of what he did, yes." When the prosecutor suggested that Hajek's stated desire to mutilate a family pet was a "sign[] of sadism," Minagawa agreed it was a sign of "a sadistic trait."

We need not belabor the point. Even had Hajek preserved this claim of prosecutorial misconduct — which he did not — the prosecutor's examination of Dr. Minagawa regarding Hajek's sadistic traits was not misconduct.

To the extent Hajek complains of the prosecutor's questions to Dr. Minagawa about whether Hajek suffered from sexual sadism, those objections were sustained. By failing to request an admonition, however, Hajek's counsel failed to preserve this issue for appellate review. In any event, these fleeting questions do not rise to prosecutorial misconduct.

Hajek contends the prosecutor's closing argument references to sadism and Hajek's interest in Satanism were misconduct. We cannot agree. In Hajek's penalty phase case, his counsel argued the death penalty was not warranted because, due to his untreated mental disease, he did not form the requisite mental

125

state for murder and attempted murder, and that medication could have controlled his illness. The prosecutor responded that Hajek committed the crime not because he was mentally ill but because he enjoyed inflicting pain. To make his point, the prosecutor referenced Hajek's sadistic characteristics and his interest in Satanism, both of which were matters in evidence. Moreover, " '[u]nlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of all the relevant facts as they reflect on its decision.' [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1418.) Here, as in *Leonard*, "the prosecutor's comments were emotional, but not excessively so. They were based on the evidence and fell within the permissible bounds of argument." (*Ibid.*)

Like Vo, Hajek also contends the prosecutor impermissibly argued postcrime lack of remorse as a factor in aggravation. The prosecutor, however, did not make that argument. Rather, he contended the jury should consider defendants' lack of remorse in deciding whether they were entitled to sympathy or mercy as a mitigating factor, e.g. "[Hajek] is a person who shows absolutely no remorse. Deserves no mercy, no mitigation." As such, the argument was proper. (*People v. Jurado, supra*, 38 Cal.4th at p. 141.)

Finally, Hajek joins in Vo's argument that the prosecutor committed misconduct by arguing Hajek had fabricated his mental illness and by referring to a letter Hajek wrote to Vo in which he described violent sexual fantasies involving Ellen. Vo, however, does little more than assert these grounds of misconduct without developing an argument. In any event, no misconduct appears. The prosecutor did not make the stated argument. Rather, he engaged in a long and detailed review of Hajek's mitigation evidence in an attempt to show it misrepresented Hajek's true nature and the extent of his culpability. It was in the

126

context of challenging Hajek's portrayal of himself as a victim of mental illness that the prosecutor referred briefly to letters by Hajek to Vo in which Hajek described wanting to rape and sodomize Ellen. The argument was not improper. (*People v. Crew, supra,* 31 Cal.4th at pp. 857-858 [prosecutor may argue "that the mitigating evidence presented by the defendant was not in fact mitigating, and . . . place[] such evidence in the broader factual context of the case"].)

In sum, we reject defendants' claims of prosecutorial misconduct.

### 9. Instructional Error

#### a. Refusal to give pinpoint instructions

Defendants contend the trial court erroneously refused to give their requested pinpoint instructions directing the jury to consider specific pieces of evidence in mitigation. Vo also claims additional instructional errors.

Vo submitted a lengthy pinpoint instruction directing the jury to consider as mitigating factors six circumstances assertedly relevant to section 190.3, factor (k), which permits consideration of "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k).) Among those six named circumstances were "whether another defendant, or defendants, equally culpable, will not be punished by death"[26] and "whether the defendant did not use force or violence in an effort to avoid arrest." Additionally, Vo's proposed instruction listed 24 "aspects of the defendant" for the jury to consider in mitigation, including "whether the defendant

---

[26] Directing the jury to another defendant's non-death sentence as a factor in mitigation is incorrect as a matter of law. (*People v. Moore* (2011) 51 Cal.4th 1104, 1141-1142 [trial court properly excluded evidence that another defendant had received life without the possibility of parole and an instruction that the defendant's accomplice had received a more lenient sentence as mitigating factors].)

has a low sense of self-esteem and self-worth," "the defendant's ability to engender feelings of love and respect for him by his family, friends, teachers, and correctional officers," and "whether the defendant has a calming and guiding effect upon younger inmates." The trial court declined to give the instruction.

Hajek's pinpoint instruction similarly would have directed to jury to consider as factors in mitigation Hajek's "history of disrupted foster and adoptive placements; the damage caused to him by numerous moves in foster and adoptive placements; emotional abuse inflicted upon him in foster and adoptive placements; his history and treatment of his mental illness with medication; his work history; his remorse for the effects of this crime on the victims; his stabilization, maturation and change since he has been incarcerated for this offense; his parents' love for him." The trial court declined to give this part of the proposed instruction.

The court, however, did agree to append to CALJIC No. 8.84, the introductory penalty phase instruction, the last paragraph of Hajek's proposed instruction stating: "In this phase of the case, you may consider sympathy, pity, mercy or compassion in determining the appropriate penalty. These may be considered by you as factors in mitigation." Although the court read this paragraph when it verbally instructed the jury, it neglected to append it to the written instruction.

Both defendants contend the court erred in refusing their instructions directing the jury to particular matters in mitigation. We disagree. "A trial court must instruct on the *law* applicable to the facts of the case. [Citations.] In addition, a defendant has a right to an instruction that pinpoints the *theory* of the defense. [Citation.] The court must, however, refuse an argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw

inferences favorable to one of the parties from specified items of evidence.' "
(*Mincey*, *supra*, 2 Cal.4th at p. 437.)  In *People v. Catlin* (2001) 26 Cal.4th 81, we
rejected the defendant's claim that the court had erroneously refused to give a
similar instruction that sought to direct the jury's attention to 13 specific factors in
mitigation.  We observed that the standard instruction "directing the jury that it
may consider in mitigation 'any other circumstance which extenuates the gravity
of the crime even though it is not a legal excuse for the crime and any sympathetic
or other aspect of the defendant's character or record that the defendant offers as a
basis for a sentence less than death, whether or not related to the offense for which
he is on trial,' adequately conveys the full range of mitigating evidence that may
be considered by the jury." (*Id*. at pp. 173-174.)  We also found that special
instructions that seek to direct the jury's attention to specific factors in mitigation
are properly "refused as argumentative and duplicative of standard instructions."
(*Id.* at p. 174.)  The standard instruction that we found sufficient in *Catlin* was also
given here.  For the same reasons set forth in *Catlin*, we reject defendants' claim
of error.

 As noted, the trial court agreed to append to CALJIC No. 8.84 the last
paragraph of Hajek's proposed instruction but, while it read the paragraph in its
verbal charge, it neglected to add it to the written instructions.  Hajek contends he
was thereby prejudiced because, where verbal and written instructions differ, the
written instructions prevail over verbal ones.  (*People v. Osband* (1996) 13 Cal.4th
622, 717.)  He reasons that without the written directive to the jury stating it could
consider sympathy pity, mercy, or compassion as factors in mitigation, the jury
would not have known it could do so.  The argument fails, because the missing
paragraph need not have been given at all.  (See *People v. Ledesma, supra,* 39
Cal.4th at p. 739.)  Under CALJIC No. 8.84 as given, defendants were free to

129

argue that the jury should exercise mercy and, indeed, Hajek's counsel told the jury they were allowed "to consider sympathy, pity, mercy and compassion, if you feel they are appropriate." There was no error, harmless or otherwise.

Vo raises other claims of instructional error, none of which has merit. He asserts the sympathy instruction that Hajek submitted and the court read failed to limit the jury's consideration of sympathy to defendants as a factor in mitigation. But a penalty phase jury may, within the ambit of the circumstances of the crime factor in aggravation, "exercise sympathy for the defendant's murder victims and for their bereaved family members." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195; accord, *People v. Zamudio* (2008) 43 Cal.4th 327, 368.) Thus, it would have been error for the court to have limited the jury's consideration of sympathy to the defendants alone.

Vo next contends the instructions were inadequate to impress upon the jury the requirement of an individualized penalty determination as to each defendant. Specifically, he asserts the first sentence of CALJIC No. 8.85, which directs the jury to "consider all of the evidence which has been received during any part of this trial," allowed the jury to improperly consider evidence admitted against only one defendant against both of them. Along these same lines, he complains the other crimes evidence instruction, while referring to Hajek alone, did not explicitly limit the jury's consideration of that evidence to Hajek.

The trial court was under no sua sponte duty to give an instruction as to the limited purpose for which evidence was received. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 479.) Vo's failure to request such an instruction forfeits the claim of error on appeal.

In any event, there was no error. In assessing a claim of instructional error, we examine the instructions as a whole. The test we apply is whether there is a

130

reasonable likelihood the jurors would have understood the instructions in a manner that violated a defendant's rights. (*People v. Pearson, supra,* 56 Cal.4th at p. 476.) In this regard, we presume that jurors are intelligent individuals who are capable of understanding instructions and applying them to the facts of the case before them. (*People v. Carey, supra,* 41 Cal.4th at p. 130.) Here, the jury was explicitly instructed to separately decide the appropriate penalty for each of the defendants and, in doing so, to "consider each defendant separately and the factors in aggravation and mitigation as to each defendant separately." Both defense counsel impressed upon the jury its responsibility to make individualized penalty determinations and to look at the evidence relevant to each defendant individually. The prosecutor also reminded the jury to decide each defendant's fate separately and structured his argument accordingly. Given these circumstances, we reject Vo's assertion that the instructions as given were inadequate.

### b. Burden of proof instructions

Defendants contend the absence of certain instructions regarding the burden of proof and jury unanimity violated various constitutional guarantees. More broadly, defendants contend that the death penalty statute is unconstitutional because it fails to assign a burden of proof to the prosecution to prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors before the death penalty may be imposed or that death is the appropriate penalty. Defendants also contend the statute and the instructions are unconstitutional because they fail to require the jury to agree unanimously on the factors in aggravation, because the instructions fail to assign a burden of persuasion to the prosecution, and because the jury is not required to return written findings regarding the aggravating factors. We have in the past rejected all of these claims. (E.g., *People v. Gonzales, supra,* 54 Cal.4th at p. 1298; *Houston, supra,* 54 Cal.4th at pp. 1231-1232; see *People v.*

131

*Lenart* (2004) 32 Cal.4th 1107, 1135-1136 [court need not assign a burden of persuasion].) We do so again.

### c. CALJIC Nos. 8.85 and 8.88

Defendants raise certain challenges to CALJIC No. 8.85, which sets forth the statutory factors (§ 190.3) to be considered in determining the penalty, and to CALJIC No. 8.88, which guides the jury in how to determine the appropriate penalty.

Pursuant to CALJIC No. 8.85, the jury was instructed to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ." (§ 190.3, factor (a).) Contrary to defendants' contentions, this factor is not so overly broad as to allow for the arbitrary and capricious imposition of the death penalty. (*Mungia*, *supra*, 44 Cal.4th at p. 1141; *People v. Parson* (2008) 44 Cal.4th 332, 369, and cases cited.) The instruction is not defective because it fails to omit inapplicable sentencing factors. (*Parson*, at p. 369, and cases cited.) Nor does the instruction's use of such adjectives as "extreme" and "substantial" impermissibly impede the jurors' consideration of mitigation. (*People v. Pearson, supra,* 56 Cal.4th at p. 478; *Parson*, at pp. 369-370, and cases cited.)

CALJIC No. 8.88, as given to the jury, provided: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it [*sic*] warrants death instead of life without parole." Both defendants contend the instruction was defective because it failed to tell jurors that mitigating factors could only be considered for that purpose. Hajek also argues the phrase "so substantial" in describing the jury's weighing of the aggravating and mitigating factors was too vague and ambiguous to guide the jury in carrying out its task. Hajek additionally

complains that CALJIC No. 8.88 failed to inform jurors that they were to determine that death was the appropriate, and not simply the authorized, punishment, and that they were required to return a sentence of life without possibility of parole if the factors in mitigation outweighed those in aggravation. Finally, Hajek argues the instruction should have informed the jurors that Hajek did not have to persuade them the death penalty was inappropriate. Our prior decisions have considered and rejected all of these challenges to the instruction (e.g., *People v. McKinzie* (2012) 54 Cal.4th 1302, 1361-1362, and cases cited), and we do so again here.

### 10. Denial of New Trial Motion

"Because a ruling on a motion for a new trial rests so completely within the trial court's discretion, we will not disturb it on appeal absent ' " 'a manifest and unmistakable abuse of discretion.' " ' " (*People v. Earp, supra,* 20 Cal.4th at p. 890.) We now address the trial court's denial of defendants' motion for a new trial.

In the proceedings below, Vo advanced nine grounds for a new trial, the denial of which he now assigns as error on appeal. We have already considered and rejected his claims of error on seven of these grounds, including: (1) insufficiency of the evidence to support the torture-murder special circumstance (*ante*, pt. II.B.1.b.); (2) admission of letters written by Hajek (*ante*, pts. II.B.3.c., II.B.3.g.iv.); (3) denial of severance motions (*ante*, pt. II.A.1.); (4) admission of Moriarty's conversation with Hajek against Vo (*ante*, pt. II.B.3.a.); (5) admission of the audiotaped jailhouse conversation between Hajek and Vo (*ante*, pt. II.B.3.b.); (6) the trial court's excusal of Juror C.E. and its refusal to excuse Juror K.W. (*ante*, pt. II.C.7.); and (7) denial of Vo's continuance requests (*ante*, pt. II.C.2.). For the same reasons we rejected his claims of error, we

133

conclude the trial court did not abuse its discretion in denying his new trial motion on those grounds. (*People v. Panah, supra,* 35 Cal.4th at p. 490.)

Vo also argued a new trial was required because insufficient evidence supported the lying-in-wait special circumstance, a claim he also raises in these proceedings. While we agree the evidence does not support this special circumstance, we conclude a new trial is not necessary on this ground for the same reason that reversal of the judgment is not required. (See *ante*, pt. II.B.1.a.)

Finally, Vo argued a new trial was required because of issues related to funding. He separately raises this claim on appeal as grounds for reversal, and we will address it below. Our conclusion that the funding issues Vo cites do not require reversal of the judgment (see *post*, pt. II.D.1.) also leads us to conclude the trial court did not abuse its discretion in denying Vo's new trial motion on this ground.

The one remaining ground upon which both defendants moved for a new trial involves the admission of the audiotape of their jailhouse conversation. In support of this particular claim, Vo's trial counsel submitted a declaration stating Juror R.E. had informed him some jurors claimed to have heard Vo admit on the audiotape that he and Hajek had killed the victim. Vo's *Keenan* counsel also filed a declaration stating that a number of jurors had told her that in listening to the audiotape during their penalty phase deliberations, they heard Vo say, "[W]e killed her." Based on these reported juror statements, Hajek also moved for a new trial, arguing the jury had considered improperly admitted evidence. Attached to Hajek's motion was a declaration from a defense paralegal who interviewed three of the jurors. The jurors told the paralegal they heard each defendant admit several times, "We killed her."

134

At the hearing on the new trial motions, counsel for both defendants argued the admissions the jurors said they had heard on the tape were not actually on the tape. Vo complained the jurors placed substantial weight on the nonexistent admissions, and Hajek argued this underscored the unreliability of the tape and why it should have been excluded in the first place. Hajek made it clear, however, that he was not asserting juror misconduct.

Two jurors, Juror K.M. and Juror L.F., testified at the new trial hearing. Both agreed the jurors had not heard Vo say "we killed her" when they listened to the tape during guilt phase deliberations on a tape player that provided poor audio quality. It was only when they listened to the tape on a different tape player during the penalty phase that they heard the admission. Juror K.M. testified she and her fellow jurors listened to the section of the tape where they heard the admission "numerous times," sometimes using earphones. Juror L.F. testified, "[w]e did not accept anything [on the tape] we could not all hear and were comfortable with saying." Following their testimony, Vo again argued — based on counsel's having listened to the tape — that the words attributed to Vo were not on the tape. Hajek reiterated that the tape recording overall was unreliable. Counsel then asked the court to listen to the tape itself before ruling on the new trial motion. Ultimately, the court denied the motion, apparently without listening to the tape.

Vo, joined by Hajek, contends on appeal that the trial court abused its discretion by not granting a new trial based on the jury's inappropriate consideration of Vo's admissions, which Vo continues to insist are not on the tape. Vo likens the jury's consideration of this evidence to juror misconduct in the form of receipt of extraneous information. As Hajek did below, Vo contends the jurors' statements about what they heard underscores the unreliability of the tape and

135

shows why it should not have been admitted in the first instance. Finally, he contends the trial court erred in failing to review the tape so it could make its own finding as to whether admissions were contained on the tape.

"We first determine whether there was any juror misconduct. Only if we answer that question affirmatively do we consider whether the conduct was prejudicial. [Citation.] In determining misconduct, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*People v. Collins*, *supra*, 49 Cal.4th at p. 242.)

We reject Vo's attempted analogy to cases in which the jury based its verdict on out-of-court information. (See, e.g., *People v. Nesler* (1997) 16 Cal.4th 561, 582-588 [juror's receipt of out-of-court information biased the juror and required reversal of sanity phase verdict].) Significantly, the tape in this case had been admitted into evidence, and the jury was entitled to consider it during its penalty phase deliberations. In listening to the tape, the jury did not create evidence that was not already before it; it simply took evidence that was before it and, as the testifying jurors described, carefully and repeatedly examined it. Vo's insistence that the jurors heard words he did not speak would require us to disregard the trial court's findings, which were supported by substantial evidence. No evidence contradicted the account the testifying jurors gave regarding the process by which they examined the tape, and their testimony was essentially consistent. Thus, Vo offers no basis for rejecting the trial court's implied findings that the jurors heard the statements they attributed to Vo on the tape. On this record, no juror misconduct appears.[27]

---

[27] Moreover, a court may not consider evidence of a juror's subjective process in deciding whether to grant a new trial based on purported juror misconduct. (Evid. Code, § 1150; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75.) Thus, to the extent Vo raises questions about the impact of the audiotaped

Given that the trial court heard and credited the two jurors' testimony on this point, it was unnecessary for the court to undertake its own examination of the audiotape by listening to it.

On a related point, Vo contends he was denied notice of this evidence and was therefore deprived of an opportunity to defend against it. Because the tape was in evidence and Vo had a copy of it, his notice argument fails.

In sum, defendants have not demonstrated a manifest and unmistakable abuse of discretion in the denial of their new trial motions. (*People v. Earp, supra,* 20 Cal.4th at p. 890.) Their claims are rejected.

*11. Eligibility for the Death Penalty*

As discussed, Hajek introduced expert testimony that he suffered from mental illness (cyclothymic disorder, bipolar disorder) before and during commission of his crimes, as well as a borderline personality disorder with antisocial traits, which together impaired his judgment and prevented him from forming the mental state required for the charged crimes. Citing *Atkins v. Virginia* (2002) 536 U.S. 304 (*Atkins*), Hajek contends severely mentally ill offenders such as himself are ineligible for the death penalty. We are not persuaded.

In *Atkins*, *supra*, 536 U.S. 304, the United States Supreme Court held the execution of the mentally retarded violates the Eighth Amendment's proscription against cruel and unusual punishment. (*Atkins*, at p. 321.) While acknowledging that mentally retarded individuals "frequently know the difference between right and wrong and are competent to stand trial," the high court concluded their personal culpability is diminished because, by definition, they have "diminished capacities to understand and process information, to communicate, to abstract

statements on the jury's verdict, he violates the proscription against invading the mental processes by which the jurors reached their verdict.

137

from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." (*Id*. at p. 318, fn. omitted.) In light of such impairments and reduced culpability, the Supreme Court found it appropriate to categorically exempt mentally retarded offenders from the death penalty because the social justifications for the punishment — retribution and deterrence — would not be served. (*Id*. at pp. 319-321.) The court additionally observed that mentally retarded defendants in the aggregate face an enhanced risk of execution in spite of factors which may call for a less severe penalty, not only due to the possibility of false confessions but also because of their lesser ability to make a persuasive showing of mitigation, to meaningfully assist counsel, to be effective witnesses on their own behalf, and to convey their remorseful demeanor. (*Id*. at pp. 320-321.)

Because Hajek never claimed to be mentally retarded and offered no evidence of mental retardation at trial, he has not demonstrated ineligibility for the death penalty under *Atkins*. Hajek, however, asserts that executing severely mentally ill offenders violates the federal and state prohibitions against cruel and unusual punishment because some of the underlying rationales of *Atkins* also apply to such offenders.

Hajek identifies no controlling federal authority barring imposition of the death penalty on mentally ill offenders. As for California law, we have held the analysis in *Atkins* inapplicable in a similar situation. In *People v. Castaneda*, *supra*, 51 Cal.4th 1292, we found the defendant failed to establish that his condition, "an antisocial personality disorder," "is analogous to mental retardation for purposes of imposition of the death penalty." (*Id*. at p. 1345.) First, in contrast to the circumstance that numerous states have acted to prohibit execution of mentally retarded offenders, "there is no objective evidence that society views as

138

inappropriate the execution of death-eligible individuals who have an antisocial personality disorder." (*Ibid*.) Second, unlike the mentally retarded, offenders with such a disorder "are aware of what they are doing" and "have the ability to choose not to commit crimes," so "their disorder does not diminish their personality culpability." (*Ibid*.) Third, "the justifications for the death penalty — retribution and deterrence — may be served by application of the law to such individuals." (*Ibid*.) Finally, the ability of offenders with an antisocial personality disorder "to charm and manipulate others, to deny responsibility, and to provide excuses for their conduct, enhances rather than diminishes their capacity to avoid wrongful conviction and execution." (*Ibid*.)

Our analysis rejecting the defendant's claim in *Castaneda* applies with similar force to Hajek's claim. Most significantly, the circumstance that an individual committed murder while suffering from a serious mental illness that impaired his judgment, rationality, and impulse control does not necessarily mean he is not morally responsible for the killing. There are a number of different conditions recognized as mental illnesses, and the degree and manner of impairment in a particular individual is often the subject of expert dispute. Thus, while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn. Thus, we are not prepared to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence. We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty.

139

There is no dispute that evidence concerning an individual capital defendant's mental illness may be relevant in the guilt phase to the mental state issues (§§ 28, 29) and in the penalty phase to the issue of mitigation (§ 190.3, factors (d), (h)). Hajek, however, has not established the propriety of extending the categorical prohibition against executing mentally retarded offenders to the broader category of mentally ill defendants, nor that imposition of the death penalty is inappropriate in his particular case.

### 12. Constitutional Challenges to the Death Penalty Statute

In addition to those constitutional challenges to the death penalty statute already addressed in connection with defendants' claims of instructional error above, defendants also contend the statute is unconstitutional because it fails to require intercase proportionality review. We have previously considered and rejected this claim and see no reason to reconsider that holding. (*People v. Parson*, *supra*, 44 Cal.4th at pp. 368-369, and cases cited.)

Defendants contend they are denied equal protection of the law because some protections extended to noncapital defendants are not extended to capital defendants. As we have recognized, however, " '[t]he availability of certain procedural protections in noncapital sentencing — such as a burden of proof, written findings, jury unanimity and disparate sentence review — when those same protections are unavailable in capital sentencing, does not signify that California's death penalty statute violates Fourteenth Amendment equal protection principles.' " (*People v. Pearson, supra,* 56 Cal.4th at p. 478.)

Moreover, "the asserted flaws in our death penalty statute, whether considered individually or together, do not render it unconstitutional." (*People v. Pearson, supra,* 56 Cal.4th at p. 479.)

140

*13. International Law*

Defendants contend the imposition of the death penalty violates international law. Not so. "California's death penalty law does not violate international law. We reach this conclusion taking into consideration defendant[s'] assertions that the International Covenant on Civil and Political Rights binds state courts and that international legal norms are among the evolving standards of decency used to define the scope of the Eighth Amendment to the federal Constitution." (*People v. Duenas* (2012) 55 Cal.4th 1, 28; see *Streeter*, *supra*, 54 Cal.4th at p. 268 [no authority prohibits a death sentence rendered in accordance with the requirements of state and federal constitutional and statutory law].)

Vo contends that international law also prohibits his execution because it would contravene international prohibitions against racial discrimination. Unable to show he was the victim of racial discrimination in this prosecution, he relies instead on statistical studies that purport to show racial discrimination against African-Americans in the application of the death penalty. The relevance of such studies as to Vo, who is not African-American, is questionable but, in any event, as he concedes, the United States Supreme Court has rejected the use of such statistical evidence to show racial discrimination in capital cases. (*McCleskey v. Kemp* (1987) 481 U.S. 279, 312-313.)

*14. Cumulative Prejudice*

Defendants contend the cumulative effect of prejudice from errors at both the guilt and penalty phase requires reversal. We disagree. "No reasonable possibility exists that the jury would have reached a different result absent any of the acknowledged or asserted errors under the applicable federal or state standard of review. [Citations.]" (*Houston, supra,* 54 Cal.4th at p. 1233.)

141

### D. Miscellaneous Claims

#### 1. Funding Issues

Vo contends that delays in payment to defense counsel and defense experts and the denial of his request for funds to reinterview penalty phase witnesses violated his constitutional rights to effective assistance of counsel, to due process, to present a defense and to a reliable capital trial. His claims are without merit.

##### a. Delays in payment to defense counsel

Vo was represented by two attorneys. James Blackman, his lead attorney, was appointed pursuant to section 987.2, subdivision (a)(3), which authorizes the appointment of private counsel where "because of a conflict of interest or other reasons, the public defender has properly refused." Jeane Dekelver was appointed cocounsel pursuant to *Keenan v. Superior Court*, *supra*, 31 Cal.3d 424, after Vo's original *Keenan* counsel withdrew. At an in camera hearing on April 26, 1995, Blackman complained that certain funding requests for ancillary services had been cut and that Dekelver had not been paid. The following day, Blackman reported the ancillary funding requests had been restored, but that payment to Dekelver remained an issue. A further in camera hearing was conducted on May 10, 1995, in which the conflicts administrator — evidently the person who processed billing and submitted it for payment — told the court she had instructed her staff to review and to deliver Blackman's and Dekelver's claims for payment. The conflicts administrator alluded to funding issues created by an unrelated case referred to as the *Nuestra Familia* case that had siphoned off funding from the conflicts budget. She assured the court that funds would be available to pay counsels' claims.

At a subsequent in camera hearing on May 16, 1995, Blackman reported that he had not been paid for a month, that Dekelver had not been paid for two

142

months, and that two defense experts had still not been paid. The conflicts administrator, who was again present, explained that she understood there was no money in the conflicts account. She reported, however, that the county had sent a fax indicating some money would be available before May 23, when the Santa Clara County Board of Supervisors would address the conflicts budget, which had been exhausted because of the *Nuestra Familia* case. She explained that the board was not refusing to fund conflicts, as Blackman had represented, but had deferred a decision. At her suggestion, the court ordered her to convey to the county that payment was required so the case could proceed to the penalty phase trial. Although further proceedings were held regarding defense requests for ancillary services, defense counsel made no further claims regarding nonpayment for services.

From this record, it appears that counsel were not paid for their services for a period of one month in Blackman's case and two months in Dekelver's case, due to funding shortfalls in the county's conflicts budget. While the delay in payment was undoubtedly stressful for trial counsel, Vo fails to show it resulted in a denial of counsel or in counsel's rendering constitutionally ineffective assistance.

Vo appears to suggest the delay in payment created a conflict of interest, but he fails to identify any particular conflict. Vo's reliance on *People v. Ortiz* (1990) 51 Cal.3d 975 is misplaced because, unlike the situation there, the trial court here did not force defendant to go to trial with unpaid counsel against both his wishes and those of his attorneys. (See *id.* at pp. 984-988.) Indeed, the trial court worked with defense counsel to press the conflicts administrator to secure funding to pay counsel so the trial could proceed uninterrupted. On this record, Vo fails to demonstrate that the temporary delay in payment affected counsel's

143

performance or divided their loyalties, or that it otherwise impaired his constitutional rights.

### b. Denial of full funding for ancillary services

Vo also argues the superior court's reduction of his request for funds for investigative services violated his rights to counsel, to present a defense, to due process, and to a reliable capital trial.

On June 7, 1995, Vo's counsel appeared before the court to seek additional funds (§ 987.9, subd. (a)) and requested $6,000 in further payments to his mental health expert, Dr. Berg, and $10,000 to the CJCJ, which had been conducting penalty phase witness interviews. The trial court asked Vo's counsel to state how many hours Berg would require for the specific tasks for which Vo sought payment. Then, after multiplying that number by Berg's hourly rate, the court authorized $2,624. With respect to the CJCJ request, the court ascertained that most of the funds sought would be used to reinterview witnesses whom CJCJ had already interviewed. Accordingly, it authorized $812.50 to permit CJCJ to interview previously uninterviewed witnesses and to allow an expert witness, Vincent Schiraldi, to prepare his testimony and to testify. After Vo's counsel explained that the interviews for which he sought the $10,000 had already been done, the court stated its role was to pass upon requests for work that was contemplated, not work that had been done: "What you're talking about really is submitting to conflicts an after-the-fact request for monies for work performed; that doesn't come before me, that goes to conflicts. You're before me for monies for work to be done."

"An indigent defendant has a statutory and constitutional right to ancillary services reasonably necessary to prepare a defense. [Citations.] The defendant has the burden of demonstrating the need for the requested services. [Citation.]

144

The trial court should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary.  [Citation.]  On appeal, a trial court's order for ancillary services is reviewed for abuse of discretion.  [Citations.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1085; § 987.9, subd. (a).)

Vo complains of delays in paying some of his experts but, as with his claim regarding delays in payments for counsel, he fails to demonstrate that delay alone rises to a problem of constitutional magnitude.  His chief complaint involves the reduction of his requests for funds to reinterview witnesses for the penalty phase.[28]  Vo argues the court's denial of his request for that funding reflected an unreasonable view of the scope of mitigating evidence.  We disagree.

When the trial court asked Vo's counsel to justify his request to "reinterview every witness," counsel replied, "[b]ecause it's a death penalty case."  The court responded, "No, no . . . .  That buzzword doesn't do it with public money.  Whether it's a death penalty case or whether it's a murder case or whether it's a rape case, you have to make an appropriate showing for the expenditure of

---

[28]     Vo advances two other arguments that need not detain us.  First, he asserts that Santa Clara County's practice of channeling funding for ancillary services through the conflicts administrator rather than the superior court violated section 987.9.  But, as the statute requires, Vo's request for ancillary funds was presented to, and passed upon by, a judge.  The fact that actual payment of the funds may have been administered by the conflicts administrator would not appear to be, as Vo claims, an improper delegation of the statutory responsibility to someone other than a judicial officer.  Vo also complains that the judge who ruled on his request — Judge Hastings — improperly denied a motion to disqualify himself from hearing Vo's request for ancillary services.  Vo cannot challenge the court's ruling on the disqualification motion on appeal.  (*People v. Panah, supra,* 35 Cal.4th at pp. 444-445 [ruling on a disqualification motion is not an appealable order but can only be reviewed by a writ of mandate from the appropriate Court of Appeal within 10 days of notice to the parties of the decision].)

public money . . . . You don't use the buzzword 'capital case' and get a blank check." The trial court was correct. "The defendant has the burden of demonstrating the need for the requested service." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 286.) Defense counsel failed to demonstrate the necessity of reinterviewing witnesses to whom his investigators had already spoken. Under these circumstances, the court did not abuse its discretion in reducing his funding request.[29] There being no abuse of discretion, we necessarily reject Vo's constitutional claims as well.

### 2. *Compliance with Section 190.9*

Defendants contend reversal is required because the trial court's failure to comply with section 190.9 — which requires that "all proceedings" in a capital case "be conducted on the record with a reporter present" — has resulted in an inadequate record on appeal. They point to numerous off-the-record conferences during the preliminary hearing and at both the guilt and penalty phases of their trial. This statutory violation, they claim, is also an error of constitutional magnitude that implicates their rights to due process, effective assistance of counsel, and heightened reliability in a capital case.

We recently summarized the governing principles thusly: " 'All proceedings in a capital case must, under section 190.9, be conducted on the record with a reporter present and transcriptions prepared. [Citation.] " '[N]o presumption of prejudice arises from the absence of materials from the appellate

---

[29] To the extent Vo's complaint is that the court erred by denying his request for funds to pay for work that he had had CJCJ do, evidently without prior authorization, he fails to demonstrate that the court's position — that it was responsible only for the authorization of payment for future investigations and not payment for past investigations — was wrong. Moreover, we fail to see what prejudice Vo suffered if the work was already done and the issue was simply a matter of payment.

record [citation], and defendant bears the burden of demonstrating that the record is inadequate to permit meaningful appellate review [citation].' " [Citations.]' [Citation.] 'The record on appeal is inadequate . . . only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort. [Citation.]' [Citation.] 'Moreover, irregularities in the preliminary hearing are no basis for reversal on appeal unless defendant can demonstrate a resulting unfairness in the subsequent trial. [Citations.]' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1070, fn. omitted.) Hence, a showing of prejudice requires more than merely listing the occasions on which there was an off-the-record discussion, and it is insufficient to simply "link each missing transcript to various arguments without explaining why the missing transcript had any impact . . . on [the defendant's] ability to raise the issue or on our ability to review it." (*Id*. at p. 1075.)

Here, defendants do little more than list missing transcripts without making the required showing. Hajek concedes he cannot "demonstrate specifically the prejudice he suffered" resulting from any noncompliance with section 190.9, but he asks this court to "take into account the resulting numerous gaps in the trial record when it assesses the cumulative effect of all the errors that occurred at his trial."[30] He also urges us to reexamine our earlier decisions recognizing that the defendant has the burden of showing prejudice and to instead hold that statutory noncompliance is reversible per se or, alternatively, presumptively prejudicial. Vo, who also fails to demonstrate prejudice, joins in this argument.

---

[30] Hajek dwells on the trial court's failure to have required the court reporter to transcribe the audiotape of defendants' jailhouse conversation when it was played for the guilt phase jury. But both counsel for the defense stipulated that the tape need not be transcribed. The claim is thus forfeited. (*Houston, supra,* 54 Cal.4th at p. 1213.)

We have previously rejected the invitation to declare a trial court's failure to comply with section 190.9 either reversible per se or presumptively prejudicial. (*People v. Taylor* (2010) 48 Cal.4th 574, 660 [rejecting reversible per se standard]; *People v. Wilson* (2005) 39 Cal.4th 309, 325 [no presumption of prejudice arises from absence of materials from the appellate record]; *People v. Cummings*, *supra*, 4 Cal.4th at p. 1333, fn. 70 ["Failure to report bench or chambers conferences between counsel and the trial judge is not a 'structural defect affecting the framework within the trial proceedings,' " nor, on appeal, is prejudice presumed].)

We have likewise rejected the argument that section 190.9 creates a constitutionally protected liberty interest in a court reporter's presence at every exchange between the court and counsel, as well as arguments that statutory noncompliance automatically violates the Fourteenth or the Eighth Amendments or impairs a defendant's Sixth Amendment right to effective assistance of counsel. (*People v. Taylor, supra,* 48 Cal.4th at p. 660; *People v. Pinholster*, *supra*, 1 Cal.4th at p. 922.)

The federal due process clause requires only that the state furnish the defendant with a record sufficient to permit adequate and effective review. (*People v. Taylor, supra,* 48 Cal.4th at p. 660.) These principles apply even where, as here, the participants' lack of recall precluded a settled statement with respect to the omitted conferences. (*People v. Cummings, supra,* 4 Cal.4th at p. 1333, fn. 70.)

We have found the record sufficient to permit review of all issues raised (*People v. Tully*, *supra*, 54 Cal.4th at p. 1075), and defendants have not sustained their burden of demonstrating otherwise. We therefore conclude the trial court's failure to comply with section 190.9 was harmless.

## III. DISPOSITION

The lying-in-wait special-circumstance findings are reversed as to both defendants. All Penal Code former section 12022.5 enhancements found true as to defendant Hajek are struck and replaced with enhancements under Penal Code former section 12022, subdivision (b) (now § 12022, subd. (b)(1)). The superior court is directed to amend the abstract of judgment to reflect this modification and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgments are otherwise affirmed.

**BAXTER, J.**

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**


I concur in the majority opinion except in one respect:  As to defendant Loi Tan Vo, the evidence is, in my view, insufficient to support the jury's torture findings.  I would therefore reverse, as to Vo, the jury's true finding on the torture-murder special-circumstance allegation (Pen. Code, § 190.2, subd. (a)(18)) and set aside the judgment of death as to Vo.  I further conclude that there is insufficient evidence to convict Vo of first degree murder on a torture-murder theory, although I agree with the majority that Vo's first degree murder conviction can be upheld on the theory of deliberate and premeditated murder.

**I.**

Codefendants Hajek and Vo, who were both 18 years old, devised a scheme to go to the home of 16-year-old Ellen Wang (with whom Hajek had been arguing), to kill Ellen's family while she watched, and then to kill Ellen.  Hajek announced his intention in advance to an acquaintance.  On January 18, 1991, Hajek and Vo arrived at the Wang residence about 10:00 a.m.  They had gloves and a pellet gun.  Inside the home were Ellen's 10-year-old sister, Alice, and her 73-year-old grandmother, Su Hung.

Hajek and Vo used a ruse to enter the Wang home.  Once inside, Hajek pointed the pellet gun at Alice, and Vo tied Su Hung's hands behind her back and took her upstairs.  Hajek guarded Alice as she watched television downstairs.  At one point, Hajek took Alice to an upstairs bathroom and left her there.  Vo later

took Alice back downstairs, and Hajek followed after about 10 minutes. Eventually, Alice's mother, Cary, arrived. Vo took a knife from the kitchen and hid in a downstairs bathroom. When Cary entered the house, Vo emerged from hiding and threatened Cary with the knife. He told her that if she screamed, he would kill the family. Cary cooperated, and Vo later returned the knife to the kitchen.

Defendant Vo then took Cary to Ellen's school in an effort to find Ellen. Cary persuaded Vo to stop at Cary's office, where Cary managed to tell someone to call the police. While Cary was out with Vo, Ellen's father, Tony, came home and found defendant Hajek downstairs with young Alice. Alice told her father that Hajek had a gun. When Cary and Vo returned, Vo and Hajek detained the entire group. During that time, each defendant went upstairs, separately, many times. On two occasions (once before Tony arrived, and once after), Hajek took Alice upstairs to see her grandmother. The first time this occurred, however, Hajek went upstairs *alone* before taking Alice upstairs. Alice could not get a clear look at her grandmother on either occasion, but she thought her grandmother was reading a newspaper or sleeping.

When police officers arrived, they arrested both Hajek and Vo. Su Hung's dead body was found in an upstairs bedroom, her hands tied behind her back and her mouth gagged. She had been strangled with a cord, and there was a three-quarter-inch-deep and three-and-a-half-inch-long slash across her throat. An autopsy revealed burst blood vessels in her face, indicating that she was strangled slowly before her throat was slashed. The jugular vein on the right side of her neck was partly severed. The doctor who performed the autopsy concluded, from the large amount of blood, that Su Hung was alive when her jugular vein was severed. Su Hung also had a one-inch-deep and one-inch-long stab wound on her shoulder and five superficial cuts on her chest. The stab wound on her shoulder

was inflicted before death, and the superficial cuts could have been inflicted before death.  The autopsy doctor could not determine whether the strangulation had rendered Su Hung unconscious before infliction of the cuts, the stab wound, and the throat slash.

Blood found on a glove used by defendant Hajek was consistent with Su Hung's blood.  There was also blood on Hajek's jacket, although the source could not be determined.  There was no blood on Vo or on any of his clothing.  A knife found in a puddle of water in the kitchen sink tested positive for blood, but the tests could not rule out an animal source.

## II.

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.]  "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding."  [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.'  [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

"To prove torture murder, the prosecution must establish ' "a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." '

3

[Citation.] To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citation.] The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 237 (*Streeter*).) In addition, "the trier of fact may find intent to torture based on *all* the circumstances surrounding the charged crime, including the nature and severity of the victim's wounds and any statements by the defendant revealing his state of mind during the crime." (*People v. Bemore* (2000) 22 Cal.4th 809, 841.)

### III.

As discussed above, to prove torture murder or the torture-murder special circumstance, the prosecution must establish "intent to cause extreme pain or suffering." (*Streeter*, *supra*, 54 Cal.4th at p. 237.) Here, there is no evidence of such intent other than the nature of Su Hung's injuries. At trial, the evidence describing those injuries was sufficient to allow the jury to reasonably infer that whoever had inflicted the injuries intended to cause extreme pain, and therefore the jury's torture findings can be upheld *only as to that person (or those persons)*. The evidence, however, is weak as to *the identity* of that person (or those persons). Defendants Hajek and Vo could have inflicted the wounds together, while Su Hung's 10-year-old granddaughter Alice was in the upstairs bathroom, or one defendant could have inflicted the wounds alone, while the other was watching Alice, or the wounds could have been inflicted at different points in time, some by Vo and others by Hajek.

That defendant Hajek went upstairs *before* bringing Alice upstairs to see Su Hung could support the inference that Hajek knew Su Hung was injured and he wanted to make it appear to Alice as if Su Hung were fine. The same evidence,

however, also suggests that Su Hung's throat had not, at that point, been slashed, as crime scene photos show that the partial severing of Su Hung's jugular vein produced a tremendous amount of blood that Hajek could not easily have concealed from Alice. Alice's testimony that her grandmother appeared to be reading the newspaper or sleeping also supports the conclusion that Su Hung's throat had not been cut when Alice saw her, for Alice surely would not have described her grandmother in such innocuous terms if she had seen large amounts of blood. Although Alice's statement that her grandmother was sleeping is consistent with the possibility that Su Hung was unconscious and, therefore, had already been strangled, that possibility tells us nothing about *who* strangled her.

The jury also could have reasonably inferred that the knife found in a puddle of water in the kitchen sink was the weapon used to slash Su Hung's throat and to inflict the wounds on her shoulder and torso. The water in the sink suggested that the sink had been recently used, from which a juror could infer that the knife had been washed. Defendants Hajek and Vo had no reason to wash the knife unless it was bloody from having been used in wounding someone. But even if the knife in the sink was the weapon used against Su Hung, the jury was not presented with evidence from which it could reasonably determine whether Hajek or Vo was the one who put it there. As mentioned on page 2, *ante*, Vo did use a knife from the kitchen to threaten Cary, but he returned that knife to the kitchen, and because he did not wound Cary when he threatened her, he did not need to wash it. Thus, the knife in the sink may not have been the knife that Vo used to threaten Cary. Moreover, once Vo had placed back in the kitchen the knife he used to threaten Cary, there was no reason to assume (as the majority does (maj. opn., *ante*, at p. 51)) that Vo, rather than Hajek, wielded the knife against Su Hung. At best, one could conclude that Vo knew where in the kitchen to find a knife and that he was inclined to use it as a weapon. But certainly Hajek,

5

too, could have retrieved a knife from the kitchen if that was what he wanted to do. In addition, the fact that Vo was inclined to use a knife as a weapon does not imply that Hajek was *not* inclined to do so. In short, the fact that Vo wielded a knife against Cary cannot support a reasonable inference that it was Vo who wielded a knife against Su Hung.

The majority relies on the fact that a second pair of gloves (not the gloves defendant Hajek was wearing) was found on the table in the kitchen. The majority reasons that defendant Vo might have gone into the kitchen, removed his gloves, obtained a knife, used it to kill Su Hung, and then washed his hands and the knife. (Maj. opn., *ante*, at pp. 51-52.) Vo *might* indeed have done all that, but the evidence of a pair of gloves lying on the kitchen table does not tend to *establish* that Vo did all that. Nor can we infer much from Vo being the one who tied Su Hung's hands behind her back and took her upstairs. Although that evidence indicates that Vo aided and abetted Su Hung's murder, no reasonable juror could infer from that evidence that Vo personally inflicted Su Hung's wounds and therefore was guilty of torturing her.

The strongest evidence of who inflicted the wounds on Su Hung (and thus tortured her) was the blood on defendant Hajek's glove that matched Su Hung's blood. As noted earlier, the doctor who performed the autopsy concluded that Su Hung was alive when her jugular vein was severed. He based that conclusion on the large amount of blood that had poured from her neck, as shown in the crime scene photos. In my view, it would be very hard to partially sever the jugular vein of a living person, thus releasing a large amount of blood, and not get any of that blood on one's hand or glove. Defendant Vo had no blood on his hands or on his clothing. That Hajek's glove was stained by Su Hung's blood is a reasonably strong indication that Hajek, not Vo, was the one who slashed Su Hung's throat. Of course, there could be other interpretations of the evidence, but the evidence

6

presented at trial was sufficient to allow the jury to infer that it was Hajek who wielded the knife against Su Hung and that, based on her wounds, Hajek had the requisite torturous intent. It is possible, of course, that defendant Vo first strangled Su Hung, after which Hajek wielded the knife (perhaps in a separate incident). But lacking is evidence from which that sequence of events can reasonably be inferred. As this court has observed, a jury's finding of guilt cannot be based on a mere possibility. (*People v. Reyes* (1974) 12 Cal.3d 486, 500 (*Reyes*); *People v. Kunkin* (1973) 9 Cal.3d 245, 250 (*Kunkin*); *People v. Redmond* (1969) 71 Cal.2d 745, 755 (*Redmond*); *Estate of Stanford* (1957) 49 Cal.2d 120, 164; see *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 (*Ramon*); *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581.)

The majority here nevertheless concludes that "there was substantial evidence showing that Vo shared Hajek's torturous intent" (maj. opn., *ante*, at p. 52) and that "the totality of the circumstances of the crime amply demonstrated an intent to torture . . . as to both defendants" (*ibid*.). As to Vo, the majority's reasoning makes four points, which I discuss below.

First, the majority observes that the prosecution's case included "substantial evidence that Vo had his own independent motive to seek revenge on Ellen," because he had romantic feelings for Ellen's friend, with whom Ellen had quarreled. (Maj. opn., *ante*, at p. 50.) But such a motive hardly supports an inference that Vo intended to inflict extreme pain on murder victim Su Hung, who was Ellen's grandmother. Thus, the evidence the majority cites does not establish torturous intent on Vo's part.

Second, the majority notes that Vo knew about Hajek's altercation with Ellen Wang and that Hajek made no secret of his intent to kill Ellen and her family. This leads the majority to conclude that a reasonable juror could infer that Vo knew Hajek's murderous intent when Vo accompanied Hajek to the Wang

7

family's home.  (Maj. opn., *ante*, at p. 50.)  I agree.  But the fact that Vo knew of Hajek's murderous intent does not establish that Vo intended to inflict extreme pain on Ellen's grandmother.  Again, the evidence the majority cites fails to establish torturous intent on Vo's part.

Third, the majority asserts that Vo actively participated in carrying out Hajek's plan to kill Ellen and her family:  Among other things, Vo tied up Su Hung (Ellen's grandmother), threatened Cary (Ellen's mother) with a knife, and then took Cary to Ellen's school to get Ellen.  (Maj. opn., *ante*, at p. 51.)  Again, the majority misses the point.  With respect to the jury's torture findings, the critical issue is not whether Vo was an accomplice to Su Hung's murder; rather, the critical issue is whether Vo intended to inflict extreme pain on Su Hung.  The majority has not pointed to any evidence from which a reasonable juror could infer that Vo had the latter intent.  Even if Vo's active participation in carrying out Hajek's murderous plan could give rise to a *suspicion* that Vo personally inflicted Su Hung's injuries, Su Hung's blood on Hajek's glove tends to exonerate Vo by implicating Hajek.  Moreover, "evidence that 'merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction[;] [s]uspicion is not evidence . . . .' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1024, quoting *Redmond*, *supra*, 71 Cal.2d at p. 755.)

Finally, the majority notes that "the evidence *is consistent with* a conclusion that Vo actively participated in the torture of Su Hung." (Maj. opn., *ante*, at p. 51, italics added.)  The majority reasons that, because nothing "foreclose[d] a conclusion that Vo tortured . . . the victim" (*ibid*.), the jury could reasonably find that he did so (even though the evidence of blood on Hajek's glove tended to implicate Hajek rather than Vo, who had no blood on his clothing or on himself).  In essence, the majority concludes that Vo can be found guilty of torture because he presented no evidence *clearly exonerating* him of torture.  It is true that this

8

court must defer to a jury's verdict when reviewing that verdict for sufficiency of the evidence. But that deference does not mean allowing a jury to infer facts from a mere possibility. As has been observed, "a mere possibility is nothing more than speculation[, and] [s]peculation is not substantial evidence." (*Ramon*, *supra*, 175 Cal.App.4th at p. 851; see *Reyes*, *supra*, 12 Cal.3d at p. 500; *Kunkin*, *supra*, 9 Cal.3d at p. 250; *Redmond*, *supra*, 71 Cal.2d at p. 755.)

## IV.

My conclusions are these:

With respect to defendant Hajek, I agree with the majority that the evidence sufficiently supports the jury's finding that he intended murder victim Su Hung to experience extreme pain or suffering, because there is substantial evidence that Hajek inflicted wounds that caused such pain and suffering. Therefore, like the majority, I would affirm the judgment of death as to defendant Hajek.

But with respect to defendant Vo, the evidence is, in my view, insufficient to support the jury's finding that he shared Hajek's intent to cause extreme pain and suffering. Therefore, unlike the majority, I would reverse, as to Vo, the torture-murder special-circumstance finding, and hence the judgment of death. Like the majority, however, I would uphold Vo's first degree murder conviction on the theory of deliberate and premeditated murder. (See maj. opn., *ante*, at pp. 52-53.)


KENNARD, J.*

---

\*      Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Hajek and Vo

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S049626
**Date Filed:** May 5, 2014

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Daniel E. Creed


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Alison Pease, Deputy State Public Defender, for Defendant and Appellant Stephen Edward Hajek

Doron Weinberg and Kathryn K. Andrews, under appointments by the Supreme Court; Law Offices of Doron Weinberg and Marilyn A. Waller for Defendant and Appellant Loi Tan Vo.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Nanette Winaker and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alison Pease
Deputy State Public Defender
770 L Street, Suite 1100
Sacramento, CA  95814-3518
(916) 322-2676

Kathryn K. Andrews
3020 El Cerrito Plaza
El Cerrito, CA  94530
(510) 527-9543

Moona Nandi
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-3664
(415) 703-5962